**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDWARD LIU, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STUBHUB HOLDINGS, INC. et al.,<br><br>Defendants. | No. 1:25-cv-09776-JMF<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**TABLE OF CONTENTS**

TABLE OF DEFINED TERMS ..................................................................................................... iii

I.    NATURE OF THE ACTION AND OVERVIEW ................................................................. 1

II.   JURISDICTION AND VENUE.......................................................................................... 7

III.  PARTIES ............................................................................................................................ 8

      A.  Plaintiffs ................................................................................................................... 8

      B.  Defendants ................................................................................................................ 8

          1.  StubHub ............................................................................................................ 8

          2.  Individual Defendants..................................................................................... 9

          3.  Underwriter Defendants................................................................................. 10

IV.   CLASS ACTION ALLEGATIONS.................................................................................. 14

V.    FACTUAL BACKGROUND ........................................................................................... 16

      A.  The Original Issuance and Secondary Ticketing Markets ................................... 16

      B.  StubHub's History and Entrance into the Original Issuance Ticketing Market ............... 18

      C.  StubHub's IPO...................................................................................................... 22

      D.  StubHub Repeatedly Touts Its Near- and Mid-Term Ability to Grow Its Direct
          Issuance and Related Advertising Business Leading Up to the IPO and in the
          Registration Statement ......................................................................................... 24

          1.  Defendants' Pre-IPO Roadshow Presentations........................................... 24

          2.  The Registration Statement......................................................................... 27

      E.  Shortly After the IPO, Analysts Initiate Coverage and Issued Favorable Near-Term
          Price Targets Premised on the Growth of StubHub's Direct Issuance and Advertising
          Businesses ............................................................................................................. 30

      F.  StubHub's Post-IPO Revelations......................................................................... 40

          1.  Q3 2025 Financial Results: StubHub Refuses to Provide Guidance ......... 40

          2.  Q4 2025 Financial Results: StubHub Shocks the Market When it Recategorizes
              Its Direct Issuance and Advertising Businesses as Long-Term Goals that Will
              Not Generate Meaningful Revenues in 2026...................................................... 42

VI.   THE REGISTRATION STATEMENT'S FALSE AND/OR MISLEADING
      STATEMENTS ........................................................................................................... 50

      A.   False and Misleading Statements Regarding Direct Issuance Being a Near-Term
           Opportunity and Part of StubHub's Serviceable Addressable Market ............................ 50

      B.   Statements Regarding the Readiness of Its Direct Issuance Platform for Broader
           Adoption by the Direct Issuance Ticketing Market ............................................................ 53

      C.   Statements Concerning the Imminency of StubHub's Expansion in the  Original
           Issuance Ticketing Market ............................................................................................... 56

      D.   Misstatements Concerning StubHub's Advertising Prospects ......................................... 59

      E.   Misstatements Concerning StubHub's Free Cash Flow ................................................... 61

      F.   Violations of Item 303 of Regulation S-K ....................................................................... 62

      G.   False and Misleading Risk Disclosures in the Registration Statement............................. 65

VII. CLAIMS FOR RELIEF..................................................................................................... 66

VIII.PRAYER FOR RELIEF .................................................................................................... 71

IX.   JURY TRIAL DEMANDED ............................................................................................. 71

**TABLE OF DEFINED TERMS**

| Term or Acronym | Definition |
|---|---|
| **1989 Interpretive Release** | May 1989 **SEC** interpretive release on **Item 303**[1] |
| **2026 Financial Guidance** | The financial guidance for 2026 provided by StubHub in the March 4, 2026 **Shareholder Letter** |
| **Analyst Reports** | October 13, 2025 reports issued by securities analysts from **JP Morgan, BMO, BofA, Oppenheimer, TD, Mizuho** and **Wedbush** initiating coverage of StubHub (as further specified in ¶ 102) |
| **Baker** | Eric Baker, StubHub's **CEO** |
| **Bhargava** | Sameer Bhargava, a member of StubHub's Board of Directors |
| **BMO** | BMO Capital Markets Corp. |
| **BMO Report** | October 13, 2025 report issued by **BMO** securities analysts, titled "Initiating at Outperform - StubHub: A Ticket Worth Its Price" |
| **BofA** | BofA Securities Inc. |
| **BofA Report** | October 13, 2025 report issued by **BofA** securities analysts, titled "StubHub Holdings: Ticket to a High-Growth Asset; Initiate at Buy with $25 PO" |
| **CEO** | Chief Executive Officer |
| **CFO** | Chief Financial Officer |
| **Citizens** | Citizens JMP Securities LLC |
| **Class** | All persons and entities who purchased or otherwise acquired StubHub Class A common stock pursuant and/or traceable to the **Registration Statement**, excluding: (1) **Defendants**; (2) members of the immediate family of any **Defendant** who is an individual; (3) any person who was an officer or director of StubHub or the **Underwriter Defendants** at all relevant times; (4) any firm, trust, corporation, or other entity in which any **Defendant** has or had a controlling interest; and (5) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person |
| **Company** | StubHub Holdings, Inc. |

---

[1] Where the definition of a defined term refers to another defined term, that other defined term is bolded.

| Defendants | The **StubHub Defendants** and the **Underwriter Defendants** collectively |
|---|---|
| **Direct Issuance** | StubHub's method/product for facilitating the sale/purchase of tickets sold directly by content rights' holders to primary purchasers |
| **EBITDA** | Earnings before income, taxes, depreciation and amortization |
| **Evercore** | Evercore Group L.L.C. |
| **FCF** | Free cash flow |
| **GMS** | Gross Merchandise Sales |
| **Goldman Sachs** | Goldman Sachs & Co. LLC |
| **Gross Merchandise Sales** | The total dollar value paid by ticket buyers on StubHub for ticket transactions and fulfillment (inclusive of StubHub service fees) |
| **Individual Defendants** | Defendants **Baker, James, Streams, Bhargava** and **Levine** |
| **IPO** | StubHub's initial public stock offering, on or about September 17, 2025 |
| **Item 303** | Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 |
| **James** | Connie James, StubHub's **CFO** |
| **JP Morgan** | J.P. Morgan Securities LLC |
| **JP Morgan Report** | October 13, 2025 report issued by **JP Morgan** securities analysts, titled "StubHub – Secondary Ticketing Leader with Growth & Margin Opportunities Across Core Resale, DI, & Ads; Initiate Coverage with Overweight Rating & $24 PT" |
| **Lead Plaintiff** | Edward Liu |
| **Levine** | Jeremy Levine, a member of StubHub's Board of Directors |
| **Mizuho** | Mizuho Securities USA LLC |
| **Mizuho Report** | October 13, 2025 report issued by **Mizuho** securities analysts, titled "StubHub Holdings, Inc. (STUB) - Initiating Coverage Outperform PT $24.00" |
| **MLB** | Major League Baseball |
| **Nomura** | Nomura Securities International, Inc. |
| **NYSE** | New York Stock Exchange |
| **Offering** | StubHub's IPO |
| **Oppenheimer** | Oppenheimer & Co. Inc. |
| **Oppenheimer Report** | October 13, 2025 report issued by **Oppenheimer** securities analysts, titled "StubHub, Inc. - Leading Secondary Ticket Marketplace Poised for Direct Issuance & Ads Expansion; Initiating Outperform & $23 Target" |
| **Original Issuance Ticketing Market** | The primary market for live event tickets, where original issuance tickets are first purchased from event content rights holders or their agents |
| **Plaintiffs** | **Lead Plaintiff** Edward Liu and additional plaintiff Tushar Bajaj |

| | |
|---|---|
| **PNC** | PNC Capital Markets LLC |
| **Prospectus** | StubHub's final **IPO** prospectus, filed with the **SEC** on or about September 16, 2025 |
| **Q3 2025** | The third fiscal quarter of 2025 (the three months ended September 30, 2025) |
| **Q4 2025** | The fourth fiscal quarter of 2025 (the three months ended December 31, 2025) |
| **Registration Statement** | The registration statement for StubHub's **IPO**, filed with the **SEC** on Form S-1 (Registration No. 333-28600), as amended and including the **Prospectus** |
| **Roadshow Deck** | The presentation authored and used by **Defendants** to market StubHub shares to prospective investors during **Defendants'** pre-IPO roadshow |
| **SAM** | Serviceable Addressable Market |
| **SEC** | Securities and Exchange Commission |
| **Secondary Ticketing Market** | The "resale" market for live event tickets, where tickets previously purchased in the **Original Issuance Ticketing Market** are offered for re-sale |
| **Securities Act** | Securities Act of 1933 |
| **Serviceable Addressable Market** | Per the **Registration Statement**, near-term market opportunities that StubHub was ready to "address today" |
| **Shareholder Letter** | "Shareholder Letter" issued by StubHub on March 4, 2026, discussing StubHub's operations, performance and strategy |
| **Streams** | Mark Streams, StubHub's executive Vice Chairman and General Counsel, and a member of StubHub's Board of Directors |
| **StubHub** | StubHub Holdings, Inc. |
| **StubHub Defendants** | StubHub and the **Individual Defendants** |
| **TAM** | Total Addressable Market |
| **TD** | TD Securities (USA) LLC |
| **TD Report** | October 13, 2025 report issued by **TD** securities analysts, titled "StubHub Holdings - Initiate STUB with Buy Rating on Ramping Resale & Emerging Direct Issuance Biz" |
| **Ticketmaster** | Ticketmaster Entertainment, LLC (a StubHub competitor and dominant presence in the **Original Issuance Ticketing Market**) |
| **Total Addressable Market** | Per the **Registration Statement**, and in contrast to StubHub's **SAM**, market opportunities that StubHub was not ready to "address today" but could address "over the long term" |
| **Truist** | Truist Securities Inc. |

v

| | |
|---|---|
| **Underwriter Defendants** | The underwriters of StubHub's IPO, namely:  J.P. Morgan Securities LLC; Goldman Sachs & Co. LLC; BofA Securities Inc.; Evercore Group L.L.C.; BMO Capital Markets Corp.; Mizuho Securities USA LLC; TD Securities (USA) LLC; Truist Securities Inc.; Nomura Securities International, Inc.; WR Securities, LLC; Citizens JMP Securities LLC; Oppenheimer & Co. Inc.; Wedbush Securities Inc.; and PNC Capital Markets LLC |
| **Vivid** | Vivid Seats (a StubHub competitor in the **Secondary Ticketing Market**) |
| **Wedbush** | Wedbush Securities Inc. |
| **Wedbush Report** | October 13, 2025 report issued by **Wedbush** securities analysts, titled "StubHub Holdings (STUB): Initiating Coverage with an Outperform Rating and $25 PT" |
| **WR** | WR Securities, LLC |

Court-appointed Lead Plaintiff Edward Liu (hereinafter, "Lead Plaintiff") and additional plaintiff Tushar Bajaj (together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through Plaintiffs' attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief is based upon, among other things, Plaintiffs' counsel's investigation, which includes, without limitation: (1) review and analysis of regulatory filings made by StubHub Holdings, Inc. ("StubHub" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (2) review and analysis of press releases and media reports issued and disseminated by StubHub; and (3) review of reports concerning StubHub issued by industry and securities analysts.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of all persons or entities who purchased or otherwise acquired StubHub Class A common stock pursuant to the registration statement and prospectus (collectively, and together with the amendments described below, the "Registration Statement") issued in connection with StubHub's September 17, 2025 initial public offering ("IPO" or the "Offering").  In that IPO, Defendants sold approximately 34,042,553 shares of StubHub Class A common stock to Plaintiffs and the Class at a price of $23.50 per share, generating net proceeds of $758 million for StubHub and fees of $42 million for the IPO's underwriters (the "Underwriter Defendants").

2.    Plaintiffs now pursue claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, against StubHub, certain of its officers and directors, and the Underwriter Defendants (collectively, "Defendants").  These claims are premised on Plaintiffs' allegations that the Registration Statement for StubHub's IPO, as prepared and provided by Defendants, contained materially misleading statements and

1

omissions concerning, *inter alia,* StubHub's near-term market opportunity in the Original Issuance Ticketing Market (defined below), StubHub's near-term growth prospects and StubHub's financial condition.

3.      In simplest terms, StubHub provides an online platform to facilitate transactions between sellers and purchasers of tickets for live events, including, *inter alia*, sporting events and music concerts, for which it charges fees to both sellers and purchasers (assessed as percentages of the sale price).

4.      Since its inception, StubHub has operated primarily in the *resale* ticket market, often referred to as the "Secondary Ticketing Market."  There, individuals or entities (fans) that purchased tickets to live events directly from the original "content rights holders" (*e.g.*, the New York Yankees or Taylor Swift, or their respective sales agents), could resell those tickets to new purchasers *via* StubHub.

5.      While StubHub has performed well in the Secondary Ticketing Market, where it is the dominant market participant, it has long sought to break into what StubHub has referred to as the "Original Issuance Ticketing Market."  Leading up to the IPO, and as indicated below, StubHub was eager to expand into the Original Issuance Ticketing Market because that market is many multiples larger than the Secondary Ticketing Market (approximately $154 billion versus $41 billion).  According to StubHub, this would entail content rights holders selling all or some subset of their original issuance tickets directly to buyers *via* StubHub's platform.  StubHub referred to this business segment as "Direct Issuance."

6.      StubHub viewed its growth in the Original Issuance Ticketing Market – in which StubHub had, at best, a minor position prior to the IPO – as the Company's future, and its greatest opportunity to increase its revenues.  Indeed, during the Roadshow presentations that Defendants

used to market the IPO, Defendants: (1) repeatedly touted that, after several years of setting the stage to expand its presence in the Original Issuance Ticketing Market, StubHub was poised to materially increase its Direct Issuance business with content rights holders in the near-term, to the tune of over $10 billion; and (2) provided revenue projections centrally premised on substantial increases in StubHub's Direct Issuance business, such that it would be an immediate and material contributor to StubHub's overall revenues and adjusted EBITDA.

7. The Registration Statement's disclosures regarding the Original Issuance Ticketing Market and StubHub's Direct Issuance business were equally sanguine. Defendants identified the Original Issuance Ticketing Market to be part of StubHub's "Serviceable Addressable Market" (or "SAM"), which Defendants defined to include StubHub's *near-term* market opportunities, *i.e.*, ones that StubHub could access "today." StubHub distinguished its SAM from its long-term, aspirational market opportunities that StubHub could *not* access immediately, which, together with its SAM, constituted its "Total Addressable Market" (or "TAM").

8. StubHub also repeatedly stressed in the Registration Statement that its then-existing Direct Issuance ticketing platform was already functioning and "well positioned" to service the needs of content rights holders and facilitate transactions in the Original Issuance Ticketing Market, and therefore attract more content rights holders to use StubHub.

9. Following the IPO, however, StubHub suddenly and drastically changed its tune.

10. The investing public received their first hint that StubHub's prospects were not as positive as had been represented when StubHub released its third quarter 2025 ("Q3 2025") financial results on November 13, 2025. Despite having completed the IPO just a handful of weeks earlier, StubHub "surprised" analysts and investors when it refused to provide any near-term

operational or financial guidance, causing StubHub shares to decline 21% to close trading at $18.82 on November 14, 2025.

11.     The reason for StubHub's silence soon became apparent on March 4, 2026, when StubHub disclosed its financial results for the fourth quarter of 2025 ("Q4 2025").  At that time, StubHub struck a dramatically different tone regarding the Original Issuance Ticketing Market and its Direct Issuance business, which it no longer described as near-term opportunities immediately available to StubHub, but as **long-term projects that would not yield any meaningful revenues for at least all of 2026**.

12.     In other words, just months after the IPO, StubHub re-drew its SAM to **exclude** the Original Issuance Ticketing Market, which Defendants previously touted, and investors previously believed, would drive imminent and material growth in revenue and adjusted EBITDA, and that Defendants, in the IPO, stressed **was a core component** of StubHub's SAM.

13.     According to StubHub, its sudden and dramatic reclassification of the Original Issuance Ticketing Market from a near-term to a long-term opportunity was based on the previously undisclosed facts that its Direct Issuance platform: (1) was incomplete, immature and unready for commercial deployment (even **six months after the IPO**); and (2) still required substantial further product development and testing before StubHub would have a viable product appropriate for commercial deployment.  These admissions stood in stark contrast to Defendants' Registration Statement representations that, **at the time of the IPO**, StubHub was well-positioned to "disrupt" the Original Issuance Ticketing Market through Direct Issuance and thereby "unlock a vastly expanded market opportunity" in the near term.  In response to this news, on March 5, 2026, StubHub shares fell nearly 13% to close trading at $8.91.

4

14.     Analysts covering StubHub were understandably concerned with StubHub's 180-degree March 2026 reversals.  For example, a Craig-Hallum analyst characterized the "*expected economics and timeline*" of StubHub's Direct Issuance business following the March 4, 2026 earnings announcement as "*flawed*," noting that "[w]e are puzzled at how these product development challenges were not apparent" earlier.[2]  Similarly, a Wedbush analyst contrasted the "limited conviction and visibility today in the value of the direct issuance business [following the earnings announcement], with management's lofty expectations for the segment [that were] unable to materialize as anticipated."[3]  During the March 4, 2026 earnings call, a JPMorgan Chase & Co. analyst inquired about the "strategy shift that's [now] taking place" regarding "direct issuance," given that "[y]ou've kind of [previously] talked about like '26 being a potential[] industry inflection point."

15.     StubHub, through its Chief Executive Officer ("CEO"), Eric H. Baker ("Baker"), purported to explain that the reason the Company now viewed Original Issuance Ticketing as a long-term opportunity was because StubHub **ostensibly overhauled its strategy for increasing its Direct Issuance business during the few months following the IPO**.  According to Baker, StubHub had decided to largely abandon its pay-to-play strategy of enticing content rights holders to sell tickets on its platform by making certain financial concessions, which included StubHub promising its content rights holders a minimum amount of sale proceeds in connection with their allocation of tickets to StubHub, regardless of how many of those tickets were actually sold. Instead, Baker stated that StubHub would focus the remainder of 2026 on developing and

---

[2] Ryan Sigdahl and Matthew Raab, *StubHub Holdings, Inc. (STUB) – Materially Worse FY26 Guidance, Narrative Shifts To Long-Term Opportunities. Maintain HOLD, Lowering Price Target to $9*, Craig-Hallum Equity Research (Mar. 5, 2026), at 1.

[3] Scott Devitt, Matthew Weiss, and Chase Tohanczyn, S*tubHub Holdings (STUB) – Downgrading to Neutral; PT to $10*, Wedbush Equity Research (Mar. 5, 2026), at 1.

improving its Direct Issuance product to better meet the needs of content rights holders and thereby entice more of them to use StubHub, and thus, StubHub took a longer view on the market opportunities the Direct Issuance business presented.

16.    Baker's explanation that StubHub had suddenly changed its strategy **post-IPO**, however, completely contradicted Defendants' representations in the Registration Statement, which **already** disclosed that: (1) StubHub had decided **pre-IPO** to phase out its pay-to-play strategy (which the Company started to eliminate in 2024, and did so at a greatly accelerated rate throughout 2025); and (2) StubHub had been and would continue to invest in improving its Direct Issuance product.

17.    Thus, in truth, **nothing** had changed post-IPO.  Rather, Defendants misrepresented and failed to disclose in StubHub's Registration Statement that StubHub's Direct Issuance platform, which was purportedly then "well-positioned" to attract content rights holders and enable material entry into the Original Issuance Ticket Market "today," was not, in fact, ready for commercial deployment or market success, but would instead require significant retooling through **at least the following year**.

18.    Finally, StubHub's Registration Statement was additionally marred by misstatements and omissions concerning two additional matters, which made StubHub appear as though it were a more attractive investment opportunity for unsuspecting investors.

19.    First, the Registration Statement similarly touted StubHub's purported near-term ability and opportunity to grow its advertising business (and thereby generate material further near- and mid-term growth in revenues and adjusted EBITDA).  However, as StubHub later admitted in March 2026, StubHub's advertising products were **even then** still immature, incomplete and not

ready for commercial deployment, and therefore would not generate material revenues throughout 2026.

20.     Second, the Registration Statement contained materially false and/or misleading statements concerning and/or overstating StubHub's 2025 free cash flows (with free cash flow described in the Registration Statement to be one of StubHub's three "key business metrics," heralded as a "meaningful indicator of liquidity for management and investors," and used to fund various strategies aimed at increasing StubHub's customer base).

21.     These additional misstatements were material, as they provided further apparent basis for StubHub's sharp, near-term growth prospects (advertising) and further shored up the Company's financial position (free cash flows) in advance of the IPO.

22.     As a result of Defendants' negligently prepared Registration Statement and the false and misleading statements and omissions therein, as noted above, StubHub's share price fell dramatically after the IPO when the truth was revealed, resulting in substantial injuries to Plaintiffs and the Class.  Consequently, Defendants are liable to Plaintiffs and the Class for damages under the Securities Act.

## II.     JURISDICTION AND VENUE

23.     The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

25.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b).  In addition, StubHub's principal executive offices are located in this District.

26.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Plaintiffs

27.     Lead Plaintiff Edward Liu, as set forth in the certification previously filed with the Court (ECF No. 47-2)[4] and incorporated by reference herein, purchased StubHub common stock pursuant, or traceable, to the Registration Statement, and suffered damages as a result of Defendants' federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

28.     Additional Plaintiff Tushar Bajaj, as set forth in the certification previously filed with the Court (ECF No. 51-2) and incorporated by reference herein, purchased StubHub common stock pursuant, or traceable, to the Registration Statement, and suffered damages as a result of Defendants' federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

### B.    Defendants

#### 1.    StubHub

29.     Defendant StubHub is incorporated under the laws of Delaware with its principal executive offices located in New York, New York.  StubHub's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "STUB."

---

[4] All references to "ECF No. __" refer to documents filed in the above-captioned action.

### 2.    Individual Defendants

30.    Defendant Eric H. Baker co-founded StubHub in 2000, served at all relevant times as StubHub's CEO and signed or authorized the signing of the Registration Statement for StubHub's IPO.  At the time of the IPO, Defendant Baker beneficially owned 14,628,264 shares of StubHub's Class A common stock, as well as 24.75 million shares of StubHub's "super-voting" (100 votes per share) Class B common stock (100% of the Class B common stock issued), providing Defendant Baker with more than 88% of StubHub's total voting power.

31.    Defendant Connie James ("James") served at all relevant times as StubHub's Chief Financial Officer ("CFO") and signed or authorized the signing of the Registration Statement for StubHub's IPO.  At the time of the IPO, Defendant James beneficially owned 309,690 shares of StubHub's Class A common stock.

32.    Defendant Mark Streams ("Streams") served at all relevant times as StubHub's Executive Vice Chairman and General Counsel, and as a director of the Company, and signed or authorized the signing of the Registration Statement for StubHub's IPO.  At the time of the IPO, Defendant Streams beneficially owned 1,800,150 shares of StubHub's Class A common stock.

33.    Defendant Sameer Bhargava ("Bhargava") served at all relevant times as a director of the Company and signed or authorized the signing of the Registration Statement for StubHub's IPO.  At the time of the IPO, Defendant Bhargava beneficially owned 623,180 shares of StubHub's Class A common stock.

34.    Defendant Jeremy Levine ("Levine") served since March 2025 as a director of the Company and signed or authorized the signing of the Registration Statement for StubHub's IPO.  At the time of the IPO, Defendant Levine beneficially owned 27,113,104 shares of StubHub's Class A common stock.

35.    Defendants Baker, James, Streams, Bhargava and Levine are referred to as the "Individual Defendants," and, together with StubHub, as the "StubHub Defendants."

36.    The Individual Defendants: reviewed and signed the Registration Statement; solicited the investing public to purchase StubHub shares issued pursuant thereto; hired and assisted the Underwriter Defendants (defined below); planned and contributed to the IPO and Registration Statement; and attended roadshows and other promotions to meet with and present favorable information to prospective StubHub investors, all motivated by their own, and the Company's financial interests.

### 3.    Underwriter Defendants

37.    Defendant J.P. Morgan Securities LLC ("JP Morgan"), a limited liability company incorporated under the laws of Delaware, with principal executive offices located at 270 Park Avenue, New York, New York 10017, served as an underwriter of StubHub's IPO.  JP Morgan (together with Defendant Goldman Sachs) served as joint book-running managers of StubHub's IPO and as representatives of the IPO underwriters.

38.    Defendant Goldman Sachs & Co. LLC ("Goldman Sachs"), a limited liability company incorporated under the laws of New York, with principal executive offices located at 200 West Street, New York, New York 10282, served as an underwriter of StubHub's IPO.  Goldman Sachs, together with Defendant JP Morgan, served as joint book-running managers of StubHub's IPO and as representatives of the IPO underwriters.

39.    Defendant BofA Securities Inc. ("BofA"), a company incorporated under the laws of Delaware, with principal executive offices located at One Bryant Park, New York, New York 10036, served as an underwriter of StubHub's IPO.

40.     Defendant Evercore Group L.L.C. ("Evercore"), a limited liability company incorporated under the laws of Delaware, with principal executive offices located at 55 East 52nd Street, New York, New York 10055, served as an underwriter of StubHub's IPO.

41.     Defendant BMO Capital Markets Corp. ("BMO"), a company incorporated under the laws of Delaware, with principal executive offices located at 151 West 42nd Street, New York, New York 10036, served as an underwriter of StubHub's IPO.

42.     Defendant Mizuho Securities USA LLC ("Mizuho"), a limited liability company incorporated under the laws of Delaware, with principal executive offices located at 1271 Avenue of the Americas, New York, New York 10020, served as an underwriter of StubHub's IPO.

43.     Defendant TD Securities (USA) LLC ("TD"), a limited liability company incorporated under the laws of Delaware, with principal executive offices located at One Vanderbilt Avenue, New York, New York 10017, served as an underwriter of StubHub's IPO.

44.     Defendant Truist Securities Inc. ("Truist"), a company incorporated under the laws of Tennessee, with principal executive offices located at 740 Battery Avenue, Atlanta Financial Center South Tower 9, Atlanta, Georgia 30339, served as an underwriter of StubHub's IPO.

45.     Defendant Nomura Securities International, Inc. ("Nomura"), a company incorporated under the laws of New York, with principal executive offices located at 309 West 49th Street, New York, New York 10019, served as an underwriter of StubHub's IPO.

46.     Defendant WR Securities, LLC ("WR"), a limited liability company incorporated under the laws of New York, with principal executive offices located at 757 Third Avenue, 6th Floor, New York, New York 10017, served as an underwriter of StubHub's IPO.

47.     Defendant Citizens JMP Securities LLC ("Citizens"), a limited liability company incorporated under the laws of Delaware, with principal executive offices located at 101 California Street, Suite 1700, San Francisco, California 94111, served as an underwriter of StubHub's IPO.

48.     Defendant Oppenheimer & Co. Inc. ("Oppenheimer"), a company incorporated under the laws of New York with principal executive offices located at 85 Broad Street, New York, New York 10004, served as an underwriter of StubHub's IPO.

49.     Defendant Wedbush Securities Inc. ("Wedbush"), a company incorporated under the laws of California, with principal executive offices located at 1000 Wilshire Blvd, Floor 9, Los Angeles, California 90017, served as an underwriter of StubHub's IPO.

50.     Defendant PNC Capital Markets LLC ("PNC"), a limited liability company incorporated under the laws of Pennsylvania, with principal executive offices located at 300 Fifth Avenue, 5th Floor, Pittsburgh, Pennsylvania 15222, served as an underwriter of StubHub's IPO.

51.     Table 1 below specifies the StubHub IPO shares purchased and underwritten by each of the Underwriter Defendants:

| Table 1 –StubHub IPO Underwriting | |
| --- | --- |
| **Underwriter** | **Shares** |
| J.P. Morgan Securities LLC | 11,042,216 |
| Goldman Sachs & Co. LLC | 10,680,176 |
| BofA Securities Inc. | 3,696,176 |
| Evercore Group L.L.C. | 2,156,028 |
| BMO Capital Markets Corp. | 770,010 |
| Mizuho Securities USA LLC | 770,010 |
| TD Securities (USA) LLC | 770,010 |
| Truist Securities Inc. | 770,010 |
| Nomura Securities International, Inc. | 731,510 |
| Citizens JMP Securities LLC | 462,006 |
| Oppenheimer & Co. Inc. | 462,006 |
| Wedbush Securities Inc. | 462,006 |
| PNC Capital Markets LLC | 462,006 |
| WR Securities, LLC | 38,500 |
| **Total** | **34,042,553** |

52.     The Underwriter Defendants helped to draft and disseminate the Registration Statement and solicited investors to purchase the StubHub common stock issued thereto.

53.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement, given:

A.     Each of the Underwriter Defendants is an investment banking firm that specializes, *inter alia*, in underwriting public offerings of securities.

B.     Each of the Underwriter Defendants served as an underwriter of the StubHub IPO and collectively received fees of approximately $42 million for their underwriting services.

C.     The Underwriter Defendants assisted StubHub and the Individual Defendants in planning and completing the IPO.

D.     The Underwriter Defendants arranged a multi-city "roadshow" prior to the IPO, during which they and StubHub representatives met with prospective investors and presented highly favorable information about StubHub and its operations and prospects.

E.     The Underwriter Defendants also demanded and obtained an agreement from StubHub and the Individual Defendants stating that StubHub would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws – and further made certain that StubHub had purchased millions of dollars in directors' and officers' liability insurance.

F.     The Underwriter Defendants conducted a purportedly adequate and reasonable "due diligence" investigation into StubHub's business and operations.  During the course of their "due diligence," the Underwriter Defendants had continual access to internal,

13

confidential, current information concerning StubHub's most up-to-date operational and financial results and prospects.

G.      In addition to availing themselves of virtually unlimited access to internal StubHub documents and information, agents of the Underwriter Defendants met with StubHub's officers, directors and counsel to engage in "drafting sessions" in advance of the IPO.  During these sessions, understandings were reached as to: (1) the strategy to best accomplish the IPO; (2) the terms of the IPO, including the price at which StubHub shares would be sold; (3) the language to be used in the Registration Statement; (4) the disclosures to be made about StubHub in the Registration Statement; and (5) the responses to be made to the SEC in connection with the SEC's review of the Registration Statement.  As a result of these constant contacts and communications between the Underwriter Defendants' representatives and StubHub's officers and directors and top management, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of: (1) the immaturity and commercial unreadiness of StubHub's Direct Issuance platform and advertising products, which left StubHub neither ready nor able to take advantage of its Original Issuance Ticketing Market and advertising opportunities in the near term; and thus (2) the absence of any material financial benefits likely to accrue to StubHub in the near term from such opportunities.

H.      The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of StubHub common stock registered thereby, including those to Plaintiffs and the other members of the Class.

## IV.    CLASS ACTION ALLEGATIONS

54.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of the following Class: all persons and entities who purchased or otherwise acquired StubHub Class A common stock pursuant and/or traceable to the Registration Statement.

14

Excluded from the Class are: (1) Defendants; (2) members of the immediate family of any Defendant who is an individual; (3) any person who was an officer or director of StubHub or the Underwriter Defendants at all relevant times; (4) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; and (5) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

55. The members of the Class are so numerous that joinder of all members is impracticable. Defendants issued and sold approximately 34,042,553 shares of StubHub common stock via the Registration Statement and IPO, and at all subsequent times thereafter these StubHub shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by StubHub or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

56. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct alleged herein.

57. Plaintiffs will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class and securities litigation.

58. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

A. whether the federal securities laws were violated by Defendants' acts as alleged herein;

B.      whether statements made by Defendants to the investing public, including in the Registration Statement, omitted and/or misrepresented material facts about the Company's business, operations, and prospects; and

C.      to what extent the members of the Class have sustained damages, and the proper measure of such damages.

59.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.      FACTUAL BACKGROUND

### A.      The Original Issuance and Secondary Ticketing Markets

60.     Historically, live event ticketing has featured two separate marketplaces: (1) the Original Issuance Ticketing Market for the purchase/sale of tickets by a content rights holder through an exclusive sales agent; and (2) the Secondary Ticketing Market for the "re-sale" of tickets already purchased/obtained via the Original Issuance Ticketing Market.  The Original Issuance Ticketing Market, which was valued at approximately $154 billion at the time of the IPO, is several multiples larger than the Secondary Ticketing Market, which was contemporaneously valued at approximately $41 billion.

61.     In the Original Issuance Ticket Market, content rights holders – such as artists, sports leagues, teams, and venue operators – sell tickets through one of a limited number of sales agents who act as exclusive partners for venues that typically bundle box office services (ticket sales) with "access control services" (managing the venue entry process).

16

62.　　At the time of the IPO, the North American Original Issuance Ticketing Market was dominated by Ticketmaster Entertainment, LLC ("Ticketmaster") (owned by Live Nation Entertainment, Inc.), which: (1) controlled approximately 65% of the Original Issuance Ticketing Market (and approximately 80% of major concert venue tickets); and (2) maintained its commanding market share through, *inter alia*, long-lasting venue exclusivity agreements, as well as a well-established platform infrastructure designed to address the specific needs of content rights holder and venues.

63.　　A handful of other companies – such as SeatGeek and AXS – hold smaller shares of the Original Issuance Ticketing Market.  At the time of the IPO, StubHub had a negligible market share (approximately 0.1%) of the Original Issuance Ticketing Market.

64.　　In the Secondary Ticketing Market, fans or other market participants (such as ticket brokers) can seek to resell tickets previously obtained via the Original Issuance Ticket Market. For example, season ticket holders or concert subscribers can seek to sell, *via* secondary ticketing marketplaces, tickets to particular games or concerts that they do not wish to or cannot attend. Likewise, ticket brokers and professional ticket sellers can resell large volumes of original issuance tickets through the Secondary Ticketing Market.

65.　　Before the internet, the Secondary Ticketing Market was plagued by numerous difficulties, primarily relating to the inability of ticket sellers and ticket buyers to find and trust each other (*i.e.*, to engage in safe and legitimate transactions).  The internet generally, and StubHub particularly, resolved these difficulties by, *inter alia*: (1) creating a global platform where secondary ticket sellers and buyers can find one another; (2) guaranteeing ticket authenticity (*e.g.*, through StubHub's FanProtect program); and (3) facilitating full cash payment to sellers and timely ticket delivery for both seller and buyers.

66.    At the time of the IPO, the $41 billion global Secondary Ticketing Market was split between the North American secondary market ($18 billion) and the "international" secondary market ($23 billion).  StubHub currently has the largest share of the U.S. Secondary Ticketing Market (at the time of the IPO, estimated to be approximately 48%), trailed by: (1) a handful of other firms, including Original Issuance Ticketing Market heavyweight Ticketmaster (with a 22% share in 2024), Vivid Seats ("Vivid") (with a 19% share in 2024) and SeatGeek (with a 10% share in 2024); and (2) a "long tail" of smaller operators.

67.    As discussed more fully below, *see* Section V.B, *infra*, StubHub's strategy for expanding from the smaller Secondary Ticketing Market into the much larger Original Issuance Ticketing Market was to implement a *new*, third ticketing model, termed "Direct Issuance," which would permit content rights holders to sell original issuance tickets directly to purchasers on its platform much the same way secondary ticket sellers and purchasers are able to transact business.

68.    One of the key selling points of StubHub's Direct Issuance model – which StubHub believed would propel its entry into the Original Issuance Ticketing Market, and distinguish it from the traditional players – is that it did not require content rights holders to use StubHub exclusively.  Rather, a content rights holder could still use a legacy distribution channel, such as Ticketmaster, and StubHub simultaneously, by, for example, selling a set percentage of the content right's holders original issuance ticket inventory on StubHub, or by using StubHub only for specific sporting events or concerts.

**B.    StubHub's History and Entrance into the Original Issuance Ticketing Market**

69.    StubHub was co-founded in 2000 by Defendant Baker as the first online secondary ticket marketplace.  In 2006, Baker left StubHub and founded a new, similar company, viagogo, focused on the European/international Secondary Ticketing Market.  In 2019, viagogo agreed to

18

purchase StubHub, and after certain regulatory delays, the integration of StubHub and viagogo into a single global ticketing platform was completed in September 2022.

70. After integrating with viagogo in 2022, StubHub substantially expanded its market share of the U.S. Secondary Ticketing Market, from approximately 35% in 2023 to 42% in 2024 and to an estimated 48% in 2025. StubHub's 2023-2025 market share increases: (1) came primarily at the expense of Vivid, whose market share decreased sharply during the same time period; and (2) were achieved in substantial part by sharply higher spending on sales and marketing, including "performance marketing" advertising expenses as well as promotional discounting of the fees StubHub charged to buyers and sellers on its ticketing platform.

71. In 2024, buyers from over 200 countries and territories purchased more than 40 million tickets from over 1 million sellers via StubHub. Approximately 60% of the tickets available on StubHub are provided by professional ticket sellers (*i.e.*, ticket brokers), with the remaining 40% provided by individual sellers (*e.g.*, season ticket holders, fans, etc.).

72. StubHub's principal revenue source is the "service fees" it charges on its "Gross Merchandise Sales" ("GMS"): the total dollar value paid by ticket buyers for ticket transactions and fulfillment (inclusive of the service fees charged to buyers and sellers). StubHub charges service fees for *both* participants in any ticket transaction (*i.e.*, to both buyers *and* sellers), set at varying percentages of the total ticket transaction value. While fee percentages can vary from transaction to transaction, the average fee percentage StubHub extracts from its GMS flow – termed its "take rate" (the amount StubHub takes from its ticket transaction flow) – has historically been approximately 20% of GMS.

19

73.     Together, GMS (total StubHub ticket transaction value) and take rate (StubHub's "cut" of these transactions) are the direct and primary determinants of StubHub's revenues, which are essentially the product of GMS and take rate.[5]

74.     StubHub has been attempting to enter and gain traction in the Original Issuance Ticketing Market since at least 2022 through Direct Issuance, which has historically represented a negligible portion of its GMS.

75.     In 2022, StubHub sold $9 million of tickets via Direct Issuance.  In 2023, StubHub increased Direct Issuance GMS to $53 million, and in 2024, to $128 million.  StubHub's 2024 Direct Issuance GMS ($128 million) accounted for approximately 1.5% of StubHub's total 2024 GMS ($8.68 billion), and less than 0.1% of the Direct Issuance ticket market ($154 billion).

76.     Prior to 2024, the primary way StubHub enticed content rights holders to sell original issuance tickets *via* StubHub was to enter into pay-to-play partnerships with well-known sports teams and leagues, including: (1) professional baseball teams, such as the New York Yankees and Los Angeles Dodgers, as well as Major League Baseball ("MLB") itself;[6] (2) professional and collegiate basketball teams (*i.e.*, NBA and NCAA teams); and (3) European

---

[5] StubHub generates further additional interest income, which it earns on the cash that it holds in between: (1) taking payment from ticket buyers, immediately following their ticket purchases; and (2) remitting that payment to sellers, minus StubHub's service fees, no later than eight days after the ticketed event actually occurs.  StubHub generated $2.8 million of such interest income in 2022, $22.5 million in 2023, $41.1 million in 2024 and $18.7 million during the first half of 2025.

[6] Shortly before the IPO, StubHub announced that MLB had designated StubHub as the "Official Direct Issuance Partner of Major League Baseball," which would "enable MLB to distribute primary ticket inventory through StubHub and other Authorized Ticket Marketplaces using StubHub's direct issuance technology [] ahead of the 2026 MLB season."  *See* StubHub September 4, 2025 press release titled "Major League Baseball and StubHub Announce Direct Issuance Technology Partnership," available at: https://investors.stubhub.com/news/news-details/2025/Major-League-Baseball-and-StubHub-Announce-Direct-Issuance-Technology-Partnership/.

soccer teams, such as Manchester City, Sevilla FC, Real Betis and Getafe.  StubHub also entered into similar arrangements with music festival promoters.

77.     Those partnerships required StubHub to provide certain financial concessions (*i.e.*, the pay-to-play aspect of the arrangement), which included StubHub promising its content rights holders a minimum amount of sale proceeds in exchange for content rights holders allocating a certain number of their tickets to StubHub.  StubHub was then required to pay content rights holders that minimum amount of sale proceeds regardless of how many of tickets it actually sold/purchased (which StubHub referred to as "inventory risk").  For example, in exchange for receiving 100,000 tickets with a face value of $100 per ticket (total ticket value: $10 million), StubHub agreed to provide the content rights holder with an upfront payment of 50% of that aggregate face value – *i.e.*, $5 million – irrespective of how much the tickets actually sold for or whether they sold at all.  This not only transferred much of the risk to StubHub, but fundamentally changed the nature of – and accounting for – the transaction by, *inter alia*, making it far more capital intensive and far less accretive to margins.  *See, e.g.*, Prospectus at 114 and F-73.  In such arrangements, StubHub acts as principal, rather than agent, in the sale of the ticket, takes the ticket into inventory (at an inventory cost equal to the financial guarantee), and records revenue from the sale of the ticket on a gross basis (*i.e.*, not simply StubHub's fees, but the gross proceeds from the ticket sale).  *Id*.

78.     With respect to StubHub's marquee Direct Issuance client,  the New York Yankees, StubHub agreed to *further* payment obligations (*i.e.*, over and above the aforementioned financial guarantees), characterized in the Registration Statement as "sponsorship and partnership fees," that obligated StubHub to pay tens of millions of dollars per year in advertising spend over a multi-

21

year period (constituting, together with related financial guarantees, a very substantial portion of StubHub's sizeable $150 million-plus "investments" in direct issuance in 2024 and 2025).

79.     However, as discussed more fully in Section V.F.2, *infra*, by 2025, StubHub had changed its Direct Issuance strategy and substantially phased out such pay-to-play arrangements, reporting that only 10% of its Direct Issuance GMS in 2025 involved partnerships where it assumed inventory risk (down from 50% in 2024).

C.     **StubHub's IPO**

80.     Since at least mid-2023, StubHub had sought to raise funds through an initial public offering of its common stock.

81.     On June 30, 2023, StubHub filed a registration statement with the SEC for such an offering, and thereafter amended it on multiple occasions between late 2023 and early 2025, including successive confidential drafts filed with the SEC on November 20, 2023, April 26, 2024, June 6, 2024, June 24, 2024, August 22, 2024, and February 20, 2025.

82.     On March 21, 2025, StubHub filed its first public registration statement with the SEC on Form S-1 (Registration No. 333-28600), which it amended in subsequent filings dated August 11, 2025, August 26, 2025, and September 8, 2025 (as amended and together with the Prospectus, the "Registration Statement").

83.     On September 8, 2025, StubHub issued a press release announcing that it had "launched the roadshow for its proposed initial public offering of 34,042,553 shares of its Class A common stock."[7]  Roadshows are utilized in initial public offerings to: (1) market IPO shares to prospective investors; (2) aid IPO companies and underwriters to evaluate investor demand; and,

---

[7] *See* StubHub September 8, 2025 press release titled "StubHub Announces Launch of Initial Public Offering," available at: https://investors.stubhub.com/news/news-details/2025/StubHub-Announces-Launch-of-Initial-Public-Offering/.

relatedly, (3) determine a final IPO price (based in part on investors' reception of the roadshow and demand for shares after the roadshow).  Typically, roadshows comprise a concentrated series of meetings (both physical, in major market centers, and virtual), held over the course of one or two weeks, in which the Company's executives and underwriters present its operations, finances and prospects to institutional investors, utilizing a standard presentation developed for such purposes.  StubHub's IPO roadshow and roadshow presentation are further detailed in Section V.D.1, *infra*.

84.    On September 12, 2025, StubHub and the Underwriter Defendants wrote to the SEC to request that the Registration Statement be declared effective on or by September 16, 2025. The SEC declared the Registration Statement effective on September 16, 2025, as of 4:00 p.m.

85.    On September 17, 2025, StubHub filed a final IPO prospectus, dated September 16, 2025, with the SEC (the "Prospectus"), which formed part of the Registration Statement.

86.    Pursuant to the Registration Statement, Defendants sold 34,042,553 shares of StubHub Class A common stock at a price of $23.50 per share, for gross proceeds of $800 million. Net IPO proceeds to StubHub totaled approximately $735.5 million, after paying: (1) $42 million in underwriting fees to the Underwriter Defendants (via sale of the IPO shares to the Underwriter Defendants at a $1.23375 per share discount to the public offering price); and (2) an additional $22.5 million in offering expenses.  Per the Registration Statement, net IPO proceeds would be used to pay down StubHub's outstanding debt by $550 million, satisfy certain tax withholding and remittance obligations, and for general corporate purposes, including working capital, operating expenses and capital expenditures, and/or acquiring or making investments in business, products, offerings and technologies.

**D.**     **StubHub Repeatedly Touts Its Near- and Mid-Term Ability to Grow Its Direct Issuance and Related Advertising Business Leading Up to the IPO and in the Registration Statement**

**1.**     **Defendants' Pre-IPO Roadshow Presentations**

87.     Between September 8, 2025 and September 16, 2025, StubHub and the Underwriter Defendants actively marketed the IPO pursuant to roadshow presentations to prospective investors. For use during those meetings, Defendants developed standardized marketing materials (the "Roadshow Deck"). *See* Exhibit A hereto (annexing Roadshow Deck).

88.     In the Roadshow Deck, Defendants identified and focused on two critical market opportunities, namely: (1) the Original Issuance Ticketing Market, through StubHub's Direct Issuance model; and (2) advertising by content rights holders on its platform. Notably, StubHub identified its opportunity in the Original Issuance Ticketing Market to be part of its Serviceable Addressable Market, or "SAM," which, as discussed more fully in the following Section, StubHub defined as a near-term market opportunity that was immediately available to it:



*See* Roadshow Deck at 11.

89.    According to StubHub, these two opportunities purportedly would allow StubHub to sharply elevate its financial performance in the near and medium term.  Indeed, Defendants constructed the Roadshow Deck so that it focused heavily on these two major market opportunities, *i.e.*, the Original Issuance Ticketing Market and advertising.  *See* Roadshow Deck at 11-16, 19-22, 25 and 28.  Most centrally, the Roadshow Deck urged prospective investors to focus on StubHub's "Larger Opportunity Beyond Resale" – namely, the approximately $153 billion original issuance market:



*See* Roadshow Deck at 13.

90.    The Roadshow Deck provided "Long-Term Financial Targets" for StubHub, including, principally: (1) annual GMS growth of 20% or more; and (2) adjusted EBITDA margins of approximately 35-40% or more.  *See* Roadshow Deck at 28.

91.    Notably, this level of targeted financial performance was not available from, and could not be generated by, StubHub's operations in the Secondary Ticketing Market alone.  Rather, StubHub's "legacy" secondary market operations could only get StubHub about halfway there:

namely, GMS growth of approximately 12% (versus the targeted 20% or more)[8] and adjusted EBITDA margins of approximately 20% (versus the targeted 35-40% or more).[9]  In short, attaining these targets required a substantial and sustained increase in StubHub's Direct Issuance and advertising business in addition to any growth in its legacy Secondary Ticketing Market.  *See* Roadshow Deck at 25 (identifying additive drivers of GMS growth as "Advertising ramp near-term" and "DI ramp medium-term," and additive drivers of margin expansion as "High contribution margin from Advertising" and "Scaling margins in DI").

---

[8] Secondary ticket markets were expected to grow at a "low double digit" annual rate (*e.g.*, 10%-12%).  StubHub's market share gains in North America, which had allowed StubHub to grow substantially faster than the overall market in prior years, were not expected to continue in the same material fashion, as StubHub had previously spent significant and purportedly non-recurring sums in sales/marketing expenses to take business and market share from its main competitor. Neither did StubHub expect to take market share in the far less consolidated international secondary ticket market (*i.e.*, grow international GMS faster than the market).  StubHub's relatively small base of international GMS meant that the incremental market share gains would do little to move the needle for overall GMS growth.  Therefore, StubHub's core/legacy secondary ticket market business was expected to generate GMS growth in the low double-digits (*e.g.*, 10%-13%).  *Id*.  This was substantially below the 20% or more annual GMS growth Defendants advertised in the Roadshow Deck.  The gap between StubHub's core/legacy financial performance levels and those presented in the Roadshow Deck was to be bridged by StubHub's realization of its purported near-term market opportunities in direct issuance and advertising.  *See, e.g.*, Roadshow Deck at 25 and 13.

[9] Likewise, and with respect to adjusted EBITDA margins – even crediting the assertion that StubHub's 2024 and first-half 2025 adjusted EBITDA margins (17% and 12%, respectively) were compressed by elevated, purportedly non-recurring sales and marketing spending to support direct issuance and take secondary market share (*see* Roadshow Deck at 27) – adjustments to normalize such spending levels still indicated that adjusted EBITDA margins from StubHub's core/legacy secondary market operations were approximately 20%.  Just as with GMS, this adjusted EBITDA level was substantially below the 35-40%+ annual levels Defendants advertised in the Roadshow Deck.  And just as with GMS, the gap between StubHub's core/legacy financial performance levels and those presented in the Roadshow Deck was to be bridged by StubHub's realization of its purported near-term market opportunities in direct issuance and advertising.  *See, e.g.*, Roadshow Deck at 25.

26

**2.      The Registration Statement**

92.      Consistent with the Roadshow Deck, the Registration Statement included numerous representations concerning StubHub's Direct Issuance and advertising growth opportunities, which it identified as being both imminent and material.

93.      Specifically, the Registration Statement defined StubHub's Direct Issuance business and Original Issuance Ticketing Market opportunities as part of its SAM, meaning that it was something that StubHub could exploit in the near term.  *See* Prospectus at 10; *see also id.* at 135 ("**Our SAM today includes** the global markets for secondary, **original issuance** and unsold tickets.").

94.      In this way, StubHub repeatedly stated that its then-existing Direct Issuance platform was already "well-positioned" to capture additional business from content rights holders. For example, StubHub recounted that its "direct issuance GMS in 2024" surpassed $100 million and that "**we are well-positioned** to enable more categories of live events and experiences on our marketplace," and that its "open distribution model[] **is well-positioned** to attract more content rights holders to use our marketplace."  *See* Prospectus at 10, 13; *see also id.* at 130 ("The combination of **our end-to-end technology**, global distribution and data intelligence… gives rise to multiple flywheel effects that enable our market share capture in secondary ticketing **and unlock our opportunity in the direct issuance and other adjacent markets**."); *id.* at 141 ("We believe our value proposition, providing broadened distribution and superior pricing intelligence **through an open distribution model, is well-positioned to attract more content rights holders to use our marketplace**.").

95.      StubHub further reinforced the notion that its Direct Issuance platform was sufficiently developed to attract increased business from content rights holders by emphasizing that it had already been used by "several marquee" organizations: "Several marquee content rights

27

holders, including teams in major U.S. and international professional sports leagues as well as major musical artists and festivals, **have already begun selling original issuance tickets through our marketplace, and we believe we are positioned to further penetrate this market**.” Prospectus at 137; *see also id.* at 4 (“Our marketplace **enables sellers of all types, including** individual fans, professional sellers and **content rights holders**.”).

96.    In fact, StubHub described its Direct Issuance platform as permitting content rights holders to sell tickets with the same relative ease as its customers who sell and purchase tickets in the Secondary Ticketing Market, StubHub’s bread and butter.  *See* Prospectus at 8 (“**Content rights holders can leverage** our global reach, trusted brands and marketing expertise to maximize their distribution and use our wealth of marketplace data to inform intelligent pricing strategies to optimize yield on their ticketing inventory, **much in the same way individual sellers and professional sellers use our ticketing marketplace for secondary ticketing transactions**.”).

97.    Thus, in the Registration Statement, Defendants positioned StubHub’s Direct Issuance platform as technologically capable and ready to be immediately used by content rights holders, which would thereby enable StubHub to rapidly expand its presence in the much larger Original Issuance Ticketing Market.

98.    The Registration Statement further stressed the importance of Direct Issuance to StubHub’s growth, describing it as one of StubHub’s six core growth strategies:

**Our Strategy for Growth**

Our growth strategies are focused on extending the competitive strengths of our business.

*        *        *

***Expand Adoption of Our Platform for Direct Issuance***

We are in the early innings of targeting the original issuance ticketing market and bringing content rights holders to our platform. **Our vision for direct issuance is**

28

**that content rights holders will list tickets directly on our marketplace as any other seller would at scale. In 2024, we surpassed $100 million of annual direct issuance GMS. We intend to continue to grow our relationships with content rights holders** and invest in growing our engaged audience of fans to power our distribution and accelerate our audience-content flywheel. **We believe our value proposition, providing broadened distribution and superior pricing intelligence through an open distribution model, is well-positioned to attract more content rights holders to use our marketplace**.

Prospectus at 12 (and repeated at 141).

99.    Indeed, the Registration Statement presented Direct Issuance as StubHub's largest "market opportunity," and one significantly larger than what remained for StubHub in the secondary ticketing market that it already led:

**Our Market Opportunity**

We believe we are the category leader in the large and growing global secondary ticketing market, where we generated substantially all of our GMS in 2024. **We believe we have a major growth opportunity ahead of us in secondary ticketing alone. We are even more excited about the larger opportunity to build the global destination for consumers to access live events and experiences, which represents a global market opportunity that is significantly larger than secondary ticketing.** Having surpassed $100 million in annual direct issuance GMS… in 2024, we are in the early stages of what we believe **will be a major disruption to the way original issuance tickets are distributed. We believe that we are well-positioned to enable more categories of live events and experiences on our marketplace**, further monetize ancillary revenue streams and play an even more vital role in the ecosystem in the future.

Prospectus at 10 (and repeated at 135); *see also id*. at 8 ("we believe this **positions us to disrupt the legacy primary ticketing model and unlock a vastly expanded market opportunity**.").

100.    Similarly, although StubHub did not technically include its advertising business in its SAM, it nonetheless represented that it was poised to expand such business in the near term, with minimal additional investment, and in fact discussed the business's "near-term opportunity" as a percentage of the Company's SAM.  *See* Prospectus at 137 ("**We estimate our near-term [advertising] opportunity to be approximately 10% of our SAM, or $19 billion**. We believe this will enable us to sell display ads and promoted listings, among other advertising opportunities.

29

**Given the existing infrastructure and traffic, we believe that further monetizing our marketplace through advertising will require minimal incremental investment"**).

101.    And as with its Direct Issuance business, StubHub identified digital advertising on its platform as one of its six core growth strategies.  *See* Prospectus at 12-13; *see also id.* at 142 ("We believe that the range of options to enable advertising on our marketplace is broad, and that the scale, depth and high purchasing intent of our user engagement provide an opportunity to sell banner ads and promoted listings, among other types of advertising, in a similar manner to other scaled digital marketplaces.").

**E.      Shortly After the IPO, Analysts Initiate Coverage and Issued Favorable Near-Term Price Targets Premised on the Growth of StubHub's Direct Issuance and Advertising Businesses**

102.    On October 13, 2025, following the expiration of the post-IPO "quiet period," numerous securities analysts (including multiple analysts employed by the Underwriter Defendants and/or their affiliates) initiated coverage of StubHub by publishing lengthy, detailed initiation reports, including the below-identified reports (collectively, the "Analyst Reports"):

| Table 2 – Post-IPO Analyst Reports | | |
|---|---|---|
| **Firm** | **Analyst(s)** | **Report Title** |
| JP Morgan | Doug Anmuth<br>Dae K. Lee<br>Neeraj S. Kookada<br>Margaret Hoffman | StubHub – Secondary Ticketing Leader with Growth & Margin Opportunities Across Core Resale, DI, & Ads; Initiate Coverage with Overweight Rating & $24 PT<br>(the "JP Morgan Report") |
| BMO | Brian J. Pitz<br>Stan Velikov | Initiating at Outperform - StubHub: A Ticket Worth Its Price<br>(the "BMO Report") |
| BofA | Justin Post<br>Steven McDermott | StubHub Holdings: Ticket to a High-Growth Asset; Initiate at Buy with $25 PO<br>(the "BofA Report") |

| | | |
|---|---|---|
| Oppenheimer | Jason Helfstein<br>Chad Larkin<br>Joshua Marin<br>Jed Kelly<br>Steven Hromin | StubHub, Inc. - Leading Secondary Ticket Marketplace Poised for Direct Issuance & Ads Expansion; Initiating Outperform & $23 Target (the "Oppenheimer Report") |
| TD Cowen | John Blackledge<br>Logan Whalley<br>William Kerr<br>James Kopelman | StubHub Holdings - Initiate STUB with Buy Rating on Ramping Resale & Emerging Direct Issuance Biz (the "TD Report") |
| Mizuho | Lloyd Walmsley<br>Wei Fang<br>Jack Yuan<br>Kevin Wang | StubHub Holdings, Inc. (STUB) - Initiating Coverage Outperform PT $24.00 (the "Mizuho Report") |
| Wedbush | Scott Devitt<br>Mathew Weiss<br>Chase Tohanczyn | StubHub Holdings (STUB): Initiating Coverage with an Outperform Rating and $25 PT (the "Wedbush Report") |

103.    Consistent with Defendants' representations in the Registration Statement and the Roadshow Deck, the Analyst Reports all presented Direct Issuance and advertising as opportunities that: (1) StubHub would seize imminently; (2) relatedly, would provide StubHub with material financial benefits in the near and medium term, including material accelerations of GMS, revenue and adjusted EBTIDA growth, and material expansion of adjusted EBITDA margins; and (3) would allow StubHub to approach or reach the targeted financial performance levels that Defendants advertised in the Roadshow.

104.    The Analyst Reports all deemed and presented StubHub's Direct Issuance performance as the **single most critical component for investor evaluation of StubHub's worth**. JP Morgan analyst Doug Anmuth put it most succinctly, terming Direct Issuance "a transformative growth driver" for StubHub.  *See* JP Morgan Report at 4.  The authors of the remaining Analyst

31

Reports agreed.[10]    Indeed, the Analyst Reports all focused on exposition of StubHub's Direct Issuance-led transformation.

105.    Based on and consistent with Defendants' representations in the Roadshow Deck and Registration Statement, the Analyst Reports all depicted StubHub with immediate and sizeable Direct Issuance ticketing sales (*e.g.*, $2 billion of Direct Issuance GMS for 2026) and ramping sharply thereafter (*e.g.*, to above $10 billion in Direct Issuance GMS by 2028, and above $20 billion by 2029-30).

106.    Table 3 below summarizes how the Analyst Reports envisioned StubHub's near- and medium-term Direct Issuance business, based on Defendants' Roadshow Deck and Registration Statement representations:

---

[10] *See, e.g.*, Wedbush Report at 21-22 ("In the near-term, we believe investors will primarily contemplate management's ability to capture share and momentum in original issuance. . . . Longer-term, we think the greatest opportunity for upside would be driven by a strong inflection in direct issuance adoption, creating significant value for the business."); BofA Report at 4 ("We expect Direct Issuance to scale rapidly in 2026+ and fuel outsized growth for the company.") and 20 ("StubHub expects Direct Issuance will be a key growth engine for the company, fueled by more CRHs moving to the open distribution model (we believe League level deals should help accelerate adoption).  StubHub is developing platform capabilities to reduce friction around onboarding partners, which should encourage more sign-ups.  For 2026, we project $2bn in Direct Issuance GMS (up from $250mnin '25) based on the assumption that StubHub signs approximately 60 CRHs and a growing percentage of non-Live Nation music venues. We expect the number of Direct Issuances partners to roughly double in 2027. . . ."); BMO Report at 9 ("Direct Issuance growth is a key tenet to GMS, revenue, and EBITDA growth in the coming years."); JP Morgan Report at 25 ("We believe StubHub has a path to rapid margin expansion, accelerating FCF, and significant deleveraging post-IPO.  Strong resale growth & Direct Issuance ramp drive our GMS growth accelerating from 7% in 2025E to 44% in '26E, 47% in '27E, & 52% in '28E while take-rate holding steady at ~19% combined with roll-out of advertising revenue underpins our revenue growth accelerating from +1% in 2025E to +55% in '26E & above 50% in 2027-28E.").

| Table 3 – Direct Issuance GMS (Projected, 2025-2030)[11] | | | | | | |
|---|---|---|---|---|---|---|
| ($ millions) | | | | | | |
| Analyst / Firm | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
| JP Morgan | $245 | $2,000 | $5,300 | $11,800 | $16,500 | |
| BofA | $250 | $2,002 | $5,406 | $11,622 | | |
| Oppenheimer | $249 | $2,117 | $4,233 | $7,408 | | |
| TD Cowen | $250 | $2,144 | $5,681 | $12,753 | $20,946 | $27,821 |
| Mizuho | | $1,948 | $5,000 | | | |
| Wedbush | $240 | $2,139 | $5,675 | $12,712 | $20,339 | $27,458 |

107.    As StubHub's total 2024 GMS was $8.7 billion, analysts understood that Direct Issuance, by itself, would generate approximately 25% GMS growth in 2026 ($2 billion), approximately 60% GMS growth in 2027 ($5 billion, representing annualized growth of approximately 30%), and by 2028, 150% more GMS ($12 billion) than StubHub's total 2024 base (representing annualized growth of nearly 50%).  The graphics below, extracted from two of the Analyst Reports, present this understanding visually:

Figure 30: StubHub Direct Issuance GMS, 2022A-2029E



■ Direct Issuance GMS

Source: Company reports, J.P. Morgan estimates.

---

[11] *See* JP Morgan Report at 26-28; BofA Report at 21, 42; Oppenheimer Report at 11, 19-20; TD Report at 19, 27-28; Mizuho Report at 20, 25; Wedbush Report at 15, 24.

\*       \*       \*



Exhibit 23: Direct Issuance is a small but rapidly growing segment for StubHub
Direct Issuance GMS ($mn)

Source: BofA Global Research estimates

BofA GLOBAL RESEARCH

*See* JP Morgan Report at 28; BofA Report at 21.

108.    Additionally, given Direct Issuance's large absolute size, imminent entry and fast ramp, analysts further understood that Direct Issuance would quickly grow from less than 1% of StubHub's total GMS in 2025 to **approximately 40% of StubHub's total GMS** (by 2028).  The graphics below, extracted from the Analyst Reports, present this understanding visually:



Figure 28: StubHub GMS Across Resale & DI, 2022A-2029E

Source: Company reports, J.P. Morgan estimates.

\*        \*        \*



Exhibit 24: We project GMS to grow 7% y/y to $9.3bn in 2025 and then accelerate in 2026
Gross Merchandise Sales ($bn)



Source: Company reports, BofA Global Research estimates

BofA GLOBAL RESEARCH

*See* JP Morgan Report at 29; BofA Report at 22.

109. Likewise, based on and consistent with Defendants' representations in the Roadshow Deck and Registration Statement, the Analyst Reports all depicted StubHub as poised to further benefit from a material influx of advertising revenues, beginning imminently (*e.g.*, $200 million of advertising revenue in 2026) and ramping sharply thereafter (*e.g.*, to $400 million in 2027, $600 million in 2028, $800 million in 2029, etc.). Table 4 below summarizes the Analyst Reports' projected revenues from StubHub's advertising:

| Table 4 – Advertising Revenue (Projected, 2025-2030) [12] ($ millions) | | | | | | |
|---|---|---|---|---|---|---|
| **Analyst / Firm** | **2025** | **2026** | **2027** | **2028** | **2029** | **2030** |
| JP Morgan | $39 | $234 | $435 | $700 | $850 | |
| BofA | $38 | $265 | $398 | $630 | | |
| Oppenheimer | $42 | $275 | $340 | $486 | | |
| TD Cowen | $39 | $274 | $410 | $634 | $865 | $1,046 |
| Mizuho | $39 | $253 | | | | |
| Wedbush | $39 | $273 | | $622 | | |

110.    As StubHub's 2024 revenue totaled approximately $1.77 billion, advertising revenues, per analysts' understanding, would quickly ramp from effectively zero in 2025 to more than $200 million in 2026, $400 million in 2027 and $600 million in 2028.  As depicted in the JP Morgan Report and TD Report below, analysts understood StubHub's new advertising revenue stream would generate approximately 10% of StubHub's total revenues, including in the near term (*e.g.*, up to over 7% in 2026, and nearly 10% in 2027):[13]

---

[12] *See* JP Morgan Report at 29, 44; BofA Report at 42; Oppenheimer Report at 19, 22; TD Report at 28; Mizuho Report at 20; Wedbush Report at 16-17, 21.

[13] Specifically, based on StubHub commentary and analysis of comparable internet marketplace advertising results, analysts estimated that StubHub advertising revenues would ramp to approximately 2% of annual GMS.  With StubHub's take rate transforming ticketing GMS into revenues at a rate of approximately 20%, this equated to estimating that advertising would rise to approximately 10% of StubHub's total revenues.  *See, e.g.*, BofA Report at 4 ("We assume Ads revenue can ramp to 2% of GMV. . . ."); *id.* at 8 ("We estimate that StubHub can generate $265mn in Ad revenue in 2026 (2% of GMS) . . . . "); TD Report at 1 ("Lastly, we expect STUB's advertising business will emerge in '26 and contribute revenue equivalent to 2% of GMS."); *id.* at 5 ("StubHub is in the early stages of launching its advertising business, which we forecast will drive advertising revenue equal to 2% of GMS as supported by both Sponsored Listings and Display ad solutions. We expect that STUB drives '25 advertising revenue of $39MM, reflecting the early launch of Display advertising offerings and growing to $274MM in '26 driven also by the launch of a Sponsored Listings type product.  Longer term, we expect that advertising revenue will grow in line with overall GMS, reaching 2% of GMS in '26 and remaining stable in the out years of our model."); BMO Report at 28 ("Advertising (which offers 80% incremental margins) is a new revenue stream, expected to grow from 0% of GMS in 2024 to 2% by 2026."); JP Morgan Report at 4 ("Advertising is another major lever, with ad revenue expected to grow from ~$40M in 2025E to $400M+ in 2027E, reaching ~2% of GMS by the end of 2026.").

36

**Figure 33: StubHub Revenue, 2022A-2029E**



Source: Company reports, J.P. Morgan estimates.

\*    \*    \*

**Figure 14 STUB: Revenue Forecast, 2022-2030E, ($BN's)**



Source: TD Cowen

37

*See* JP Morgan Report at 29 ("StubHub currently generates revenue primarily from ticketing—service fees charged on every ticket sold, resale & DI—but advertising—spend from brands and sellers promoting events and listings to StubHub's large, engaged audience—should start to bring in **high-margin revenue stream beginning in 4Q25**."); TD Report at 16, 20 ("we expect that STUB will more immediately drive advertising revenue through Display advertising . . . StubHub has natural opportunity to layer advertising into the business **beginning in late '25**").

111.    Finally, as analysts further noted, because advertising revenues were understood to have extremely high margins (meaning, far more of every dollar in revenue passed through to StubHub's bottom line EBITDA and profit),[14] the new 10% revenue stream represented by advertising was expected to provide an even greater contribution to StubHub's EBITDA (approximately 20%).  The graphic below, extracted from the TD Report, visually demonstrates this by decomposing StubHub's EBTIDA into three distinct streams, consisting of: (1) StubHub's

---

[14] *See, e.g.*, Wedbush Report at 16 ("Based on disclosed metrics and commentary from marketplace peers, we think advertising could offer high-margin (~80%+) incremental revenues for StubHub, with the potential to reach 2-3% of GMS longer-term."); BofA Report at 5 ("Advertising should be highly profitable, with potential for 90%+ gross margins and 80% EBITDA margins. We assume Ads revenue can ramp to 2% of GMV in 2026 and contribute nearly 5ppts to EBITDA margins."); *id.* at 8 ("Advertising is a highly profitable, margin accretive revenue stream. We estimate that StubHub can generate $265mn in Ad revenue in 2026 (2% of GMS), which translates to $212mn in EBITDA assuming an 80% margin. Our estimates suggest Advertising can add nearly 5ppts to EBITDA margins for 2026."); BMO Report at 28 ("Advertising (which offers 80% incremental margins) is a new revenue stream, expected to grow from 0% of GMS in 2024 to 2% by 2026."); Mizuho Report at 20 ("The company expects to scale its advertising business in 2026, which we forecast to grow from $39M in 2025 to $253M next year, which at an ~80% incremental margin, stands to contribute $200M+ in Adj EBITDA in 2026E."); JP Morgan Report at 29-30 ("As the platform ramps up its advertising business, initial revenue is expected to come from brand partnerships and sponsored listings, with contribution margins modeled at ~80% given the asset-light nature of digital ads. While ad revenue was negligible in 2023-24, we project a strong ramp beginning in 4Q25 as sponsored listings launch and brand partnerships scale, reaching ~2% of GMS exiting 2026. This translates to ad revenue growing from ~$40M in 2025E to $400M+ in 2027E and approaching $850M by 2029E.").

secondary ticket business; (2) StubHub's Direct Issuance business; and (3) StubHub's advertising business:

**Figure 16 STUB: EBITDA Breakdown '26E-'30E ($MM's)**

*See* TD Report at 21.

112.    Indeed, as the above graphic clarifies, analysts understood that StubHub's new entries into Direct Issuance and advertising would dramatically transform StubHub's EBITDA base (from effectively 0% of EBITDA in 2025 to more than half of total EBITDA from 2027 onwards) and EBITDA growth (boosting annual EBITDA growth of approximately 20% from secondary market ticketing alone **to approximately 100% overall**).[15]

---

[15] *See also* BofA Report at 1 ("We expect EBITDA margins to more than double in 2026 and approach 40% long-term, with growth driven by marketing spend leverage, a turn in DI business to profitability, and ramp in Ads business"); JP Morgan Report at 1 ("Profit inflection in 2026. We project Adj. EBITDA margins to rebound from 13% in 2025E to 35%+ in 2026E as resale moves beyond tough comps and industry headwinds, DI becomes self-sufficient, and high-margin advertising ramps.").

**F.      StubHub's Post-IPO Revelations**

**1.      Q3 2025 Financial Results: StubHub Refuses to Provide Guidance**

113.    On November 13, 2025, StubHub reported its first post-IPO financial results of operations, for Q3 2025 (ended September 30, 2025), by issuing a press release, filing a Form 10-Q with the SEC for the same period, and hosting an earnings call with analysts and investors to further discuss StubHub's operations and financial performance.

114.    Those financial results revealed, *inter alia*, that free cash flow – which it used to fund debt reduction and fuel growth – had sunk to **negative $4.6 million** for Q3 2025.  This represented a **143% decrease** from the year-ago quarter (positive $10.6 million), as well as a second straight sequential quarterly decline (from $9.7 million for the second quarter of 2025 and $151.1 million for the first quarter of 2025).

115.    Even more jarring, StubHub departed from typical reporting practices, and refused to provide near-term financial or operational guidance at that time (*i.e.*, for the fourth quarter of 2025, which by then was already half over, or for 2026).  Instead, StubHub explained that it would not provide its first post-IPO guidance until March 2026, when reporting StubHub's financial results for the fourth quarter and full-year of 2025.

116.    Although multiple analysts inquired about StubHub's Direct Issuance progress with questions premised on and consistent with Defendants' Roadshow and Registration Statement disclosures (*e.g.*, how many major teams had signed on for Direct Issuance distribution, how much Direct Issuance revenue could be expected), the StubHub Defendants refused to provide any substantive answers to such questions, and instead merely repeated their insistence that they were not providing any guidance:

Q - Douglas Anmuth (JP Morgan analyst)

40

Thanks so much for taking questions. Eric, **during 2025, you've made some substantial investments in core resale, market share, and also direct issuance. Can you just talk about the returns you're seeing on those two areas of spending and whether you expect those to continue in '26?** And then I know there's some noise as you mentioned in the 4Q on sales versus last year, but just curious on the thought process and not providing a 4Q guide and that you're halfway through the quarter. Thank you.

A - Eric H. Baker

Sure. Thanks for the question, Doug. Appreciate it. So, I'm going to get a few things in there in terms of what we've been doing with market share investment, how we think about that, and how we think about the outlook for the business. Again, **I think as we said in our opening remarks, we take a long-term approach. So, excuse me, we are not providing guidance and we'll be talking about 2026 when we're on our next call.**

*    *    *

Q - Shweta Khajuria (Wolfe Research analyst)

Okay. Thank you for taking my questions. **The first one is on Direct Issuance. Could you please talk to how you're thinking about the number of teams that you expect to perhaps bring on onto the platform next year? And what level of visibility do you have in terms of the timeline, anything you can comment on? When do you need to sign them all by to benefit by the end of next year?** So, that's the first one. And the second one, any color on just the overall demand trends that you're seeing through the quarter through October and November that could help us out as to how we think about fourth quarter going forward? Thank you.

A - Eric H. Baker

Yes, no, Shweta, thank you for the question. I know I think in terms of, let me talk generally, I think about, **I can talk to you generally about DI and open distribution, how we think about that. And also certainly how do we see sort of live event demand and what's going on. Obviously, as we've said, the way that we think and we're not providing guidance at this time, and I'm sure we look forward to the next call and talking about next year then.**

November 13, 2025 StubHub Q3 2025 Earnings Call, Bloomberg Tr. at 15.

117.    In response to StubHub's November 13, 2025 disclosures, analysts universally lowered their price targets and StubHub shares fell $3.95 per share on November 14, 2025 to close

41

trading at $14.87 (a one-day decline of 21.0% from the November 13, 2025 closing price of $18.82).

> **2.**     **Q4 2025 Financial Results: StubHub Shocks the Market When it Recategorizes Its Direct Issuance and Advertising Businesses as Long-Term Goals that Will Not Generate Meaningful Revenues in 2026**

118.    On March 4, 2026, StubHub: (1) reported its financial results of operations for the fourth quarter of 2025; (2) issued a press release setting forth Q4 2025 results and shareholder letter further discussing StubHub's operations, performance and strategy (the "Shareholder Letter"); (3) filed an annual report on Form 10-K with the SEC for the same period; and (4) hosted a conference call with analysts and investors to further discuss StubHub's operations and financial performance.

119.    In the Shareholder Letter and on the conference call, the StubHub Defendants provided financial guidance for 2026, including: (1) GMS of $9.9 to $10.1 billion (representing 9% growth over 2025 at the midpoint); and (2) adjusted EBTIDA of $400 to $420 million (representing an adjusted EBITDA margin of approximately 20%) (the "2026 Financial Guidance"). *See* Shareholder Letter at 2.

120.    This new level of projected financial performance was far below both: (1) consensus analyst estimates (for GMS of $10 to $12.25 billion and $690 to 705 million adjusted EBITDA); and (2) the financial targets that Defendants had included in the Roadshow Deck (GMS growth of approximately 20% or more and adjusted EBITDA margins of 35% to 40% or more).

121.    The cause of the divergence was straightforward.  Defendants' much higher Roadshow financial targets and analysts' financial estimates included material contributions to GMS, revenues, and adjusted EBITDA from Direct Issuance, and to a lesser degree, from advertising.  But as StubHub explained, its 2026 Financial Guidance was driven solely by

42

StubHub's "core resale marketplace" operations and "**d[id] not assume any material revenue contribution from either**" Direct Issuance or advertising. *See* Shareholder Letter at 2.

122.    StubHub further revealed that it had reclassified Direct Issuance and advertising opportunities, from immediately-available opportunities that StubHub was poised to realize, per the Registration Statement, "today," to "longer-term growth opportunities" and "transformational long-term opportunit[ies]" that StubHub would remain unable to realize throughout the coming year and/or the foreseeable future.

123.    Specifically, the Shareholder Letter informed investors that:

Regarding our guidance for the year – StubHub's financial performance in 2026 will continue to be driven by our core resale marketplace, which constitutes the vast majority of our revenue. **Direct Issuance and Advertising remain compelling opportunities for us, but our FY2026 guidance does not assume any material revenue contribution from either initiative.**

With this context in mind, this letter has three objectives.

1.    Summarize our FY 2026 business progress and financial performance.

2.    Provide our FY 2026 outlook and guidance, which is grounded in our core resale business.

3.  **Explain how we think about longer-term opportunities like Direct Issuance and Advertising**.

                    *        *        *

**Longer-term Opportunities: Direct Issuance and Advertising** – We believe **Direct Issuance**—non-exclusive, open distribution of originally issued tickets— **remains a transformational long-term opportunity for StubHub** and the broader live event ecosystem. We have made progress through business development with marquee content rights holders across sports and music in multiple geographies, and we believe demand for this distribution model has been validated.

                    *        *        *

Similarly, our efforts to build our advertising business are showing promising early results as we leverage our unique advantages: a high-intent audience planning live event attendance, proprietary data across millions of events, and natural integration points for complementary services. Early partnerships have helped validate the

43

opportunity and are helping inform how we will scale advertising in a way that is truly additive by enhancing relevance and utility for customers. Our advertising business is generating modest revenue today, and we are continuing to iterate toward a model that enhances the seller and buyer experience.

We are taking a disciplined approach to both initiatives, prioritizing scalable execution. This measured path forward reflects our commitment to maintaining the marketplace experience that defines our competitive advantage while compounding shareholder value over the long term.

Shareholder Letter at 2, 4-5.

124.    According to the Shareholder Letter, this sudden reclassification of StubHub's Direct Issuance business from a near-term to a long-term prospect that would not generate any meaningful revenues in 2026 was purportedly due to the fact that StubHub had changed its strategy, such that the Company would: (1) transition from a pay-to-play model to a model that emphasized a more product-led strategy, *i.e.*, a strategy that made its Direct Issuance product more capable of meeting the needs of content rights holders; and (2) spend 2026 making the investments/improvements necessary to do so.  As the Shareholder Letter explained:

> **[W]e are evolving our Direct Issuance Strategy toward a more scalable, less capital-intensive growth model, which naturally reduces investment intensity.** In FY 2025, our catalogue growth strategy was defined primarily through a business development-led approach to establish relationships and bring inventory onto the platform. **Based on what we've learned about the needs of content rights holders, we are shifting more of our effort toward building a technology-enabled ecosystem that makes Direct Issuance easier to adopt and operate at scale across a broader set of rights holders**.

*    *    *

> **Looking ahead, our experience has reinforced that the largest market potential will come from making Direct Issuance frictionless to adopt across a much broader range of rights holders**. **That requires reducing operational friction** for partners with varying levels of technological sophistication – and advances in artificial intelligence are materially expanding what is now practical to build on the supply side. By leveraging these advancements, we believe we can bring capabilities to market that would have been difficult to deliver even a year ago—including AI-assisted tools that automate workflows and simplify inventory management.

44

> **For FY2026, we are prioritizing building the product foundation required to scale Direct Issuance broadly. Accordingly, we are shifting from a primarily business development-led strategy to a more product-led strategy**: building an AI-enabled, technology-driven ecosystem that enables inventory to be contributed and managed with minimal operational burden. Development is underway to bring these supply-side products to market. **We believe this approach positions Direct Issuance to become a durable growth engine when this self-serve capability is in place. This strategy shift means we will not be optimizing for immediate revenue growth, but for maximizing our revenue opportunity over the long-term**.

Shareholder Letter at 4-5.

125.    During StubHub's March 4, 2026 conference call with analysts and investors, analysts pressed StubHub and Defendants Baker and James for more fulsome explanations as to why Direct Issuance and advertising were no longer viewed as near-term opportunities expected to produce material near-term financial benefits.  In his responses, Defendant Baker reiterated that StubHub's products for Direct Issuance and advertising were not yet ready for effective market deployment, and required further development and testing before they could be introduced effectively into the market.

126.    For example, when questioned by Evercore analyst Mark Mahaney about when advertising would begin to generate material top- and bottom-line benefits, Defendant Baker explained that StubHub's advertising products were not yet ready for market deployment and would require further development and refinement throughout 2026:

> Let me give you first on the advertising piece, what has evolved and how we've made some deliberate decisions in terms of how we're thinking about the strategy and timing there. I'll walk you through that and then Connie can address sort of how that fits into guidance. So advertising, big opportunity for us. We know that we have a great group of users and folks on the site that have very a passionate and clear intent that people want to reach. We also know we have a bunch of sellers on the platform who have a perishable item and they want to get their ticket in front of the right buyers. So there's a lot of demand and interest for that.
>
> **We always said that we have to get that right in terms of the customer experience, experience for the buyer and the seller and in how it fits in our business before we're going to scale it up. And therefore, we did what we said**

45

**we were going to do, which is in the fourth quarter we started rolling out the ad product, sponsored listings as well. And we saw a good reaction from sellers to that. We started generating revenue and testing. What we realized in our thinking is we said, gosh, it's very important that we get this right to maximize the experience for the long term and maximize the business model for the long term so that we create maximum value for the participants in our ecosystem as well as for our shareholders. And in doing that, we've come to the determination that we want to spend more time working that through, working the product through and experimenting with it in this coming year**.

127.    Likewise, when similarly questioned by JP Morgan analyst Doug Anmuth as to the advent of Direct Issuance, Defendant Baker provided effectively the same answer – that StubHub's Direct Issuance product was not ready for market deployment and/or market success:

Q - Douglas Anmuth (JP Morgan analyst)

And then if I could just follow-up on direct issuance. **You've kind of talked in the past about like '26 being a potentially industry inflection point. And now obviously there's a strategy shift that's taking place. I guess what has changed most here in your view on the outlook and progress for direct issuance?**

A - Eric H. Baker

Sure. Thank you for the question, Doug. And let me walk you through what's evolved on direct issuance and what we've seen and why we've made this deliberate decision to shift to the product development for this year. So just for everyone, again to set the context, direct issuance for us is this belief in this open distribution. Content is going to want to come, sell their tickets directly over StubHub and use our data and distribution to do so. We've had great success with folks like the Yankees, Ambassador Theatre Group, and others to prove this out.

**And as in the past six months, as we've gone out and we've been excited about it, there's a lot of, we believe, demand and enthusiasm for it. And quite frankly, we've been very excited about how broad and deep that is, by which I mean there's a long tail of different types of events and a great breadth of them. What we have found, Doug, in going through it with the team, is that really, we think one of the key unlocks [sic] to unlock it even faster is eliminating friction on the product side, make it easy for people to use the product and technology because the will is there, everything makes sense, and that really unlocks more of what we talked about with a number of customers we had seen, where you have this self-serve ecosystem which is a great solution for the customer.**

It's also a great business model that scales very nicely, **and so as we looked at and we sat down, we said, really, with what's going on, we should focus in '26 on**

46

**developing that product, particularly with the fact that given everything going on with AI, there's a real chance to advance those tools quickly and to get them to a good place. As a result, that does mean that we are deliberately shifting to a longer-term focus. We think we will create more value in the long term rather than focusing on the short-term revenue creation this year**.

March 4, 2026 StubHub FQ4 Earnings Call, Bloomberg Tr. at 10.

128.    Notably, during the conference call, Defendant Baker purported to assert that StubHub decided to change its strategy, which resulted in Direct Issuance going from an immediate to a long-term opportunity, during the few months following the IPO:

**[O]ur first several months as a public Company have provided valuable perspective on our strategy** to unlock new market opportunities. We believe **direct issuance**, non-exclusive, open distribution of originally issued tickets, **remains a transformational long-term opportunity for StubHub** and the broader live event ecosystem.

March 4, 2026 StubHub FQ4 Earnings Call, Bloomberg Tr. at 3; *see also id.* at 8 (discussing how StubHub's Direct Issuance strategy "evolved" purportedly "in the past six months").

129.    But Baker's purported explanation – that StubHub had suddenly changed its strategy post-IPO – is flatly irreconcilable with StubHub's repeated touting of its near-term Direct Issuance opportunity in its Registration Statement.  Indeed, as the Registration Statement makes clear, the twin pillars of StubHub's purported post-IPO strategy – phasing out pay-to-play arrangements and improving its Direct Issuance product for use by content rights holders – **were already in place prior to the IPO**.

130.    Indeed, StubHub's Registration Statement disclosed that StubHub had already largely phased-out its pay-to-play arrangements (noting that only 10% of its Direct Issuance GMS in 2025 came from such arrangements, down from 50% in 2024), and that it would be continuing to invest in and improve its Direct Issuance product for use by all manner of content rights holders.

131.    For example, with respect to the play-to-play arrangements, the Prospectus disclosed that:

47

> To help accelerate content rights holders' adoption of our marketplace as a distribution channel for original issuance tickets, we initially entered into agreements with certain content rights holders to reduce the perceived operational burden and economic risk of utilizing our marketplace . . . .  As our marketplace continues to demonstrate its value as a distribution channel for original issuance tickets, **we are phasing out the use of arrangements with content rights holders that result in us assuming any inventory risk. In the first half of 2025, less than 10% of our direct issuance GMS was derived from sales of tickets for which we assumed any amount of inventory risk**.

Prospectus at 9; *see also id.* at 133 ("In 2024, we surpassed $100 million of annual direct issuance GMS, **approximately 50% of which was derived from sales of tickets for which we assumed any amount of inventory risk**.").

132.    Similarly, with respect to StubHub's Direct Issuance platform, the Registration Statement stated that:

> Similarly, while our seller products today are primarily focused on inventory management and pricing intelligence for the secondary market, **we plan to add additional features to our seller products and tools to continue reducing friction for sellers, including content rights holders with larger ticket portfolios, to list and sell their tickets on our marketplace**.

Prospectus at 142.

> We are in the early innings of targeting the original issuance ticketing market and bringing content rights holders to our platform. Our vision for direct issuance is that content rights holders will list tickets directly on our marketplace as any other seller would at scale. While we are aware that certain content rights holders have historically used our marketplace from time to time, the supply side of our platform has been built primarily to service individual sellers and professional sellers in the secondary ticketing market. **We are focused on expanding the supply on our marketplace to include original issuance tickets and aim to expand our offerings to include a full suite of product features to better service content rights holders to allow them to seamlessly manage the pricing and distribution strategies for their larger ticket portfolios**.

*Id.* at 8; *see also id*. at 132 (same).

133.    Notwithstanding these strategy shifts identified in the Registration Statement, StubHub continued to characterize growth in its Direct Issuance business as a near-term

opportunity while stressing that its product-technology infrastructure **as it existed at the time of the IPO was "well-positioned" to take advantage of that opportunity**.

134.    Thus, post-IPO, **nothing** had changed with respect to StubHub's Direct Issuance strategy.  Rather, at the time of the IPO, that strategy had already been in place since at least 2024 (when the percentage of its Direct Issuance GMS attributable to pay-to-play arrangements began decreasing sharply), and Defendants misrepresented the state and prospects of the Company's Direct Issuance business, including by  failing to disclose to investors that: (1) StubHub's Direct Issuance product was not in fact ready for widespread use by content rights holders; (2) that it would not be ready in 2026; and (3) that, as a result, its strategy rendered Direct Issuance a long-term, rather than near-term, prospect that would not generate any meaningful revenue for all of 2026.

135.    Ahead of Q4 2025 results, analysts like TD Cowen expected "strong growth in '26," supported in part by the "ramping Direct Issuance (DI) business."  Analysts were left perplexed at how StubHub's strategy could have shifted so abruptly.  For example, on March 5, 2025, Craig-Hallum noted that it was "**puzzled** at how these product development changes [to the Direct Issuance business] were not apparent [to StubHub management] a few months ago."[16]  Wedbush downgraded shares of StubHub, noting that "**management's lofty expectations** for the [Direct Issuance] segment [was] unable to materialize as anticipated."[17]

---

[16] Ryan Sigdahl and Matthew Raab, *StubHub Holdings, Inc. (STUB) – Materially Worse FY26 Guidance, Narrative Shifts To Long-Term Opportunities. Maintain HOLD, Lowering Price Target to $9*, Craig-Hallum Equity Research (Mar. 5, 2026), at 1.

[17] Scott Devitt, Matthew Weiss, and Chase Tohanczyn, S*tubHub Holdings (STUB) – Downgrading to Neutral; PT to $10*, Wedbush Equity Research (Mar. 5, 2026), at 1.

136. In response to these revelations, on March 5, 2026, StubHub shares fell by $1.26 to close trading at $8.91 (a one-day decline of 12.9% from their March 4, 2026 closing price of $10.17).

## VI. THE REGISTRATION STATEMENT'S FALSE AND/OR MISLEADING STATEMENTS

137. As set forth below, StubHub's IPO Registration Statement was: (1) negligently prepared, and as a result contained untrue statements of material facts or omitted state other facts necessary to make the statements made not misleading; and (2) not prepared in accordance with the rules and regulations governing its preparation, including SEC rules and regulations requiring disclosure of knowns trends, events or uncertainties that were having or were reasonably likely to have an impact on the registrant's continuing operations.

### A. False and Misleading Statements Regarding Direct Issuance Being a Near-Term Opportunity and Part of StubHub's Serviceable Addressable Market

138. As set forth in Section V.D.I, *supra*, Defendants' Roadshow Deck marketing the IPO focused substantially on StubHub's instant, near-term "market opportunity" in the Original Issuance Ticketing Market, and presented that opportunity as one of the primary drivers of a sharply positive inflection in StubHub's near- and medium-term revenues, margins and earnings. *See* Roadshow Deck at 11-16, 20-22, 25 and 28. That narrative was repeated in the Registration Statement's discussion of StubHub's Serviceable Addressable Market (or SAM) and Total Addressable Market (or TAM).

139. Specifically, the Registration Statement defined StubHub's SAM to encompass **instant, near-term** market opportunities (ones that StubHub could access "today"), which it differentiated from its TAM, which it defined to encompass not just its SAM, but also more aspirational market opportunities that StubHub could **not** access immediately but could potentially enter in the longer term:

We view our market opportunity in terms of **a Serviceable Addressable Market ("SAM"), which we address today**, and a Total Addressable Market ("TAM"), which we believe we can address over the long term.

Prospectus at 10.

140. The Registration Statement further explained that StubHub categorized the Original Issuance Ticketing Market – which was the *sin qua non* of its Direct Issuance strategy – as part of its SAM, along with its opportunities in the Secondary Ticketing Market:

> We view our market opportunity in terms of a Serviceable Addressable Market ("SAM"), which we address today, and a Total Addressable Market ("TAM"), which we believe we can address over the long term. **Our SAM today includes the global markets for secondary, original issuance and unsold tickets**. We believe we are the leader in the $18 billion North American secondary ticketing market based on our GMS for 2024 as compared to similar metrics of our largest competitors for 2024. See "Glossary" for additional information. We believe we are also the category leader in the international secondary ticketing market due to the fragmented, localized and offline nature of the existing international market for secondary ticket sales. We believe the international secondary ticketing market represents a $23 billion opportunity over the medium term as these markets continue to be penetrated by global digital commerce. **We are also growing in the $132 billion global original issuance ticketing market and believe we can help enable the distribution and recovery of approximately $22 billion in unsold tickets through our marketplace. Together these markets represent our SAM, which we estimate to be $194 billion.**

Prospectus at 10 (and repeated at 135).

141. The Registration Statement further conveyed the immediacy of the opportunity presented by Direct Issuance and the Original Issuance Ticketing Market by stressing how numerous "marquee" content rights holders had already been using StubHub's Direct Issuance product, and equating such use of its platform to its use by participants in the Secondary Ticketing Market:

> **Several marquee content rights holders, including teams in major U.S. and international professional sports leagues as well as major musical artists and festivals, have already begun selling original issuance tickets through our marketplace**. In 2024, we surpassed $100 million of annual direct issuance GMS, approximately 50% of which was derived from sales of tickets for which we assumed any amount of inventory risk.

Prospectus at 133.

> **Content rights holders can leverage our global reach, trusted brands and marketing expertise** to maximize their distribution and use our wealth of marketplace data to inform intelligent pricing strategies to optimize yield on their ticketing inventory, **much in the same way individual sellers and professional sellers use our ticketing marketplace for secondary ticketing transactions**.

*Id.* at 8 (repeated at 132).

> Our marketplace **enables sellers of all types, including individual fans, professional sellers and content rights holders**.

*Id.* at 4 (repeated at 128).

> We are even more excited about the larger opportunity to build the global destination for consumers to access live events and experiences, which represents a global market opportunity that is significantly larger than secondary ticketing. **Having surpassed $100 million in annual direct issuance GMS in 2024, we are in the early stages of what we believe will be a major disruption to the way original issuance tickets are distributed. We believe that we are well-positioned to enable more categories of live events and experiences on our marketplace**, further monetize ancillary revenue streams and play an even more vital role in the ecosystem in the future.

*Id.* at 10-11 (and repeated at 135).

142.    The statements identified in ¶¶ 138-41, *supra*, concerning the near-term nature and imminency of StubHub's Direct Issuance/Original Issuance Ticketing Market opportunities were materially false and/or misleading when made, because they: (1) were not in fact achievable or even available in the near-term, but were, as StubHub subsequently admitted, long-term opportunities that StubHub would not be able to exploit for the entirety of 2026; and (2) omitted to disclose material facts indicating the opposite, namely, that at the time of the IPO, StubHub's Direct Issuance platform was immature, incomplete and **not** ready for widespread commercial deployment, and consequently Direct Issuance would not and could not produce any near-term material financial benefit or growth.

52

143.    Indeed, after the IPO, during StubHub's March 4, 2026 conference call, Defendant Baker conceded that StubHub's Direct Issuance platform: (1) was still not ready for deployment in March 2026, nearly six months later; (2) still required yet more time for further testing and development before StubHub would have an appropriate, workable product to deploy commercially; and thus (3) would not allow StubHub to grow GMS through Direct Issuance for the entirety of 2026.

144.    And while Defendant Baker attempted to claim that a purported post-IPO change in strategy was the basis for StubHub's sudden and jarring recategorization of its Direct Issuance/Original Issuance Ticketing Market opportunities as "long-term," the Registration Statement itself makes clear that those strategies – namely, StubHub's transition from pay-to-play arrangements and focus on improving its Direct Issuance platform to better serve the needs of content rights holders – were already in place well before the IPO.  *See* Section V.F.2, *supra*.

### B.    Statements Regarding the Readiness of Its Direct Issuance Platform for Broader Adoption by the Direct Issuance Ticketing Market

145.    As set forth in Section V.D.1, *supra*, during their Roadshow presentations, Defendants marketed the IPO by stressing StubHub's purportedly imminent and fast-ramping entry into the much-larger Original Issuance Ticketing Market, *via* broadening adoption of a non-exclusive "direct issuance" ticketing model, as a growth driver that would cause StubHub's revenues and EBITDA to sharply accelerate in the near and medium term, from 2026 onwards.

146.    Consistent with the Roadshow representations, the Registration Statement included numerous representations concerning the immediate usability of StubHub's Direct Issuance platform by content rights holders.  Indeed, StubHub repeatedly stressed that its technology infrastructure was well-positioned to take immediate advantage of the large Original Issuance Ticketing Market:

53

**Expand Adoption of Our Platform for Direct Issuance**

We are in the early innings of targeting the original issuance ticketing market and bringing content rights holders to our platform. Our vision for direct issuance is that content rights holders will list tickets directly on our marketplace as any other seller would at scale. In 2024, we surpassed $100 million of annual direct issuance GMS. We intend to continue to grow our relationships with content rights holders and invest in growing our engaged audience of fans to power our distribution and accelerate our audience-content flywheel. **We believe our value proposition, providing broadened distribution and superior pricing intelligence through an open distribution model, is well-positioned to attract more content rights holders to use our marketplace**.

Prospectus at 13 (repeated at 141).

**Our Market Opportunity**

We believe we are the category leader in the large and growing global secondary ticketing market, where we generated substantially all of our GMS in 2024. We believe we have a major growth opportunity ahead of us in secondary ticketing alone. We are even more excited about the larger opportunity to build the global destination for consumers to access live events and experiences, which represents a global market opportunity that is significantly larger than secondary ticketing. Having surpassed $100 million in annual direct issuance GMS … in 2024, we are in the early stages of what we believe will be a major disruption to the way original issuance tickets are distributed. **We believe that we are well-positioned to enable more categories of live events and experiences on our marketplace, further monetize ancillary revenue streams and play an even more vital role in the ecosystem in the future**.

*Id.* at 10 (and repeated at 135).

Consumers do not care whether a ticket is an original issuance ticket or a secondary ticket; they just want a single, trusted and reliable destination to buy any ticket for any event, anywhere in the world, in any language, with any currency, through any device. Content rights holders simply want to maximize revenue and attendance by reaching the largest possible audience and accessing the best data to price intelligently. **We believe we have built a platform that is well-positioned to tackle these wants,** and in doing so, we believe StubHub can become the destination fans will turn to for access to every ticket, every event and every option on demand.

*Id.* at 124.[18]

---

[18] *See also* Prospectus at 10, 135 (further relevant usage of "well-positioned" terminology).

54

147.    StubHub further reinforced the commercial readiness of its Direct Issuance platform for widespread adoption in the Original Issuance Ticketing Marketplace – equating content rights holders' use of Direct Issuance to its well-established business in the Secondary Ticketing Market – and promoted such usage by touting the fact that several marquee sports teams and musical acts had already used Direct Issuance to sell original issuance tickets:

> **Content rights holders can leverage our global reach, trusted brands and marketing expertise to maximize their distribution** and use our wealth of marketplace data to inform intelligent pricing strategies to optimize yield on their ticketing inventory, **much in the same way individual sellers and professional sellers use our ticketing marketplace for secondary ticketing transactions**.

Prospectus at 8 (repeated at 132).

> **Our marketplace enables sellers of all types, including individual fans, professional sellers and content rights holders. Sellers on our marketplace can use our technology, distribution, data and brand to reach passionate fans and price tickets efficiently**. **Content rights holders can also better fill seats in their venues by accessing the richest live event market dataset to inform dynamic pricing to sell tickets that may not otherwise sell**. We manage end-to-end services for our sellers, including marketing, payments, fulfillment and customer support, making it easy for any seller to create a listing, set a price and allow us to market it to fans.

*Id.* at 4 (repeated at 128).

> **Several marquee content rights holders, including teams in major U.S. and international professional sports leagues as well as major musical artists and festivals, have already begun selling original issuance tickets through our marketplace, and we believe we are positioned to further penetrate this market.**

*Id.* at 137.

148.    The statements identified in ¶¶ 145-47, *supra*, that StubHub's Direct Issuance infrastructure was ready for and well-positioned for wider adoption by content rights holders, were materially false and/or misleading when made, because **at the time of the IPO**, StubHub's Direct Issuance platform was immature, incomplete and **not** ready for widespread commercial

55

deployment, and consequently Direct Issuance would not and could not produce any near-term material financial benefit or growth.

149.     Indeed, after the IPO, during StubHub's March 4, 2026 conference call, Defendant Baker conceded that StubHub's Direct Issuance platform: (1) was still not ready for deployment in March 2026, nearly six months later; (2) still required yet more time for further testing and development before StubHub would have an appropriate, workable product to deploy commercially; and thus (3) would not allow StubHub to grow GMS through Direct Issuance for the entirety of 2026.

150.     And while Defendant Baker attempted to claim that a purported post-IPO change in strategy was the basis for StubHub's sudden and jarring recategorization of its Direct Issuance/Original Issuance Ticketing Marketing opportunities as "long-term," the Registration Statement itself makes clear that those strategies – namely, StubHub's transition from pay-to-play arrangements and a focus on improving its Direct Issuance platform to better serve the needs of content rights holders – were already in place well prior to the IPO.  *See* Section V.F.2, *supra*.

C.     **Statements Concerning the Imminency of StubHub's Expansion in the Original Issuance Ticketing Market**

151.     As noted above, *see* Section VI.A, *supra*, the Registration Statement identified Direct Issuance as part of StubHub's Serviceable Addressable Market – *i.e.*, a market opportunity that StubHub was ready to "address today" (in contradistinction to the opportunities in StubHub's Total Addressable Market that StubHub could only address in the "long term").  *See* ¶ 139, *supra*; Prospectus at 10-11, 135.

152.     The Registration Statement further reinforced the notion that StubHub's expansion in the Original Issuance Ticketing Market was imminent, explaining that StubHub stood at the

cusp of realizing its Direct Issuance opportunities, which StubHub's scale and technology had

purportedly "unlock[ed]":

> Our Mutually Reinforcing Flywheels
>
> The success of our marketplace and our ability to attract supply and demand is accelerated by our mutually reinforcing flywheels that create a powerful network effect for our business. **The combination of our end-to-end technology, global distribution and data intelligence, enhanced by our category-defining brands, gives rise to multiple flywheel effects that enable our market share capture in secondary ticketing and unlock our opportunity in direct issuance and other adjacent markets**.
>
> *    *    *
>
> We believe our audience-content flywheel is in its beginning stages **as we increasingly target the original issuance ticketing market.** We expect this flywheel to accelerate as we invest in strategies to propel us towards our vision of becoming the global destination for consumers to access live events and experiences, **offering content rights holders powerful distribution and monetization capabilities. Consequently, we believe this positions us to disrupt the legacy primary ticketing model and unlock a vastly expanded market opportunity**.

Prospectus at 6 (and repeated at 130); Prospectus at 8 (and repeated at 132).

153.    Encapsulating many of the above-identified representations, the Registration

Statement also represented that StubHub's Direct Issuance platform functioned to solve content

rights holders' problems and positioned StubHub to "further penetrate" the Original Issuance

Ticketing Market:

> We estimate the global original issuance ticketing market consists of $132 billion in annual ticket sales globally as of 2024 based on public event attendance data across major sports leagues, eSports, theaters and performance art venues and music festivals and concerts around the world. **We see the opportunity for our global ticketing marketplace to help content rights holders and fans solve problems created by the legacy primary ticketing model which we believe does not meet the needs of fans or content rights holders. We believe our model represents a better solution to serve all stakeholders by maximizing revenue and attendance for content rights holders.** We do not require exclusivity with our marketplace, meaning that tickets may be listed for sale simultaneously on our marketplace as well as other channels, including a venue's legacy primary ticketing provider and other ticketing marketplaces, to achieve the broadest possible

57

distribution. **Several marquee content rights holders, including teams in major U.S. and international professional sports leagues as well as major musical artists and festivals, have already begun selling original issuance tickets through our marketplace, and we believe we are positioned to further penetrate this market**.

Prospectus at 137.

154.   The Registration Statement representations identified in ¶¶ 152-53 above concerning StubHub's readiness for imminent and material entry into the Original Issuance Ticketing Market were false and/or misleading when made, because they misrepresented the commercial and operational readiness of StubHub's Direct Issuance platform and omitted to disclose material facts indicating the opposite – namely, that **at the time of the IPO**, StubHub's Direct Issuance platform was immature, incomplete and **not** ready for commercial deployment, and consequently Direct Issuance would not and could not provide any near-term material financial benefit or growth.

155.   Indeed, as the StubHub Defendants conceded after the IPO, StubHub's Direct Issuance platform: (1) was still not ready for deployment in March 2026, nearly six months later; (2) even then (*i.e.*, March 2026), still required substantial further time for further development before StubHub would have an appropriate, workable product to deploy commercially; and thus (3) would not and could not allow StubHub to grow GMS through Original Issuance Ticketing Market entry in any material way throughout 2026 (at least).  *See* Section V.F.2, *supra*.

156.   And while Defendant Baker attempted to claim that a purported post-IPO change in strategy was the basis for StubHub's sudden and jarring recategorization of its Direct Issuance/Original Issuance Ticketing Marketing opportunities as "long-term," the Registration Statement itself make clear that those strategies – namely, StubHub's transition from pay-to-play arrangements and a focus on improving its Direct Issuance platform to better serve the needs of content rights holders – were already in place well prior to the IPO.  *See* Section V.F.2, *supra*.

58

### D.    Misstatements Concerning StubHub's Advertising Prospects

157.    As set forth in Section V.D.1, *supra*, Defendants, during the Roadshow, presented StubHub's purportedly imminent and fast-ramping entry into advertising – *i.e.*, selling display ads on StubHub's website to marketers desirous of reaching StubHub consumers, and selling "sponsored listing" opportunities to StubHub ticket sellers (*e.g.*, providing premier placement on event webpages to increase seller exposure) – as a second growth driver that would cause StubHub's revenues and EBITDA to sharply accelerate in the near and medium term, between 2026 and 2030.

158.    Consistent with such Roadshow representations, the Registration Statement: (1) identified advertising as one of StubHub's core opportunities for growth; and (2) represented StubHub's advertising opportunity to be both material and imminent.

159.    First, although StubHub did not define those opportunities as part of its SAM, the Registration Statement nevertheless distinguished advertising from all other components of StubHub's TAM (such as sports betting, sports merchandise, and leisure attractions and experiences) as a market opportunity that StubHub could access easily and in the "near-term," and even discussed it as a percentage of the Company's SAM:

> *Digital Advertising Market*
>
> We believe that the range of options to enable advertising through our marketplace and network of customers is broad, and that the scale, depth and high purchasing intent of our user engagement provides an attractive opportunity to advertise and sell into our customer base. Based on the disclosed metrics of peer global digital marketplaces, **we estimate our near-term opportunity to be approximately 10% of our SAM, or $19 billion**. We believe this will enable us to sell display ads and promoted listings, among other advertising opportunities. **Given the existing infrastructure and traffic, we believe that further monetizing our marketplace through advertising will require minimal incremental investment**.

Prospectus at 137 (*see also id*. at 13, 142).

160.    These statements were materially false and/or misleading because as StubHub subsequently admitted during its Q4 2025 conference call, its advertising platform was immature, incomplete and not ready for commercial deployment, but instead required substantial retooling.

161.    The Registration Statement further represented that StubHub's estimated "near term" advertising opportunity was quite sizable (multiple billions of dollars), requiring only "minimal incremental investment":

> *Digital Advertising Market*
>
> We believe that the range of options to enable advertising through our marketplace and network of customers is broad, and that the scale, depth and high purchasing intent of our user engagement provides an attractive opportunity to advertise and sell into our customer base. Based on the disclosed metrics of peer global digital marketplaces, **we estimate our near-term opportunity to be approximately 10% of our SAM, or $19 billion**. We believe this will enable us to sell display ads and promoted listings, among other advertising opportunities. **Given the existing infrastructure and traffic, we believe that further monetizing our marketplace through advertising will require minimal incremental investment**.

Prospectus at 137.

> **Improve the Monetization of Our Marketplace Through Advertising**
>
> There are meaningful sources of additional monetization of our marketplace activity that we do not offer today and intend to offer in the future. For example, **we believe that the range of options to enable advertising on our marketplace is broad**, and that the scale, depth and high purchasing intent of our user engagement provide an opportunity to sell banner ads and promoted listings, among other types of advertising, in a similar manner to other scaled digital marketplaces. **Given the existing infrastructure and traffic on our marketplace, we believe that monetizing through advertising will require minimal incremental investment**.

*Id.* at 142.

162.    The Registration Statement representations identified in ¶¶ 159-61 above concerning StubHub's advertising strategy and opportunity were materially false and/or misleading when made, because they: (1) presented StubHub's advertising opportunity as imminent and without material obstacle; and (2) omitted to disclose material facts indicating the

opposite – namely, that at the time of the IPO, StubHub's advertising product was immature, incomplete and **not** ready for deployment, and consequently that advertising would not and could not provide any near-term material financial benefit or growth.

163. Indeed, as the StubHub Defendants later revealed after the IPO, advertising: (1) was still not ready for deployment in March 2026, nearly six months later; (2) even then (*i.e.*, March 2026), still required yet more time for further testing and development before StubHub would have an appropriate, workable product to deploy; and thus (3) would not and could not allow StubHub to further "monetize" its platform in any material way throughout 2026. *See* Section V.F.2, *infra.*

**E.    Misstatements Concerning StubHub's Free Cash Flow**

164. StubHub's Registration Statement identified free cash flow ("FCF") as one of three "key business metrics" and/or "non-GAAP financial measures" (along with GMS and adjusted EBITDA, discussed above) that management believed useful for evaluating StubHub's business and operations. *See* Prospectus at 23, 98, 103-104. Specifically, as Defendants explained in the Registration Statement, FCF provided "a **meaningful indicator** of liquidity for management and investors" because it represented "the amount of cash generated from operations that, after capital expenditures, can be used for strategic initiatives, including continuous investment in our business and strengthening our balance sheet." Prospectus at 103.

165. In light of FCF's materiality, the Registration Statement consequently disclosed StubHub's FCF for the most recent three complete fiscal years (2022, 2023 and 2024), as well as for the first six months of 2025, as follows:

| Table 5: StubHub Key Business Metrics and Non-GAAP Financial Measures | | | | | |
|---|---|---|---|---|---|
| | **Six Months Ended June 30,** | | **Year Ended Dec. 31,** | | |
| | **2025** | **2024** | **2024** | **2023** | **2022** |
| **Free Cash Flow** | $160,826 | $395,133 | $255,110 | $301,954 | $ (49,827) |

*See* Prospectus at 23, 98, 103.

166.    Notwithstanding such disclosures, the Registration Statement was nonetheless misleading because it did not disclose that StubHub's FCF would not only continue to trend downward in Q3 2025, but that the trend would **accelerate, resulting in a negative FCF**.  Indeed, when StubHub revealed its Q3 2025 financial results after the IPO, StubHub disclosed that FCF had decreased by 135% year-over-year in the third quarter (compared to a decrease of 50% year-over-year in the second quarter) to -$4.6 million.  According to StubHub's Q3 2025 quarterly report on Form 10-Q filed with the SEC, the purported reason FCF decreased was changes in the timing of StubHub's payments to vendors.

167.    Given that the IPO took place just **two weeks** before the close of the third quarter, and given that StubHub was undoubtedly aware of the timing of its own payments under its agreements/arrangements with its own vendors, StubHub had to have been aware of the massive third quarter decrease in its FCF at the time of the IPO, but negligently failed to disclose that information.

### F.    Violations of Item 303 of Regulation S-K

168.    Defendants also violated their affirmative obligations to provide certain material information in these offering documents as required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), which requires companies to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable and unfavorable impact on net sales or revenues or income from continuing operations."

169.    In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the

62

registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

\*        \*        \*

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

170.    Further, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, **event or uncertainty** is known, management must make two assessments:

(1)    Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2)    If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

171.    Item 303 thus requires disclosure of known trends, events, *or* uncertainties that are **reasonably likely to have a material effect** on the company's financial condition or operational results.  Here, the failure of the Registration Statement to disclose the facts detailed in ¶¶ 113-36 violated Item 303 because these undisclosed adverse events, trends and uncertainties were known to Defendants and were reasonably likely to have, and did have, a materially adverse effect on the Company's financial condition, revenue and income.  For example, as detailed in ¶¶ 113-36, several known adverse trends, events and/or uncertainties were then-impacting and reasonably likely to impact StubHub's financial condition at the time of the Offering, including, *inter alia*:

- StubHub's inability to further penetrate the Original Issuance Ticketing Market at the time of the IPO, particularly given the: (1) underdeveloped status of the Company's Direct Issuance platform, which was (and is still) not ready for widespread commercial deployment; and (2) refusal of content rights holders to

63

adopt (or signal adoption in the near- or mid- term) StubHub's platform or marketplace on a widespread basis as evidenced by, for example, the failure of StubHub's pay-to-play or other strategies to generate further adoption;

- StubHub's inability to achieve its touted near- and mid-term digital advertising growth opportunity and revenue projections at the time of the IPO, including due to the StubHub Defendants' failure to position the Company to monetize its marketplace and the "high purchasing intent of [StubHub's] user engagement" by virtue of selling, *inter alia*, banner ads and promoted listings;

- That the material decline of StubHub's FCF at the time of the IPO – just two weeks before the close of the third quarter – would continue into and throughout the third quarter and result in FCF turning negative; and

- As a result of the foregoing then-existing developments, trends, events and/or uncertainties, the Company's forecasted growth prospects, market opportunity and financial condition deviated radically from those presented to investors in the Registration Statement.

172. These trends, events and/or uncertainties were known to Defendants, because: (1) the StubHub Defendants had already shifted their strategy away from the pay-to-play model – which Baker later claimed was the reason for the delayed "disruption" of the Original Issuance Ticketing Market – at the time of the IPO; (2) given the StubHub Defendants' purported "vastly expanded market opportunity" in the Original Issuance Ticketing Market, and by virtue of their roles as officers and directors of the Company, they would have been aware of both the market's near- and medium-term appetite to adopt or utilize StubHub's marketplace and the corresponding refusal by content rights holders to increase or initiate their usage of the marketplace and/or the Company's Direct Issuance product; (3) as one of StubHub's core opportunities for growth, and given its materiality and purported imminence, the StubHub Defendants – in their roles as Company executives and directors – would have been aware that the growth prospects from the Company's advertising opportunity were not as immediate and substantial as depicted in the Registration Statement; (4) given that the IPO took place shortly before the close of Q3 2025, and given StubHub's contractual obligations with its own vendors, the StubHub Defendants would

64

have been aware of the massive third quarter decrease in the Company's FCF at the time of the IPO; and (5) the Underwriter Defendants had a duty to conduct an adequate due diligence investigation in their role marketing and selling shares of StubHub in the IPO.

## G.      False and Misleading Risk Disclosures in the Registration Statement

173.    The Registration Statement contained and incorporated certain generalized and vague "Risk Factors," that claimed to warn of unrealized, future, risks.  While the risk factors warned that, "if any of these risks actually occur, our business, financial condition, results of operations and prospects could be harmed," they omitted then existing material facts that made the purported "risk factors" false and misleading.  Thus, the Registration Statement warned that events could or may happen in the future, while in reality, those risks were already occurring and had manifested as of the time of the IPO.

174.    For instance, the Registration Statement provided that:

> There can be no assurance that we will succeed in expanding the adoption of our platform for direct issuance or that any demand for future offerings or initiatives we may pursue, including additional live event and experience categories and adjacent market opportunities across the live event ecosystem, will exist, develop or be sustained. Further, these efforts entail investments in and resources spent on our systems and infrastructure, payments platform, and increased legal and regulatory compliance expenses, which could distract management and divert capital and other resources from our more established offerings. **If** we are unsuccessful in executing on our business strategy to reach more categories of events and experiences, including through direct issuance, our business and growth prospects **may** be harmed.

Prospectus at 28.

175.    The Registration Statement went on to provide that:

> **If** content rights holders are not convinced of the value proposition of our marketplace, **if** we are unsuccessful in building and maintaining relationships with content rights holders, or **if** we do so in a way that is not profitable or fails to compete successfully against our current or future competitors, we **may** be unable to realize the objectives of this business strategy or realize our anticipated value in the original issuance ticketing market.

*     *     *

Furthermore, the adoption of our platform for direct issuance is subject to a number of factors, some of which may be out of our control, including the ability or willingness of content rights holders to use our platform to sell original issuance tickets, our competitors' exclusivity rights governing ticket sales for certain events or venues or buyers' willingness to engage with our brands and marketplace as a source for original issuance ticket purchases. **If** we are not able to expand the adoption of our platform for direct issuance in a cost-effective manner, our growth prospects would be adversely affected.

Prospectus at 28-29.

176.    The statements identified in ¶¶ 174-75 *supra* concerning risk disclosures surrounding StubHub's market opportunities, infrastructure, and readiness for imminent and material entry into the Original Issuance Ticketing Market were materially false and/or misleading, because they warned of risks that already occurred, and omitted to disclose material facts indicating that, at the time of the IPO, StubHub's Direct Issuance platform was immature, incomplete and **not** ready for widespread commercial deployment, and thus, did not represent achievable or even available near-term opportunities, but were, as StubHub subsequently admitted, long-term opportunities that StubHub would not be able to exploit for the entirety of 2026.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM

### Violation of Section 11 of the Securities Act

### (Against All Defendants)

177.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

178.    This Count is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Defendants.

66

179.   The Registration Statement was inaccurate and/or misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.

180.   StubHub is the registrant and issuer of the common stock offered pursuant to Registration Statement in the IPO.  As such, StubHub is strictly liable under Section 11 of the Securities Act to Plaintiffs and the Class members for the Registration Statement's material misstatements and omissions.

181.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, without omissions of any material facts, and not misleading.

182.   The Individual Defendants signed the Registration Statement, were StubHub officers or directors at the time of the IPO, and are therefore statutorily liable under Section 11 of the Securities Act.

183.   The Individual Defendants had a duty to make a reasonable and diligent investigation into the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading.  By virtue of the Individual Defendants' failures to exercise reasonable care, the Registration Statement contained misstatements of material facts and omissions of material facts.  As such, the Individual Defendants are liable under Section 11 of the Securities Act to Plaintiffs and the Class.

184.   The Underwriter Defendants served as the underwriters for the IPO and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act.  As such, the Underwriter Defendants participated in the solicitation, offering, and sale of the common stock to

the investing public pursuant to the Registration Statement. As such, the Underwriter Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Underwriter Defendants had a duty to ensure that such statements were true and that there were no omissions of material fact that would make the statements misleading. By virtue of the Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misstatements of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, the Underwriter Defendants are liable under Section 11 of the Securities Act to Plaintiffs and the Class.

185. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, without omission of material facts, and not misleading.

186. By reason of the conduct alleged herein, each of the Defendants named in this claim are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiffs and the Class members within the scope of this cause of action pursuant to Section 11(f) of the Securities Act.

187. Plaintiffs and other members of the Class purchased StubHub shares in the IPO and/or pursuant and traceable to the defective IPO Registration Statement.

188. Plaintiffs and the Class have sustained damages. The value of StubHub common stock has declined substantially subsequent to, and due to, the Defendants' violations.

**SECOND CLAIM**

**Violation of Section 12(a)(2) of the Securities Act**

**(Against StubHub and the Underwriter Defendants)**

189.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

190.    By means of the defective Prospectus, StubHub and the Underwriter Defendants promoted, solicited and sold StubHub common stock to Plaintiffs and other members of the Class.

191.    The Prospectus contained untrue statements of material fact and omitted to disclose material facts, as detailed above.  Defendants owed Plaintiffs, and other members of the Class who purchased StubHub common stock pursuant to the prospectus, the duty to make a reasonable and diligent investigation of the statements contained therein, to ensure that such statements were true and that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus, as set forth above.

192.    Plaintiffs did not know, nor in the exercise of reasonable diligence could Plaintiffs have known, of the untruths and omissions contained in the Prospectus at the time Plaintiffs acquired StubHub common stock.

193.    By reason of the conduct alleged herein, StubHub and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiffs and other members of the Class who purchased StubHub common stock pursuant to the Prospectus sustained legal damages in connection with their purchases of the shares.  Accordingly, Plaintiffs and the other members of the Class have the right to rescind and recover the consideration

69

paid for their shares, with interest thereon or damages as allowed by law or in equity, and hereby tender their common stock to Defendants sued herein.  Class members who have sold their StubHub common stock seek damages to the extent permitted by law.

## THIRD CLAIM

### Violation of Section 15 of the Securities Act

### (Against the Individual Defendants)

194.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

195.    This count is brought by Plaintiffs pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the Class, against the Individual Defendants.

196.    The Individual Defendants participated in the preparation and dissemination of the Registration Statement, signed the Registration Statement, and otherwise participated in the process necessary to conduct the IPO.

197.    The Individual Defendants, by virtue of their offices, directorships and specific acts, were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of StubHub within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause StubHub to engage in the acts described herein.

198.    The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

199.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class within for damages suffered.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class representatives;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding rescission, disgorgement, or such other equitable or injunctive relief as deemed appropriate by the Court;

(d)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e)    Such other and further relief as the Court may deem just and proper.

## IX.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: April 6, 2026                Respectfully submitted,

                    **KIRBY McINERNEY LLP**

                    */s/ Andrew M. McNeela*
                    Andrew M. McNeela
                    Ira M. Press
                    Lauren K. Molinaro
                    250 Park Avenue, Suite 820
                    New York, NY 10177
                    Telephone: 212-371-6600
                    Email: amcneela@kmllp.com
                       ipress@kmllp.com
                       lmolinaro@kmllp.com

                    *Lead Counsel for Lead Plaintiff Edward Liu and the Proposed Class*

71

**ROBBINS GELLER RUDMAN & DOWD LLP**
Robert M. Rothman
Vincent M. Serra
William J. Geddish
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Email: rrothman@rgrdlaw.com
  vserra@rgrdlaw.com
  wgeddish@rgrdlaw.com

*Counsel for Additional Plaintiff Tushar Bajaj*

72

# EXHIBIT A



# Roadshow Presentation

September 2025

PRINTING, COPYING, AND DISTRIBUTION OF ROADSHOW MATERIALS IS STRICTLY PROHIBITED IP ADDRESS: 49.37.10.155 EMAIL: user@netroadshow.com

## Disclaimer

StubHub Holdings, Inc. (the "Company" or "we") has filed a registration statement (including a preliminary prospectus) on Form S-1 (the "Registration Statement") with the Securities and Exchange Commission (the "SEC") for the offering of securities to which this presentation (this "Presentation") and accompanying oral commentary relates, but the Registration Statement has not yet been declared effective. These securities may not be sold, nor may offers to buy be accepted, prior to the time the Registration Statement becomes effective. Before you invest in any securities of the Company, you should read the Registration Statement and any other documents the Company has filed (or will file) with the SEC for more complete information about the Company and the offering. You may get these documents for free by visiting the SEC's website at www.sec.gov. Alternatively, a copy of the preliminary prospectus relating to the offering may be obtained from: J.P. Morgan Securities LLC, c/o Broadridge Financial Solutions, 1155 Long Island Avenue, Edgewood, NY 11717 or by email at prospectus-eq_fi@jpmchase.com and postsalemanualrequests@broadridge.com, and Goldman Sachs & Co. LLC, Attention: Prospectus Department, 200 West Street, New York, NY 10282, by telephone at (866) 471-2526, or by email at Prospectus-ny@ny.email.gs.com.

## No Offer or Solicitation

This Presentation and accompanying oral commentary does not constitute an offer to sell or the solicitation of an offer to buy securities, and shall not constitute an offer, solicitation, or sale in any jurisdiction in which such offer, solicitation, or sale would be unlawful prior to registration or qualification under the securities laws of that jurisdiction. Any offers, solicitations or offers to buy, or any sales of securities must be made in accordance with the Securities Act and applicable SEC regulations, including prospectus regulations. Any such offering of securities will only be made by means of a registration statement (including a prospectus) filed with the SEC, after such registration statement becomes effective. No such registration statement has become effective as of the date of this Presentation.

## Cautionary Statement Regarding Forward-Looking Statements

This Presentation and accompanying oral commentary contains forward-looking statements about us and our industry that involve substantial risks and uncertainties. These forward-looking statements reflect our current views with respect to, among other things, future events and our future business, financial condition and results of operations. These statements are often, but not always, made through the use of words or phrases such as "aim," "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "outlook," "plan," "potential," "predict," "project," "seek," "should," "will" and "would" or the negative version of those words or phrases or other comparable words or phrases of a future or forward-looking nature. These forward-looking statements are not statements of historical fact, and are based on current expectations, estimates and projections about our industry as well as certain assumptions made by management, many of which, by their nature, are inherently uncertain and beyond our control. For example, all statements we make regarding our expected market opportunity, growth, initiatives, or strategies are forward-looking statements. We caution you that the foregoing list is not exhaustive and may not contain all the forward-looking statements made in this Presentation. All forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those indicated in these statements.

You should not rely upon forward-looking statements as predictions of future events. We have based the forward-looking statements contained in this Presentation primarily on our current expectations and projections about future events and trends that we believe may affect our business, financial condition, results of operations and prospects. We derive many of our forward-looking statements from our operating budgets and forecasts, which are based on many detailed assumptions. While we believe that our assumptions are reasonable, we caution that it is very difficult to predict the impact of known factors, and it is impossible for us to anticipate all factors that could affect our actual results. New risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this Presentation. The forward-looking statements included in this Presentation are made only as of the date hereof and are expressly qualified in their entirety by the cautionary statements included in this Presentation.

Neither the Company nor J.P. Morgan Securities LLC and Goldman Sachs & Co. undertake any obligation to update or revise any forward-looking statement as a result of new information, future events or otherwise, except as otherwise required by law.

## Market and Industry Data

This Presentation includes estimates regarding market and industry data. Unless otherwise indicated, information concerning our industry and the markets in which we operate, including our general expectations, market position, market opportunity and market size, are based on our management's knowledge and experience in the markets in which we operate, together with currently available information obtained from various sources, including publicly available information, industry reports and publications, surveys, our customers, trade and business organizations and other contacts in the markets in which we operate. Certain information is based on management estimates, which have been derived from third-party sources, as well as data from our internal research. In presenting this information, we have made certain assumptions that we believe to be reasonable based on such data and other similar sources and on our knowledge of, and our experience to date in, the markets in which we operate. While we believe the estimated market and industry data included in this Presentation is generally reliable, such information is inherently uncertain and imprecise. Market and industry data is subject to change and may be limited by the availability of raw data, the voluntary nature of the data gathering process and other limitations inherent in any statistical survey of such data. In addition, projections, assumptions and estimates of the future performance of the markets in which we operate are necessarily subject to uncertainty and risk due to a variety of factors. These and other factors could cause results to differ materially from those expressed in the estimates made by third parties and by us. The Company has not independently verified the accuracy or completeness of the data contained in these industry publications and other publicly available information. Accordingly, we make no representations as to the accuracy or completeness of that data nor do we undertake to update such data after the date of this Presentation.

## Trademarks

The trademarks included herein are the property of the owners thereof and are used for reference purposes only. Such use should not be construed as an endorsement of the Company's business.

## Key Business Metrics and Non-GAAP Financial Measures

This Presentation includes certain financial measures not presented in accordance with generally accepted accounting principles in the United States ("GAAP"), including Adjusted EBITDA, Adjusted EBITDA margin and free cash flow which are presented for supplemental informational purposes only and are not intended to be substitutes for any GAAP financial measures, including net (loss) income or net (loss) income as a percentage of revenue or net cash provided by (used in) operating activities, as applicable, and, as calculated, may not be comparable to companies in other industries or within the same industry with similarly titled measures of performance. These non-GAAP measures have limitations as analytical tools and should not be construed as an inference that our future results will be unaffected by unusual or non-recurring items. Therefore, non-GAAP financial measures should be considered in addition to, not as a substitute for, or in isolation from, measures prepared in accordance with GAAP. Please refer to the Registration Statement for more information, including reconciliations of non-GAAP financial measures. Please refer to the Appendix for a reconciliation of each non-GAAP financial measure presented herein to the most directly comparable financial measure stated in accordance with GAAP.

This Presentation includes certain other of the Company's key business metrics including Gross Merchandise Sales. "Gross Merchandise Sales" or "GMS" represents the total dollar value paid by buyers for ticket transactions and fulfillment. GMS includes fees we charge buyers and sellers that can vary by transaction, as well as the net proceeds we remit to sellers. Our definition of GMS does not include applicable sales, value-added and other indirect taxes, shipping costs and the impact of discounts and coupons as well as event cancellations or expected cancellations after the initial transaction on our platform.



# Offering Summary

| | |
|---|---|
| **Issuer** | StubHub Holdings, Inc. |
| **Base Offering Size** | $749 million – $851 million ($800 million at midpoint) |
| **Base Shares Offered** | 34,042,553 (100% primary) |
| **Option to Purchase Additional Shares** | 15% (100% primary) |
| **Price Range** | $22.00-$25.00 per share of Class A common stock |
| **Exchange / Ticker** | NYSE / STUB |
| **Use of Proceeds** | StubHub intends to use the net proceeds from this offering (i) to repay existing indebtedness outstanding under term loan Credit Facilities, (ii) to satisfy anticipated tax withholding and remittance obligations related to the vesting and settlement of RSUs in connection with this offering, and (iii) the remaining net proceeds, if any, for general corporate purposes, including working capital, operating expenses and capital expenditures or to acquire or make investments in businesses, products, offerings and technologies |
| **Lock-Up** | 180 days for StubHub. The earlier of (i) the second trading day following StubHub's second quarterly earnings release after the IPO and (ii) 180 days for directors, executive directors and substantially all securityholders. Early release of 5% of shares of common stock held at IPO assuming (i) 90 days post-IPO, (ii) post-first quarterly earnings release after the IPO, and (iii) the stock price is 30% above the IPO price for 5 of 10 consecutive trading days, with 1 of such 5 trading days occurring post-earnings (provided that if the early release date is within 7 trading days prior to StubHub's blackout period, the early release date will be the 7th trading day prior to the blackout period). Beginning 90 days post-IPO, certain stockholders (excluding directors and officers) may sell shares up to the amount to cover taxes on RSUs vesting during the lock-up period but must keep remaining shares locked up |
| **Lead Bookrunning Managers** | J.P. Morgan, Goldman Sachs & Co. LLC |
| **Bookrunning Managers** | BofA Securities, Evercore ISI, BMO Capital Markets, Mizuho, TD Cowen, Truist Securities, Wolfe | Nomura Alliance |
| **Co-Managers** | Citizens Capital Markets, Oppenheimer & Co., Wedbush Securities, PNC Capital Markets LLC |
| **Expected Pricing Date** | September 16, 2025 (after market close) |

# Summary Highlights

*All statistics refer to LTM ending Q2'25 unless noted*

### Global Scale
Over $9bn GMS[1]

### High Growth
21% GMS Growth[1]

### Strong Margins
15% Adj. EBITDA Margin[2],
*Incl. Investment in Direct Issuance*

### Cash Machine
$236mm FCF Excluding
Debt Service in 1H25[3]

### Durability
Proven Marketplace with
Network Effects

### Leading Marketplace
Global Leader in
Secondary Ticketing[4]

### Category Defining Brand
84% Brand Awareness[5]

### Unmatched Data
20+ Years of Proprietary
Marketplace Data

### Proving Vision
$100mm+ Direct Issuance
GMS in FY24

(1) Gross Merchandise Sales (GMS) represents the total dollar value paid by buyers for their transaction and fulfillment. GMS growth represents LTM June 2025 over LTM June 2024 growth.
(2) We define Adjusted EBITDA margin as Adjusted EBITDA divided by total revenue for the same period. Please see appendix for GAAP to non-GAAP reconciliation.
(3) We define free cash flow as net cash provided by (used in) operating activities less capital expenditures, which includes purchases of property and equipment, purchases of intangible assets and capitalized software development costs. Please see appendix for GAAP to non-GAAP reconciliation.
(4) Based on Gross Merchandise Sales.
(5) Refers to aided brand awareness in the U.S. Source: CoLab Group, StubHub Brand Study conducted on ProQuo AI. 2024 commissioned by StubHub.

StubHub

5



# Our Business Model



**Consistent ~20% Service Fee % Per Transaction**



**Profitable on First Transaction**



**Upfront Cash at Time of Sale**



**Capital Light**

**Network Effects Create Scale Benefits**



7

# Growth and Liquidity Flywheels

*Two core mutually reinforcing flywheels accelerate scale and profitability*



# North American Secondary Market

**Market has consistently grown at a double-digit CAGR, pre- and post-COVID**

- Consumers prioritizing live events and experiences over products
- Consumers demanding more content and becoming fans of a broader range of live events
- Growing sports and music event tourism market
- Investment in live event production and infrastructure to meet growing demand
- Better technology and greater demand for tickets are driving secondary ticketing velocity

**North American Secondary Market ($bn)[1]**

13% CAGR

14% CAGR

Covid Impact

- 2017: $11.4
- 2018: $12.9
- 2019: $14.7
- 2022: $13.5
- 2023: $16.7
- 2024: $17.5



(1) Estimates of North American Secondary Market for each year presented except 2024 are based on data published by Infiniti Research (Technavio). The North American secondary market for 2024 was estimated based management estimates, industry and market data and publicly available information.

9

# Steady Growth at Scale

**20%+ annual Gross Merchandise Sales ("GMS") growth over the last three years**

**Quarterly ($mm)**

30% CAGR

| | Q2'22 | Q3'22 | Q4'22 | Q1'23 | Q2'23 | Q3'23 | Q4'23 | Q1'24 | Q2'24 | Q3'24 | Q4'24 | Q1'25 | Q2'25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GMS | $1,046 | $1,245 | $1,664 | $1,434 | $1,827 | $1,869 | $1,727 | $1,810 | $2,135 | $2,189 | $2,546 | $2,080 | $2,300 |
| % Growth – YoY | 61% | 41% | 49% | 78% | 75% | 50% | 4% | 26% | 17% | 17% | 47% | 15% | 8% |
| % Growth – YoY (excluding Eras Tour) | | | | | | | | | | | | 24% | 19%[1] |

**Annual ($mm)**

| | 2023 | 2024 | 1H'25 |
|---|---|---|---|
| GMS | $6,857 | $8,680 | $4,380 |
| % Growth – YoY | 44% | 27% | 11% |
| % Growth – YoY (excluding Eras Tour) | 30% | 29% | 21% |



Note: Gross Merchandise Sales (GMS) represents the total dollar value paid by buyers for their transaction and fulfillment.
(1) Impacted by implementation of federally mandated all-in-pricing in May 2025.

10



# Our Vision

*We envision StubHub as the global destination for consumers to access live events and experiences*

## Buyers

**Buyers** simply want ease, choice, and convenience to buy **any ticket** they want

- Want one source to buy **any ticket** for **any event**, **anywhere** in the world, in **any language**, **any currency**, through **any device**
- No preference whether a ticket is primary or secondary

## Sellers

**Sellers** simply want to maximize revenue and attendance

- Primary issuers and secondary sellers want to sell as many tickets as possible at the best possible price
- The platform with the **broadest distribution** and the **best data to support smart dynamic pricing** will be the revenue maximizing platform for **all** sellers

# Larger Opportunity Beyond Resale

*Our vision is set on leveraging our core assets to disrupt the original issuance market, representing a combined ~$153bn opportunity*

Total Ticketing Market
(secondary + primary + unsold)

## $194bn

Secondary
Ticketing
$41bn

**Building a destination that enables discovery and access for**

 **Any ticket**

 **Any event**

 **Original issue or resale**

# Direct Issuance Thesis

Direct Issuance ("DI") refers to content rights holders – teams, artists, etc. – selling tickets over our marketplace directly to fans as any other seller would

| | | | |
|---|---|---|---|
| Content can maximize yield on inventory by accessing StubHub distribution and pricing intelligence | Does not require exclusivity | StubHub is agnostic to primary/access control provider | Fans do not differentiate between DI and resale |



14

# Direct Issuance Model

|  | **"Primary" Model** | **"Direct Issuance" Model** |
|---|---|---|
| **Venue Access Control Provider** | • Manages manifest, database and authentication | • Manages manifest, database and authentication |
| **Distribution Outlets** | • Venue box office<br>• Access control website | • Venue box office<br>• Access control website<br>• StubHub<br>• All other outlets |
| **Results** | ✖ Narrow distribution<br>✖ Limited access to data<br>✖ Limited competition and innovation, resulting in poor product experience | ✓ Maximized distribution across all outlets<br>✓ Broad access to marketplace data<br>✓ Competition leading to better product experience for consumers |

StubHub

# Direct Issuance Momentum

*We have successfully established case studies with marquee content rights holders*

## $100mm+

2024 Direct Issuance GMS

## 30%+

of World Series attendees in NY purchased tickets on StubHub

### Direct Issuance momentum is accelerating, with current DI clients including:



Teams in the NBA, MLB, and European Soccer and **recently signed** league-wide partnership with Major League Baseball **launching in March 2026**



Major musical artists and festivals

**Once open distribution becomes the norm, we believe content rights holders will make all tickets available on StubHub by default**

StubHub

16

# Industry Leading AI Initiatives

*StubHub is able to capitalize on generative & agentic AI tailwinds to enhance user experience across customer support and agentic fulfillment*







**AI-driven customer support** reduces costs while **boosting NPS[1] scores**

**Agentic fulfillment automation** improves last-minute sales and fulfillment

StubHub

(1)  "NPS" refers to net promoter score

17

# Data Flywheel

*First-party data is the raw material that drives the product innovation and pricing intelligence key to the long-term vision*
*AI tools and machine learning are accelerating the advantage created by this flywheel effect*

**More transaction volume**

**Data Flywheel**

**Fuels product innovation for better consumer experience**

**Generates more first party user behavior and pricing data**

## Impacts of Data Flywheel

 **StubHub is positioned to be a beneficiary of AI tailwinds**

- AI is positioned to dramatically increases the value of scaled, high quality, proprietary data which StubHub collects as a market leader

- Fine-tuned AI models fed with this data is a tailwind to enhance the customer experience, transform operations and drive both revenue and efficiency

 **AI is also transforming operations**

- Enables the automation of many internal workflows including software development

 **AI strengthens and accelerates the Data Flywheel**

StubHub

18

# Seller Tool Adoption Drives Data Advantage + Innovation

✓ **Adoption of StubHub seller tools creates scaled, high quality data streams**

- *Around real time and historical availability and pricing*

✓ **This data feeds the data flywheel, accelerated by AI**

- *Powering innovation across the platform*

✓ **Provides a foundation for a wider set of seller tools including those for Direct Issuance partners**



19

# Advertising Is Poised To Scale Rapidly

## StubHub's Advertising Roll-Out is Underway

- **Leveraging global audience** of purchase and experience minded consumers
- **Utilizing existing data** and scale advantage
- **Additive to customer discovery experience** when tailored to event preferences and geography
- Highly attractive to brands in categories adjacent to live events, which spend heavily on customer acquisition
- Two advertising revenue streams led by **CTO Art Yegorov** (ex-Trade Desk):
  - **Brand partnerships** robust pipeline with signed agreements today including partners:

      

  - **Sponsored listings launching to POS users in Q4 2025:**



Brand partnerships

Sponsored Listing

## Other Marketplaces Have Proven Out Advertising Expansion



*Marketplace's advertising revenue as a % of total transaction volume (2024)[1]*

| | |
|---|---|
| amazon | 10% |
| Etsy | 6% |
| instacart | 3% |
| ebay | 2% |
| Uber | 2% |



(1) Company filings and Wall Street research

20

# StubHub Partnerships Create a Robust Pipeline with Multiple Signed Agreements Today

## Brand Partnerships



**Monetizing StubHub's highly engaged audience** and platform by partnering with external brands

## Sponsored Listing



**Maximizes visibility and drives faster ticket sales** by placing inventory in front of most relevant and high-intent fans

StubHub

21

# Direct Issuance Product Development

**Current State**

**Future State with StubHub Distribution**



**Single Storefront on Primary**

**Ad-Hoc Marketing Efforts**

**Basic Pricing Decisions**

**Minimal Flexibility in Operations**

**Patchy Data from Variety of Sources**

**Content Rights Holder Inventory**



AI Agents Handle All Operations; Automatically Discover, Hold and Fulfil Inventory



Intelligent, Integrated Decision Making Across Ticketing Value Chain – Powered by AI Agent Acting on Behalf of Content



# Audience – Content Flywheel

*Accelerates the vision of creating global consumer destination for live events and experiences*

**Larger engaged direct audience**

**Broader selection of inventory for audience to access**

**Audience – Content Flywheel**

**Better distribution and monetization channel for CRHs**

**More content distributed through our marketplace**

## Impacts of Audience-Content Flywheel

✓ **Enables long-term vision of a global live entertainment destination for consumers**

✓ **Significantly expanded TAM**

✓ **Superior economic structure**



23

# Financial Model Highlights

# Our Business Model

*Proven formula for strong growth, durable margin expansion, compelling cash flow conversion*

| Growth Drivers | Margin Drivers | Cash Flow Conversion Drivers |
|---|---|---|
| Resale market growth and International market growth | Sales & Marketing efficiency as scale | Favorable negative net working capital dynamics |
| + | + | + |
| Resale market share capture | Fixed cost leverage *(including AI automation)* | Minimal capital expenditures |
| + | + | + |
| Advertising ramp near-term | High contribution margin from Advertising | Benefit from NOL carryforwards *(over $1bn accumulated as of 2024)* |
| + | + | = |
| DI ramp medium-term | Scaling margins in DI | **Highly cash flow generative** |

# Steady Growth at Scale

GMS ($mm)

*Consistent 20%+ Gross Merchandise Sales growth, well in excess of market growth rates*



Secondary market share recapture in North America began in 2023 following full platform integration



Market share has since expanded rapidly and is approaching 50% of the U.S. secondary ticketing market



Entered into original issuance market in 2024, generating over $100mm of Direct Issuance GMS

May 2025 implementation of federally mandated all-in pricing believed to have ~10% one-time impact on the growth of the N.A. secondary ticketing market

| | 2023 | 2024 | Q1'25 | Q2'25 |
|---|---|---|---|---|
| GMS | $6,857 | $8,680 | $2,080 | $2,300 |
| % Growth – YoY | 44% | 27% | 15% | 8% |
| % Growth – YoY (excluding Eras Tour) | 30% | 29% | 24% | 19%[1] |



Note: Gross Merchandise Sales (GMS) represents the total dollar value paid by buyers for their transaction and fulfillment.
(1) Impacted by implementation of federally mandated all-in-pricing in May 2025.

26

# Proven Profitability and Cash Flow Generation



**Adj. EBITDA margin**

*After achieving 25%+ Adj. EBITDA margins in 2023, made strategic decisions to invest in new initiatives beginning in 2024*

26% (2023)
17% (2024)
12% (1H'25)

✓ *Strategic decision to invest in new initiatives, such as Direct Issuance*

✓ *Continued investment in Direct Issuance capabilities*

✓ *Increased customer acquisition spend to accelerate relative market share gains*

| | 2023 | 2024 | 1H'25 |
|---|---|---|---|
| Adj. EBITDA ($mm) | $354 | $299 | $102 |

**FCF ex-debt servicing costs ($mm)[1]**

*Predictable and favorable net working capital dynamics compound cash flow with >100% conversion[2]*

$435 (2023)
$402 (2024)
$236 (1H'25)

✓ *Favorable negative net working capital dynamics*
- *Collect GMS at the time of sale*
- *Remit payment to seller at later date*

✓ *Minimal capital expenditures*

✓ *Benefit from net operating loss carryforwards*
- *Over $1bn cumulative pre-tax*

| | 2023 | 2024 | 1H'25 |
|---|---|---|---|
| % Conversion[2] | 123% | 135% | 231% |



Note: Adjusted EBITDA, adjusted EBITDA margin and free cash flow are non-GAAP measures. See Appendix for a reconciliation to the most directly comparable GAAP financial measure.
(1) Excludes $133.2mm, $147.1mm and $75.4mm of interest payments on outstanding debt, net of cash received on the settlement of interest rate swap derivatives for 2023, 2024 and 1H'25 respectively.
(2) Conversion calculated as FCF-ex debt servicing costs divided by Adj. EBITDA.

27

# Long-Term Financial Targets



| | Long-Term Targets |
|---|---|
| GMS Growth YoY | ~20%+ |
| Adj. EBITDA Margin | ~35-40%+ |
| Free Cash Flow Conversion | ~100%+ |

## Management Philosophy

### Our Core Priorities

- Maximize **GMS** growth
- Compound **Cash Flow** at scale

### Capital Allocation Priorities

- **De-lever** and maintain a healthy balance sheet
- **Disciplined organic investment**
- Builders, not buyers, but **selectively evaluate M&A opportunities**



Note: Long-term targets are targets and not projections. These targets are forward-looking and subject to significant business, economic, regulatory and competitive uncertainties and contingencies, many of which are beyond the Company's control and remain subject to change. Actual results may vary, and those variations may be material.

28

# Appendix

PRINTING, COPYING, AND DISTRIBUTION OF ROADSHOW MATERIALS IS STRICTLY PROHIBITED.
IP ADDRESS: 46.37.10.155
EMAIL: user@retroadshow.com

# Non-GAAP Reconciliations

| | FY23 | Q1'24 | Q2'24 | Q3'24 | Q4'24 | FY24 | Q1'25 | Q2'25 | 1H'25 | LTM Q2'25 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Net Income (Loss)** | $405 | ($16) | ($8) | ($33) | $54 | ($3) | ($22) | ($54) | ($76) | ($55) |
| Interest Income | (23) | (9) | (11) | (11) | (10) | (41) | (8) | (10) | (19) | (40) |
| Interest Expense | 156 | 41 | 46 | 48 | 45 | 180 | 42 | 44 | 86 | 179 |
| (Benefit) Provision for Income Taxes | (320) | (10) | 36 | (17) | 30 | 40 | (8) | (18) | (26) | (12) |
| Other Expense (Income), Net | 2 | – | 0 | (2) | – | (2) | – | 0 | 0 | (2) |
| Foreign Currency Losses (Gains) | 25 | (9) | (5) | 20 | (46) | (41) | 24 | 61 | 85 | 58 |
| Losses (Gains) on Derivatives | 8 | (7) | (4) | 8 | (1) | (3) | (1) | 1 | 1 | 8 |
| Depreciation and Amortization | 23 | 6 | 6 | 6 | 6 | 25 | 6 | 6 | 13 | 25 |
| Acquisition-related Costs | 4 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Stock-based Compensation Expense | 35 | 2 | 1 | 1 | 3 | 8 | 5 | 2 | 8 | 12 |
| Debt Refinancing Costs and Loss on Extinguishment of Debt | – | 33 | 1 | – | – | 34 | – | – | – | – |
| Indirect Tax Contingency Costs | 35 | 15 | 11 | 12 | 14 | 52 | 9 | 13 | 22 | 48 |
| Litigation Reserves | – | 16 | – | 22 | 6 | 44 | – | – | – | 28 |
| Other Costs and Expenses | 5 | 1 | 1 | 2 | 2 | 5 | 0 | 8 | 8 | 11 |
| **Adjusted EBITDA** | $354 | $66 | $73 | $56 | $104 | $299 | $48 | $54 | $102 | $262 |
| **Revenue** | $1,368 | $360 | $443 | $434 | $533 | $1,771 | $398 | $430 | $828 | $1,795 |
| *Net Income (Loss) as a Percentage of Revenue* | *30%* | *(4%)* | *(2%)* | *(8%)* | *10%* | *(0%)* | *(6%)* | *(13%)* | *(9%)* | *(3%)* |
| Adjusted EBITDA as a Percentage of Revenue | 26% | 18% | 16% | 13% | 20% | 17% | 12% | 13% | 12% | 15% |

| | FY23 | Q1'24 | Q2'24 | Q3'24 | Q4'24 | FY24 | Q1'25 | Q2'25 | 1H'25 | LTM Q2'25 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Net Cash Provided by (Used in) Operating Activities** | $307 | $260 | $138 | $12 | ($149) | $261 | $158 | $19 | $178 | $41 |
| (-) Purchases of Property and Equipment | (2) | (0) | (0) | (1) | (0) | (2) | (1) | (0) | (1) | (2) |
| (-) Purchases of Intangible Assets | (2) | (0) | (1) | (1) | (0) | (2) | (0) | (0) | (1) | (2) |
| (-) Capitalized Software Development Costs | (2) | (1) | (1) | (1) | (1) | (3) | (6) | (9) | (15) | (16) |
| **Free Cash Flow** | $302 | $259 | $136 | $11 | ($151) | $255 | $151 | $10 | $161 | $21 |
| *LTM free cash flow* | *$304* | *$377* | *$546* | *$501* | *$255* | *$255* | *$148* | *$21* | *$21* | *$21* |

 StubHub

30

(1) Includes $75.4 million, $147.1 million, and $133.2 million of interest payments on our outstanding debt, net of cash received on the settlement of interest rate swap derivatives for the six months ended June 30,2025 and the years ended December 31, 2024 and 2023, respectively.