**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDWARD LIU, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　　Plaintiff,<br><br>　　　　　-v-<br><br>STUBHUB HOLDINGS, INC., *et al.*,<br><br>　　　　　　　　　　　Defendants. | Case No. 1:25-cv-09776-JMF<br><br>[rel. Case No. 25-cv-10208-JMF]<br><br>[rel. Case No. 25-cv-10445-JMF]<br><br>[rel. Case No. 26-cv-2986-JMF] |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

**LATHAM & WATKINS LLP**
Jeff G. Hammel
Jason C. Hegt
Alexander L. Mills
Chengliang (Larry) Hong
1271 Avenue of the Americas
New York, New York 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
jeff.hammel@lw.com
jason.hegt@lw.com
alexander.mills@lw.com
larry.hong@lw.com

*Counsel for StubHub Holdings, Inc.*,
*Eric H. Baker, Connie James, Mark Streams,*
*Sameer Bhargava, and Jeremy Levine*

**ALLEN OVERY SHEARMAN STERLING US LLP**
Daniel Lewis
Daniel Kahn
599 Lexington Avenue
New York, New York 10022
Tel: (212) 848-4000
daniel.lewis@aoshearman.com
daniel.kahn@aoshearman.com

*Counsel for J.P. Morgan Securities LLC,*
*Goldman Sachs & Co. LLC, BofA Securities, Inc.,*
*Evercore Group L.L.C., BMO Capital Markets*
*Corp., Mizuho Securities USA LLC, TD Securities*
*(USA) LLC, Truist Securities, Inc., Nomura*
*Securities International, Inc., WR Securities,*
*LLC, Citizens JMP Securities, LLC, Oppenheimer*
*& Co. Inc., Wedbush Securities Inc., and PNC*
*Capital Markets LLC*

June 5, 2026

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................................1

BACKGROUND ..................................................................................................................3

      A.    StubHub Is The Largest Platform In The Secondary Ticketing Market ..................3

      B.    StubHub Plans To Expand Into The Original Issuance Ticketing Market .............3

      C.    StubHub's IPO And The Offering Materials' Extensive Disclosures .....................4

      E.    This Litigation.........................................................................................................8

LEGAL STANDARD...........................................................................................................8

ARGUMENT .......................................................................................................................9

I.    PLAINTIFFS FAIL TO PLEAD A MATERIALLY FALSE OR MISLEADING STATEMENT........................................................................................................................9

      A.    The Direct Issuance Statements Were Not Materially Misleading........................10

            1.    The AC Fails To Plead Contemporaneous Falsity.....................................10

            2.    StubHub's Puffery Statements Are Not Actionable .................................16

            3.    StubHub's Opinion Statements Are Not Actionable ................................17

            4.    Plaintiffs Fail to Plead That The Risk Disclosure Statements Were Materially Misleading ........................................................................18

      B.    Plaintiffs Fail to Plead That the Advertising Prospect Statements Were False ........................................................................................................................19

      C.    Plaintiffs Fail to Plead That The Free Cash Flow Statements Were False ........................................................................................................................21

      D.    The AC Fails To Allege A Violation Of Item 303 ...............................................23

II.    PLAINTIFFS DO NOT ADEQUATELY PLEAD STANDING TO ASSERT A CLAIM UNDER SECTION 12(a)(2)................................................................................25

III.    PLAINTIFFS HAVE FAILED TO PLEAD A SECTION 15 CLAIM ............................27

CONCLUSION...................................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Arfa v. Mecox Lane Ltd.*,
2012 WL 697155 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F. App'x 14 (2d Cir.
2012) ................................................................................................................22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...........................................................................................9

*Barilli v. Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. 2019) ....................................................9, 17, 21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...........................................................................................9

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .................................................13, 25

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) .........................................................................21

*Caiafa v. Sea Containers Ltd.*,
331 F. App'x 14 (2d Cir. 2009) .........................................................................25

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020) ...........................................................18, 19

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
565 F. Supp. 3d 478 (S.D.N.Y. 2021) ...........................................................14, 15

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) .............................................................................9, 16

*Coronel v. Quanta Cap. Holdings Ltd.*,
2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ........................................................12

*Fogel v. Vega*,
759 F. App'x. 18 (2d Cir. 2018) .........................................................................10

*Fogel v. Wal-Mart de Mexico SAB de CV*,
2017 WL 751155 (S.D.N.Y. Feb. 27, 2017) .......................................................10

*Friedman v. Endo Int'l PLC,*
    2018 WL 446189 (S.D.N.Y. Jan. 16, 2018) (Furman, J.), *aff'd sub nom.*
    *Steamfitters' Industry Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494 (2d
    Cir. 2019) .................................................................................................................17

*Garnett v. RLX Tech. Inc.,*
    632 F. Supp. 3d 574, 614 (S.D.N.Y. 2022), *aff'd sub nom. Tseng v. De Vries,*
    2023 WL 8073087 (2d Cir. Nov. 21, 2023).................................................................26

*Gregory v. ProNAi Therapeutics Inc.,*
    297 F. Supp. 3d 372 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).........................18

*Gustafson v. Alloyd Co.,*
    513 U.S. 561 (1995).................................................................................................25

*Hawes v. Argo Blockchain plc,*
    2024 WL 4451967 (S.D.N.Y. Oct. 9, 2024) ....................................................................11, 16

*Honig v. Hansen,*
    2021 WL 4651475 (S.D.N.Y. Oct. 6, 2021) ............................................................16

*In re Bristol-Myers Squibb Co. CVR Sec. Litig.,*
    658 F. Supp. 3d 220 (S.D.N.Y. 2023)..................................................................9, 11

*In re CIT Grp., Inc. Sec. Litig.,*
    349 F. Supp. 2d 685 (S.D.N.Y. 2004)..................................................................17

*In re Cosi, Inc. Sec. Litig.,*
    379 F.Supp.2d 580 (S.D.N.Y. 2005).....................................................................26

*In re Fairway Grp. Holdings Corp. Sec. Litig.,*
    2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015), *adopted,* 2015 WL 5255469
    (Sept. 9, 2015).....................................................................................................16

*In re Focus Holding Media Ltd. Litig.,*
    701 F. Supp. 2d 534 (S.D.N.Y. 2010)..................................................................22

*In re Gen. Elec. Co. Sec. Litig.,*
    856 F. Supp. 2d 645 (S.D.N.Y. 2012)..................................................................15

*In re HEXO Corp. Sec. Litig.,*
    524 F. Supp. 3d 283 (S.D.N.Y. 2021)..................................................................25, 27

*In re Morgan Stanley Info. Fund Sec. Litig.,*
    592 F.3d 347 (2d Cir. 2010)................................................................................9, 27

*In re NovaGold Resources Inc. Sec. Litig.,*
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)..................................................................11

*In re ProShares Trust Sec. Litig.*,
    728 F.3d 96 (2d Cir. 2013)..................................................................................................12

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816
    F.3d 199 (2d Cir. 2016)........................................................................................................3

*In re Stemline Therapeutics, Inc. Sec. Litig.*,
    313 F. Supp. 3d 543 (S.D.N.Y. 2018)................................................................................21

*Jiajia Luo v. Sogou, Inc.*,
    465 F.Supp.3d 393 (S.D.N.Y. 2020)...................................................................................15

*Johnson v. Sequans Commc'ns S.A.*,
    2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) .......................................................................16

*Lau v. Opera Ltd.*,
    527 F. Supp. 3d 537 (S.D.N.Y. 2021).........................................................................13, 20

*Lowinger v. Pzena Inv. Mgmt., Inc.*,
    341 F. App'x 717 (2d Cir. 2009) .......................................................................................24

*Mullen v. Terran Orbital Operating Corp.*,
    2024 WL 3553134 (S.D.N.Y. July 26, 2024), *aff'd sub nom.*, *Mullen v. Bell*,
    2025 WL 1793642 (2d Cir. June 30, 2025) .......................................................................11

*Nurlybayev v. ZTO Express (Cayman) Inc.*,
    2019 WL 3219451 (S.D.N.Y. Jul. 17, 2019) .....................................................................24

*Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*,
    715 F. Supp. 3d 483 (S.D.N.Y. 2024), *aff'd*, 2024 WL 4647131 (2d Cir. Nov.
    1, 2024) ...............................................................................................................................13

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
    98 F.3d 2 (2d Cir. 1996)............................................................................................. *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)............................................................................................................17

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
    2026 WL 810180 (2d Cir. Mar. 24, 2026)..........................................................................24

*Rubinstein v. Credit Suisse Grp. AG*,
    457 F. Supp. 3d 289 (S.D.N.Y. 2020)................................................................................25

*Sandoz v. Waterdrop Inc.*,
    2023 WL 1767526 (S.D.N.Y. Feb. 3, 2023).......................................................................22

*Saraf v. Ebix, Inc.*,
 2023 WL 4561655 (S.D.N.Y. July 17, 2023), *aff'd*, 2024 WL 1298246 (2d
 Cir. Mar. 27, 2024) ......................................................................................................3

*Schaffer v. Horizon Pharma PLC*,
 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ...............................................................17, 21

*Schoenhaut v. Am. Sensors, Inc.*,
 986 F. Supp. 785 (S.D.N.Y. 1997)..............................................................................15

*Scott v. Gen. Motors Co.*,
 46 F. Supp. 3d 387 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015)....................12, 24

*Scott v. Gen. Motors Co.*,
 605 F. App'x 52, 54 (2d Cir. 2015) ..............................................................................11

*Smith v. Gap, Inc.*,
 2026 WL 1502033 (2d Cir. May 28, 2026) ...................................................................19

*Stadnick v. Vivint Solar, Inc.*,
 2015 WL 8492757 (S.D.N.Y. Dec. 10, 2015), *aff'd*, 861 F.3d 31 (2d Cir.
 2017) ....................................................................................................................22, 26

*Tseng v. De Vries*,
 2023 WL 8073087 (2d Cir. Nov. 21, 2023)....................................................................26

*Wandel v. Gao*,
 590 F. Supp. 3d 630 (S.D.N.Y. 2022)...........................................................................22

*Willard v. UP Fintech Holding Ltd.*,
 527 F. Supp. 3d 609 (S.D.N.Y. 2021)......................................................................23, 25

*Yaroni v. Pintec Tech. Holdings Ltd.*,
 600 F. Supp. 3d 385 (S.D.N.Y. 2022).....................................................................18, 20

*Yung v. Lee*,
 432 F.3d 142 (2d Cir. 2005).......................................................................................25

## STATUTES

15 U.S.C. § 77l(a)(2)...................................................................................................25

## REGULATIONS

17 C.F.R. § 229.303(a)(3)(ii).........................................................................................24

<div align="center">

**PRELIMINARY STATEMENT**[1]

</div>

StubHub operates the world's largest online ticketing platform connecting buyers and sellers of concert, sporting event, and other tickets in more than 200 countries around the globe. Since its inception, substantially all of StubHub's sales have been resales of tickets originally sold elsewhere, although in recent years StubHub has started to expand into the original issuance ticketing market by facilitating direct ticketing sales. When StubHub's stock price declined following its IPO, this lawsuit was filed.

Plaintiffs attempt to plead claims under Sections 11, 12(a)(2), and 15 of the Securities Act based on the theory that the Offering Materials for StubHub's IPO misled investors on three topics: (i) StubHub's future prospects in the original issuance ticketing market, (ii) its ability to develop an advertising business, and (iii) its 2025 free cash flow. Each of these theories fails because the Offering Materials themselves contained detailed disclosures addressing the very points Plaintiffs claim were concealed or misrepresented. Moreover, despite its wordiness, the AC includes none of the usual hallmarks of a viable securities claim: no internal reports or documents contradicting the disclosures, no former employees or confidential witnesses—indeed, no contrary facts from any source. In short, the AC does not plead a single fact that contradicts the statements in the Offering Materials, which is fatal to Plaintiffs' claims against all Defendants.

*First*, the AC pleads no facts establishing that StubHub's statements regarding its future prospects in the original issuance ticketing market are false. StubHub told investors it was "in the early innings" of targeting this market and disclosed that its platform was "primarily focused on"

---

[1] Unless otherwise specified, emphases are added, quotations and internal citation marks are omitted, citations to Ex.__ are to the accompanying Declaration of Alexander L. Mills, and capitalized terms have the meaning set forth in the Amended Complaint (Ex. 1, cited as "AC" or "¶_") and/or the Offering Materials (Ex. 2, cited as "OM").

the secondary market.  OM at 13. The Offering Materials made no promise regarding the pace or extent of growth of this business.  To the contrary, StubHub warned investors that "[t]here can be no assurance that [StubHub] will succeed in expanding the adoption of [its] platform for direct issuance" (OM at 28) and that success depended on factors "out of [StubHub's] control" (OM at 29).  Plaintiffs identify nothing contradicting these disclosures and point only to StubHub's disclosure six months after the IPO that it was still working to grow this business—disclosures that are entirely consistent with the Offering Materials.  *See* Section I.A.

*Second*, StubHub was equally transparent about its digital advertising opportunities. StubHub disclosed that it did not currently offer digital advertising and had negligible revenue from this business, but that it "intend[ed] to offer [this] in the future."  OM at 142.  Plaintiffs' allegation that six months after the IPO this business was "generating modest revenue" and "showing promising early results" is again entirely consistent with what StubHub disclosed in the Offering Materials and does not render any statements false or misleading.  *See* Section I.B.

*Third*, Plaintiffs do not challenge the accuracy of StubHub's free cash flow figures from fiscal years 2022 through 2024 and the first half of 2025.  Instead, they fault StubHub for not disclosing preliminary results from a quarter that had not yet closed as of the IPO.  The law in this Circuit is clear that a company has no obligation to report in-process quarterly financials before they are finalized and that there is no discernible trend to be disclosed where, as here, the relevant figures fluctuated significantly from quarter to quarter.  *See* Section I.C.

*Finally*, Plaintiffs' Section 12(a)(2) claim fails for all the reasons above plus the additional reason that Plaintiffs lack standing.  Plaintiffs' own sworn certifications show that neither Plaintiff purchased shares at the IPO price—meaning they did not purchase directly from any Defendant, which is a prerequisite under Section 12(a)(2).  *See* Section II.

The AC states no claim and should be dismissed in its entirety.

## BACKGROUND[2]

### A.    StubHub Is The Largest Platform In The Secondary Ticketing Market

StubHub was founded in 2000 as the first online platform for buying and selling tickets on the secondary market. ¶ 69; OM at 1. To help grow this business, StubHub created a technology-enabled global ticketing marketplace where tickets were sourced and priced dynamically, and all types of live events could be supported. OM at 1, 82. As of its IPO, StubHub was the largest platform in both the international and U.S. secondary ticketing market for live events. *Id.* at 1-4.

### B.    StubHub Plans To Expand Into The Original Issuance Ticketing Market

At the time of the IPO, StubHub estimated the total sales in the secondary ticketing market at approximately $41 billion per year. ¶¶ 5, 60, 66; AC, Ex. A, Roadshow Deck at 11. By contrast, the estimated market for original issuance ticketing—*i.e.*, sales in which content rights holders like sports teams and musical artists make the initial ticket sale to customers—was over $130 billion. OM at 4. At the time of the IPO, StubHub's market share of the original issuance ticketing market was approximately 0.1%. ¶ 63. Seeking to break into this much larger market, StubHub introduced a business model known as "direct issuance," which allows content rights holders to sell tickets directly to purchasers on StubHub's global ticketing marketplace while continuing to use legacy distribution channels. ¶¶ 5, 68, 74; OM at 8-9.

---

[2] This background is drawn from (i) the well-pleaded factual allegations in the AC and documents referenced therein, (ii) StubHub's SEC filings, and (iii) "information already in the public domain and facts known or reasonably available to the shareholders." *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 517 n.1, 539 n.13 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *Saraf v. Ebix, Inc.,* 2023 WL 4561655, at *1 (S.D.N.Y. July 17, 2023) (Furman, J.), *aff'd*, 2024 WL 1298246 (2d Cir. Mar. 27, 2024).

To help accelerate adoption, StubHub entered into arrangements with several marquee content rights holders—including several major U.S. and international professional sports teams, musical artists, and festivals—under which StubHub guaranteed those sellers a minimum level of proceeds regardless of actual ticket sales. ¶¶ 76-78. That plan worked: StubHub's Gross Merchandise Sales (a metric that reflects the value of tickets sold) from direct issuance grew more than 14 times from 2022 to 2024—from $9 million to $128 million. ¶ 75. However, even with this upswing, StubHub's direct issuance business still represented just 0.1% of the total original issuance market. *Id.* As StubHub disclosed, it began to phase out those guaranteed revenue arrangements in 2025 "[a]s our marketplace continues to demonstrate its value as a distribution channel for original issuance tickets[.]" ¶ 131; OM at 9. Although in the early stages, StubHub was continuing to make progress in growing this business. For instance, just two weeks before the IPO, StubHub announced that Major League Baseball had designated StubHub as the "Official Direct Issuance Partner." ¶ 76 n.6 (citing press release).

### C.    StubHub's IPO And The Offering Materials' Extensive Disclosures

On September 17, 2025, StubHub conducted its IPO, listing its Class A common stock on the New York Stock Exchange with an opening price of $23.50 per share. ¶¶ 85-86. Fourteen investment banks served as the underwriters, who collectively purchased and underwrote 34 million shares offered in the IPO. ¶¶ 37-53.

In the Offering Materials, StubHub made extensive disclosures about its business and financial condition, its near-term and long-term prospects, and the associated risks, including disclosures on each of the topics Plaintiffs challenge in this lawsuit.

**Original Issuance Disclosures.** The Offering Materials described StubHub as being "in *the early innings of targeting the original issuance ticketing market* and bringing content rights holders to our platform." OM at 8, 13, 28, 132, 141. In a similar vein, StubHub projected that it

was "*in the early stages* of what we believe will be a major disruption to the way original issuance tickets are distributed." *Id.* at 10, 135. Despite this cautious optimism, the Offering Materials did not make any predictions about how much direct issuance would grow, or over what time period. Instead, StubHub tempered any optimism by providing a number of boldface "risk factors" warning investors about the potential challenges of expanding direct issuance, including the following:

- Under the heading "*We may not be successful in executing our business strategy to expand our reach to more categories of events and experiences*" (emphasis in original):

  o "There can be no assurance that we will succeed in expanding the adoption of our platform for direct issuance or that any demand for future offerings or initiatives we may pursue . . . will exist, develop or be sustained." OM at 28.

- Under the heading "*We may not be successful in expanding the adoption of our platform for direct issuance in a cost-effective manner*" (emphasis in original):

  o "If content rights holders are not convinced of the value proposition of our marketplace, if we are unsuccessful in building and maintaining relationships with content rights holders, or if we do so in a way that is not profitable or fails to compete successfully against our current or future competitors, we may be unable to realize the objectives of this business strategy or realize our anticipated value in the original issuance ticketing market." *Id.*

  o "[T]he adoption of our platform for direct issuance is subject to a number of factors, some of which may be out of [StubHub's] control, including the ability or willingness of content rights holders to use [the] platform to sell original issuance tickets, [StubHub's] competitors' exclusivity rights governing ticket sales for certain events or venues or buyers' willingness to engage with [StubHub's] brands and marketplace as a source for original issuance ticket purchases." *Id.* at 29.

The Offering Materials further disclosed that StubHub's "seller products today are primarily focused on inventory management and pricing intelligence for the secondary market" and that StubHub "plan[ned] to add additional features to [its] seller products and tools to continue

5

reducing friction for sellers, including content rights holders with larger ticket portfolios, to list and sell their tickets on [its] marketplace." *Id.* at 13, 86, 142.  Eliminating all doubt about the current and near-term size of the direct issuance business, the Offering Materials noted that the platform was not currently suited to serve content rights holders at scale: "[w]hile we are aware that certain content rights holders have historically used our marketplace from time to time, the supply side of our platform has been built primarily to service individual sellers and professional sellers in the secondary ticketing market." *Id.* at 8, 132.[3]

**Advertising Disclosures.**  The Offering Materials were similarly transparent about StubHub's nascent efforts to add an advertising function, which would allow sellers to pay to advertise or promote their tickets within StubHub's marketplace.  Under the heading "***Improve the Monetization of Our Marketplace Through Advertising***," StubHub disclosed that "[t]here are meaningful sources of additional monetization of our marketplace activity that we do not offer today" and that it "intend[ed] to offer [them] in the future."  OM at 142.  The Offering Materials made clear that this revenue stream was not imminent by listing digital advertising as a component of TAM, which StubHub described as a market that could be addressed "over the long term," as opposed to SAM, which was the market "we [StubHub] address today."  *Id.* at 10, 135, 137; *see also* Roadshow Deck at 11.  Likewise, as the AC concedes, investors knew that StubHub's advertising business was generating "effectively zero" revenue in 2025, since all reported revenue came from traditional ticketing service fees.  ¶ 110.

---

[3] In the roadshow presentation allegedly shown to prospective investors ahead of the IPO, StubHub presented largely the same information.  This presentation described StubHub as being a "global leader in secondary ticketing," and noted its "vision" "to disrupt the original issuance market," which it presented as a "Larger Opportunity Beyond Resale."  Roadshow Deck at 5, 13.  Plaintiffs do not challenge any of these statements as misleading.

**Free Cash Flow Disclosures.**  The Offering Materials disclosed StubHub's FCF for fiscal years 2022 through 2024 and the first six months of 2025—the accuracy of which was not in dispute.  ¶¶ 164-67; OM at 23.  These disclosures showed that FCF fluctuated significantly between different quarters.  ¶¶ 165-66; OM at 23, 103-04, 107-08.  The Offering Materials warned investors of the reasons for this dynamic and about the limitation of relying on FCF figures:

- Under the heading "***Our results of operations vary from quarter to quarter and year over year, so our financial performance in certain financial quarters or years may not be indicative of, or comparable to, our financial performance in subsequent financial quarters or years***":

  - "We believe our financial results and cash needs will vary greatly from quarter to quarter and year to year depending on, among other things, the timing of and demand for certain tours, tour cancellations, event ticket sales, seasonal and other fluctuations in our results of operations, the timing of guaranteed payments, financing activities, acquisitions and investments and receivables management."  OM at 31.

- "A limitation of the use of free cash flow is that it does not represent the total increase or decrease in our cash balance for the period. Free cash flow should not be considered in isolation or as an alternative to cash flows from operations and should be considered alongside our other financial liquidity measures, such as net cash provided by (used in) operating activities and our other GAAP results."  *Id.* at 103.

- "Seasonal trends in our GMS and the timing of major events throughout the year impact free cash flow for any given quarter and can vary year to year."  *Id.* at 104.

Although the AC omits some of these disclosures, the Offering Materials left no doubt about the opportunities and risks in StubHub's business.

### D.    Post-IPO Developments

Before StubHub made any statements to the market following the IPO—with no new information in the market about the company—its stock had declined approximately 20% from the IPO price.  Ex. 6, Stock Price Chart.

StubHub made its first post-IPO announcement on November 13, 2025, when it provided its 3Q25 financial results and said that it would begin providing forward-looking earnings guidance

7

in March 2026 (its first full year as a public company) but would not provide guidance for the balance of 2025. ¶¶ 114-15. The November 13, 2025 disclosures did not address StubHub's direct issuance or digital advertising businesses. ¶¶ 114-16. StubHub's shares fell by 21% the following day. ¶ 117.

On March 4, 2026, StubHub reported its 4Q25 financial results and issued forward-looking guidance for 2026. ¶¶ 118-33. In a detailed discussion of the factors that could impact performance over the coming year, StubHub explained that its "financial performance in 2026 will continue to be driven by our core resale marketplace, which constitutes the vast majority of our revenue." Ex. 5, Shareholder Letter at 2. With respect to direct issuance and advertising, StubHub noted that they "remain compelling opportunities for us, but our FY2026 guidance does not assume any material revenue contribution from either initiative." *Id.* StubHub emphasized that it "believe[s] Direct Issuance . . . remains a transformational long-term opportunity for StubHub and the broader live event ecosystem" and that the "demand for [its] distribution model has been validated." *Id.* at 4. Similarly, StubHub noted that "[o]ur advertising business is generating modest revenue today, and we are continuing to iterate toward a model that enhances the seller and buyer experience." *Id.* StubHub's share price fell by 12.9% the following day. ¶ 136.

### E.    This Litigation

This lawsuit was filed 12 days after the November 13, 2025 announcement. In the AC, Plaintiffs assert three claims under the Securities Act: a Section 11 claim against all Defendants, a Section 12 claim against StubHub and the Underwriter Defendants, and a Section 15 claim against the Individual Defendants. ¶¶ 177-99. All of these claims fail.

### LEGAL STANDARD

To state a claim under Section 11, the plaintiff must establish that a registration statement filed with the SEC "'contained an untrue statement of a material fact or omitted to state a material

fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 235 (S.D.N.Y. 2023) (Furman, J.). Section 12(a)(2) is similar to Section 11 and applies to alleged material misstatements or omissions in prospectuses. *Id.* (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)). To survive dismissal, plaintiffs must allege facts showing that the registration statement contained a material misstatement "when such part [of the registration statement] became effective," in the case of Section 11 claims, or at the time a prospectus was distributed, in the case of Section 12(a)(2) claims. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182-83 (2d Cir. 2014).

In alleging these elements, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[L]egal conclusion[s] couched as [] factual allegation[s]" or "naked assertion[s]" devoid of "further factual enhancement" do not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007). "A court need not . . . accept as truth conflicting pleadings that . . . are contradicted by statements in . . . documents upon which [the] pleadings rely." *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 253 n.18 (S.D.N.Y. 2019). Plaintiffs fail to meet these standards.

## ARGUMENT

### I. PLAINTIFFS FAIL TO PLEAD A MATERIALLY FALSE OR MISLEADING STATEMENT

The AC challenges statements in the Offering Documents concerning (i) the direct issuance business, (ii) advertising revenue streams, and (iii) free cash flow. In essence, Plaintiffs have taken any topic where they wanted StubHub's progress to be quicker and alleged that the Company's post-IPO disclosures revealed that dozens of statements in its Offering Materials were allegedly

false or misleading when made.  App'x A.[4]  That hindsight-based theory is fundamentally flawed because StubHub's subsequent disclosures do not reveal any of its prior statements to be false.  All of Plaintiffs' miscellaneous theories fail to plead a false statement.

### A.    The Direct Issuance Statements Were Not Materially Misleading

#### 1.    The AC Fails To Plead Contemporaneous Falsity

Plaintiffs' core allegation is that the Offering Materials contained material misstatements regarding the imminency of its expansion into the original issuance ticketing market and the readiness of StubHub's platform to accommodate such expansion.  ¶¶ 138-56.  Plaintiffs fail to identify a single misstatement or omission.

*First*, Plaintiffs challenge statements about the current status and future plans for StubHub's direct issuance business but offer no facts rendering those statements false.  In particular, Plaintiffs challenge as misleading StubHub's statements classifying the original issuance ticketing market as part of StubHub's SAM because such market opportunity was "not in fact achievable or even available in the near-term" but was instead a "long-term opportunit[y]." ¶ 142 (referencing ¶¶ 138-41); *see also* OM at 10, 132-33, 135.  The problem for Plaintiffs is that StubHub never said that SAM was an opportunity that could be fully achievable "in the near term." To the contrary, StubHub explained that SAM was the market "we address today."  ¶¶ 139-40; OM at 10, 135.  Plaintiffs' own allegations show that statement to be true: "[s]everal marquee content rights holders . . . *have already begun* selling original issuance tickets through [StubHub's] marketplace" (¶¶ 95, 141), and "[s]hortly before the IPO," MLB designated StubHub as the

---

[4] **Appendix A** is a chart containing the alleged misstatements and corresponding categories from the AC. *See Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017) (collecting cases accepting appendices that serve as "organizational tools"), *aff'd sub nom.*, *Fogel v. Vega*, 759 F. App'x. 18 (2d Cir. 2018).

"Official Direct Issuance Partner" (¶ 76 n.6).  Thus, Plaintiffs fail to state a claim.  *Scott v. Gen. Motors Co.*, 605 F. App'x 52, 54 (2d Cir. 2015) (affirming dismissal of Securities Act claims where "District Court correctly held that plaintiff failed to identify any inaccuracy"); *Hawes v. Argo Blockchain plc*, 2024 WL 4451967, at *4 (S.D.N.Y. Oct. 9, 2024) (dismissing Section 11 claim where "not a single fact is pleaded tending to show that the statement is untrue").

StubHub did not speak about the size of the market it was servicing or how quickly that market would grow.  To the contrary, it expressly warned investors that StubHub was "in the early innings of targeting the original issuance ticketing market" (¶¶ 98, 132, 146; OM at 8, 13, 28, 132, 141) and that StubHub faced a number of risks in further targeting this market (OM at 28-29, 38, 40).  "Prospectuses must be read as a whole."  *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).  And based on these disclosures, no reasonable investor could have concluded that StubHub's expansion into the original issuance ticketing market was guaranteed or imminent. *Mullen v. Terran Orbital Operating Corp.*, 2024 WL 3553134, at *5-6 (S.D.N.Y. July 26, 2024) (Furman, J.) (dismissing Section 11 claim because a reasonable investor would not have mistaken the minimum "cash to balance sheet" estimate as a guarantee), *aff'd sub nom.*, *Mullen v. Bell*, 2025 WL 1793642 (2d Cir. June 30, 2025); *In re NovaGold Resources Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 292-95 (S.D.N.Y. 2009) (dismissing Section 11 claim because a reasonable investor would "understand that [the Registration Statement's] cost estimates and [defendant's] current view that the Project was economically viable were subject to change").[5]

---

[5] To the extent Plaintiffs base their claims on statements made by the analysts (¶¶ 102-12), these claims fail because none of the analyst opinions can be attributed to the Defendants.  *See Bristol-Myers*, 658 F. Supp. 3d at 236 n.9 (recognizing an analyst report cannot form the basis of a Securities Act claim).

11

Likewise, Plaintiffs challenge statements that StubHub was "growing in the $132 billion global original issuance ticketing market" and that StubHub was "in the early stages of what we believe will be a major disruption to the way original issuance tickets are distributed." ¶¶ 140-41. But Plaintiffs do not make a single factual allegation that StubHub lacked a viable path to further penetrate the original issuance ticketing market as of the IPO—and, again, the Complaint itself alleges the opposite. ¶ 76 n.6 (recognizing that "[s]hortly before the IPO" StubHub became the "Official Direct Issuance Partner of Major League Baseball"). The absence of factual allegations undermining these statements is dispositive. *See Coronel v. Quanta Cap. Holdings Ltd.*, 2009 WL 174656, at *14 (S.D.N.Y. Jan. 26, 2009) (no Section 11 liability where "the Complaint puts forth no factual allegations contradicting" the disclosure); *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 396 (S.D.N.Y. 2014) (same), *aff'd*, 605 F. App'x 52 (2d Cir. 2015).

Plaintiffs' only attempt to support their theory about the current status or future growth of the direct issuance business is a statement by StubHub's CEO Eric Baker nearly six months after the IPO (March 2026) in which Mr. Baker supposedly "recategorize[ed]" StubHub's "Direct Issuance/Original Issuance Ticketing Market opportunities" as "long-term." ¶¶ 143-44. But Mr. Baker's statements during this March 2026 earnings call did not "recategorize" anything and, in fact, were entirely consistent with what StubHub had said all along. During this call, Mr. Baker told investors that the original issuance ticketing market "*remains* a transformational long-term opportunity for StubHub," which is consistent with StubHub's disclosure in the Offering Materials that it was "in the early innings of targeting the original issuance ticketing market." *Compare* Ex. 4, March 4, 2026 Tr. at 5 *with* OM at 8. The fact that StubHub used slightly different language to address the same topic is not actionable. *See In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 109 (2d Cir. 2013) (dismissing Section 11 claim where issuer merely "alter[ed] disclosures deemed

12

adequate in the first instance"). Moreover, even if StubHub did change how it viewed the direct issuance business six months after the IPO—which it did not—that subsequent change says nothing about whether the earlier statement was correct when made. *See Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*, 715 F. Supp. 3d 483, 504-05 (S.D.N.Y. 2024) (subsequent change to EBITDA projections did not mean earlier guidance was false when issued), *aff'd*, 2024 WL 4647131 (2d Cir. Nov. 1, 2024); *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 555 (S.D.N.Y. 2021) (Section 11 claims cannot be based on "events occurring after" IPO).

***Second***, Plaintiffs challenge statements in the Offering Materials relating to the readiness of StubHub's platform to serve the original issuance ticketing market. ¶¶ 145-50. These include general opinion statements like "[w]e believe our value proposition, providing broadened distribution and superior pricing intelligence through an open distribution model, is well-positioned to attract more content rights holders to use our marketplace" (¶ 146); or anodyne descriptions of marketplace capabilities like "[c]ontent rights holders can leverage our global reach, trusted brands and marketing expertise to maximize their distribution" (¶ 147) and "[o]ur marketplace enables sellers of all types, including individual fans, professional sellers and content rights holders" (¶ 147). But none of these statements contain a specific statement about the readiness of StubHub's platform to support the direct issuance business. To the contrary, the Offering Materials disclosed precisely what Plaintiffs claim was omitted: StubHub's platform was "built primarily to service" the secondary market and needed "additional features" to effectively service content rights holders in making initial ticketing sales. OM at 8, 13. These disclosures preclude any claim of falsity. *See Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *8 (S.D.N.Y. Jan. 14, 2010) ("disclosure of information alleged in the Complaint to have been withheld from prospective investors renders the Complaint insufficient as a matter of

13

law"); *Olkey*, 98 F.3d at 5 (recognizing that the prospectus must be read "as a whole"). In an attempt to sidestep the plain language of the Offering Materials, Plaintiffs rely solely on Mr. Baker's statements during the March 2026 conference call that StubHub was "prioritizing building the product foundation required to scale direct issuance broadly" and that "[d]evelopment is underway to bring these supply-side products to market." ¶ 124. However, none of those statements contradicted StubHub's earlier statements about the readiness of the platform for direct issuance; they merely confirmed again that the platform was a work-in-progress.[6]

*Third*, Plaintiffs challenge statements purportedly "reinforc[ing] the notion that StubHub's expansion in the Original Issuance Ticketing Market was imminent." ¶ 152. As an initial matter, Plaintiffs cannot premise a Securities Act claim on their subjective reading of what the statements purportedly "reinforced." *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 494-95 (S.D.N.Y. 2021) (dismissing Section 11 claims where plaintiffs alleged that issuer "created the false and misleading impression" but did not identify why any particular statement was misleading). To survive dismissal, Plaintiffs need to identify a specific statement and allege why it was false. *Id.* The AC does no such thing. For example, Plaintiffs challenge StubHub's statement describing its technology as giving rise to "multiple flywheel effects" that "unlock our opportunity in direct issuance and other adjacent markets." ¶ 152; OM at 6. But even putting aside the fact that that statement is obvious puffery (*see infra* Section IA(2)), StubHub made clear that this flywheel "***is in its beginning stages*** as we ***increasingly target*** the original issuance ticketing market." ¶ 152. These disclosures must be read together, *Olkey*, 98 F.3d at 5, and in that context StubHub's measured optimism could not possibly mislead investors into

---

[6] *See* OM at 8 ("We are focused on expanding the supply on our marketplace to include original issuance tickets. . . ."); *id.* at 13 ("we plan to add additional features to our seller products and tools to continue reducing friction for sellers").

14

thinking (according to Plaintiffs) that "StubHub stood at the cusp of realizing its Direct Issuance opportunities." ¶ 152.

Plaintiffs also challenge the statement that "[w]e see the opportunity for our global ticketing marketplace to help content rights holders and fans solve problems created by the legacy primary ticketing model which we believe does not meet the needs of fans or content rights holders." ¶ 153. But again, Plaintiffs provide no allegation as to why that statement is in any way false, much less how it would give rise to the "impression" that StubHub's expansion into the original issuance ticketing market was "imminent." The absence of well-pled facts contrary to this disclosure, much less materially so, precludes Plaintiffs' claims. *Jiajia Luo v. Sogou, Inc.*, 465 F.Supp.3d 393, 415 (S.D.N.Y. 2020) (dismissing Section 11 claim where "Plaintiffs do not state any 'concrete facts' showing that any statement [defendant] made was false"); *Farfetch*, 565 F. Supp. 3d at 494-95.

***Finally***, Plaintiffs discuss the pre-IPO "roadshow" presentation, although they do not appear to be asserting any claims based on the presentation. *See* ¶¶ 87-91, 138. In any case, none of the statements in this pre-IPO slide deck can give rise to claims under Sections 11 or 12(a)(2). *First*, the presentation was not incorporated into the Offering Materials and thus cannot trigger Securities Act liabilities as a matter of law. *See In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 655 (S.D.N.Y. 2012) (holding that plaintiffs could not rely on statements not incorporated into issuer's offering document). *Second*, as Plaintiffs themselves admit, the information presented was "consistent with" that in the Offering Materials. ¶ 92. *Third*, even if there were any differences in language, the slide deck statements are not actionable because the Offering Materials govern. *See Olkey*, 98 F.3d at 9 (finding that representations made at roadshows were "immaterial since they are contradicted by plain and prominently displayed language in the prospectuses");

15

*Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 795 (S.D.N.Y. 1997) ("[P]laintiffs cannot now complain about road shows statements that were subsequently contradicted by specific disclosures in the Prospectus—which any plaintiff, regardless of his or her level of sophistication, could have read.").

### 2.    StubHub's Puffery Statements Are Not Actionable

As previewed above, certain of the original issuance statements Plaintiffs challenge are inactionable expressions of corporate optimism.  Puffery encompasses statements that are "too general to cause a reasonable investor to rely upon them." *UBS AG*, 752 F.3d at 183.  StubHub's statements that it was "well-positioned" to expand into new markets (¶¶ 141, 146-47, 152-53) are classic examples of inactionable corporate optimism.  *See, e.g.*, *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *13 (S.D.N.Y. Aug. 19, 2015), *adopted,* 2015 WL 5255469 (Sept. 9, 2015) (statements of "in the early innings of growth" and "well positioned to support growth" are "immaterial corporate puffery"); *Johnson v. Sequans Commc'ns S.A.*, 2013 WL 214297, at *14 (S.D.N.Y. Jan. 17, 2013) (company's statement that it "believe[s] we are better positioned to drive our roadmap to meet those needs" are "non-actionable").  The same is true of the statement that StubHub could "disrupt the legacy primary ticketing model." ¶¶ 99, 152.[7] Courts routinely dismiss claims based on similarly generic predictions of success.  *Honig v. Hansen*, 2021 WL 4651475, at *5 (S.D.N.Y. Oct. 6, 2021) ("Statements that 'vaguely and enthusiastically' describe a company's performance and 'expectations of business success' are considered to be inactionable puffery."); *Argo Blockchain*, 2024 WL 4451967, at *3 ("Statements expressing a general view that 'things are going well,' that a company is 'well positioned,' or that

---

[7] *See also* ¶¶ 94, 152 ("unlock our opportunity in direct issuance and other adjacent markets"); ¶ 146 ("[W]e believe StubHub can become the destination fans will turn to for access to every ticket, every event and every option on demand.").

a year was 'successful' are . . . generally deemed to be puffery, and hence non-actionable.").

### 3.    StubHub's Opinion Statements Are Not Actionable

Likewise, many of StubHub's statements are inactionable opinion statements.  *See, e.g.,* ¶¶ 141, 146-47, 152-53 (prefacing statements with "we believe").  Statements prefaced with terms like "we believe" are opinions because they "expressed Defendants' views."  *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *10 (S.D.N.Y. Jan. 18, 2018) (Furman, J.).  For such opinion statements to be actionable, Plaintiffs would need to allege that StubHub (1) "did not hold the belief [it] professed"; (2) "the supporting fact[s] [it] supplied were untrue"; or (3) "the speaker omit[ted] information whose omission makes the statement misleading to a reasonable investor."  *Friedman v. Endo Int'l PLC*, 2018 WL 446189, at *5 (S.D.N.Y. Jan. 16, 2018) (Furman, J.), *aff'd sub nom.  Steamfitters' Industry Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494 (2d Cir. 2019).

Here, none of these statements contain an embedded fact, much less a false one, and Plaintiffs do not allege any fact even suggesting that Defendants disbelieved these statements when made.  As to the third prong, Plaintiffs do not identify "particular [] and material facts" about the basis for these opinions whose omission made the opinion statement misleading.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015) (noting that it is "no small task" to challenge an opinion statement).  Thus, none of these opinion statements are actionable.  *Sky Solar*, 389 F. Supp. 3d at 256 (dismissing Section 11 claims where "Plaintiffs have offered no factual allegations" that would "support an inference that [company] did not actually believe the opinions, nor has Plaintiff shown that they were misleading"); *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 687-89, 691 (S.D.N.Y. 2004) (dismissing Section 11 claims where plaintiffs did not plead "any facts to show that defendants did not believe, or have a reasonable basis to believe" opinion statements).

17

**4.    Plaintiffs Fail to Plead That The Risk Disclosure Statements Were Materially Misleading**

Plaintiffs next challenge the risk disclosures themselves as misleading based on the theory that they cautioned about risks related to StubHub's entry into the original issuance ticketing market (via direct issuance) when, in fact, there were unspecified issues that "were already occurring and had manifested as of the time of the IPO." ¶¶ 173-76.  That theory fails for the simple reason that Plaintiffs have not pled that any of these risks "had already transpired" at the time the Offering Materials were issued.  *Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 396-99 (S.D.N.Y. 2022) (Furman, J.); *see also Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 405-06 (S.D.N.Y. 2020) (no liability based on "generic" risk disclosures that "cannot be understood as a guarantee" that products and systems would not have defects).

For example, Plaintiffs challenge the disclosure that "[i]f we are unsuccessful in executing our business strategy to reach more categories of events and experiences, including through direct issuance, our business and growth prospects may be harmed." ¶ 174.  But Plaintiffs fail to allege any facts showing that as of the IPO, StubHub was already having trouble executing direct issuance or other business strategy, much less that StubHub "knew or should have known of that fact at the time of the IPO." *Pintec*, 600 F. Supp. 3d at 397; *see also Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 n.19 (S.D.N.Y. 2018) ("[W]hile the risk of failure [of a drug candidate] was present (and disclosed) at all times, the reality of failure of [the candidate] did not durably come to pass during the Class Period."), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).  On the contrary, there is no dispute that as of the IPO, StubHub had already entered into multi-year direct issuance partnerships with marquee content rights holders, including a partnership with MLB just before the IPO.  *See* ¶¶ 76-78; OM at 133.  Moreover, even if a problem with executing business strategy later emerged—which it did not—StubHub's "risk disclosures cannot be understood as a

18

guarantee" of the success of its business strategy. *Chapman*, 466 F. Supp. 3d at 405; *see also Smith v. Gap, Inc.*, 2026 WL 1502033, at *3 (2d Cir. May 28, 2026) ("We reject Plaintiffs' proposed rule that a risk disclosure is actionable whenever a company fails to disclose that the risk already materialized in some way."). Accordingly, Plaintiffs' challenge to the risk disclosures should be dismissed.

**B.      Plaintiffs Fail to Plead That the Advertising Prospect Statements Were False**

Plaintiffs' next theory of falsity centers around the Offering Materials' description of StubHub's digital advertising opportunity—in essence, the potential to allow sellers to pay money to advertise or promote their listings ahead of others within the StubHub platform. ¶¶ 157-62.[8] In particular, Plaintiffs challenge as false StubHub's statement that "[b]ased on the disclosed metrics of peer global digital marketplaces, we estimate our near-term [advertising] opportunity to be approximately 10% of our SAM, or $19 billion" because this statement allegedly "presented StubHub's advertising opportunity as imminent and without material obstacle." ¶¶ 159, 161. But again, no reasonable investor reading the Offering Materials in full could have concluded that StubHub's development into digital advertising was guaranteed or imminent. *Olkey*, 98 F.3d at 5. To the contrary, the Offering Materials disclosed in plain terms that StubHub did not currently offer these advertising products and only "intend[ed] to offer [them]" in the future. OM at 142. The reference to $19 billion "advertising opportunity" was a projection about the *market* StubHub could address or tap into, not a projection about its revenue. In other words, while StubHub used "10% of [] SAM" (¶159) as a way to think about the size of this opportunity as compared to its current business, the Offering Materials clearly listed digital advertising under a boldface header

---

[8] To the extent Plaintiffs rely on statements in the roadshow presentation, they fail for the same reasons explained above. *See supra* pp. 15-16.

of "Total Addressable Market (TAM)," which StubHub expressly defined as opportunities it could "address over the long term."  OM at 137 (listing digital advertising under TAM); ¶ 140 (defining TAM).

To plead falsity, Plaintiffs again rely solely on Mr. Baker's post-IPO statements during the March 2026 earnings call that StubHub wanted to "spend more time working [its advertising] product through and experimenting with it."  ¶ 126.  But that statement does not contradict any of StubHub's prior statements.  In fact, Mr. Baker's March 2026 statement is entirely in line with what StubHub had disclosed in the Offering Materials.  As Plaintiffs acknowledge, Mr. Baker explained during that call that StubHub's advertising business was "generating modest revenue" and "showing promising early results."  ¶ 123 (quoting Ex. 5, Shareholder Letter at 5).  This is consistent with the disclosure in the Offering Materials six months earlier that StubHub did not currently offer these products and intended to offer them in the future.  OM at 142.  If anything, these statements show progress in that endeavor, not a retreat.  In any event, these statements six months after the IPO say nothing about StubHub's market projections six months prior.  *Pintec*, 600 F. Supp. 3d at 397 (finding the statement must be false when made); *Opera Ltd.*, 527 F. Supp. 3d at 555 (same).

Plaintiffs' remaining challenges to statements about digital advertising involve quintessential opinion statements.  *See* ¶ 159 ("*we believe* that further monetizing our marketplace through advertising will require minimal incremental investment"); ¶ 161 ("*we believe* that the range of options to enable advertising on our marketplace is broad").  Plaintiffs do not point to any facts showing that these statements were not sincerely believed.  *See* ¶¶ 159-62.  Nor do Plaintiffs show that these statements contained an embedded false fact or omitted material contrary facts, by for example, showing that advertising requires substantive investment or that there was a limited

20

range of options to enable advertising on StubHub's marketplace.  *Id.*  Absent these allegations, these opinions are not actionable.  *See, e.g.*, *In re Stemline Therapeutics, Inc. Sec. Litig.*, 313 F. Supp. 3d 543, 550-51 (S.D.N.Y. 2018) (dismissing claims where plaintiffs' alleged opinions were misleading by omission but information omitted did not conflict "with what a reasonable investor would [have taken] from opinion statements in the [p]rospectus"); *Sky Solar*, 389 F. Supp. 3d at 256 (finding opinion statements inactionable where "Plaintiffs have offered no factual allegations" that would "support an inference that [company] did not actually believe the opinions, nor has Plaintiff shown that they were misleading").

## C.    Plaintiffs Fail to Plead That The Free Cash Flow Statements Were False

Plaintiffs' next assertion is that the Offering Materials made certain misstatements concerning StubHub's free cash flow.  ¶¶ 164-67.[9]  The Offering Materials disclosed StubHub's FCF for fiscal years 2022 through 2024 and the first six months of 2025 and there is no debate that each of those historical figures were accurate.  OM at 23, 98, 103; *see also* ¶ 165.  "[I]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data."  *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, *38-39 (2d Cir. 2012).  Nonetheless, Plaintiffs claim that StubHub should have disclosed that purported negative trends in FCF "would accelerate, resulting in a negative FCF" in Q3 2025, even though the third quarter would not conclude until ***two weeks after*** the IPO.  ¶¶ 166-67.  That argument is also without basis.

---

[9] To the extent Plaintiffs challenge the characterization of free cash flow as a "key business metric" and the statement "[w]e believe that free cash flow is a meaningful indicator of liquidity for management and investors" (OM at 103; ¶ 164), those challenges fail because Plaintiffs plead no facts whatsoever to support the alleged falsity, and those statements are inactionable opinions. *See Horizon Pharma*, 2018 WL 481883, at *10.

As a starting point, the law is clear that "[a] company has no obligation to report its quarterly financial results before they have been finalized." *Sandoz v. Waterdrop Inc.*, 2023 WL 1767526, at \*10 (S.D.N.Y. Feb. 3, 2023) (dismissing Section 11 claim based on alleged failure to disclose preliminary quarterly financial results).[10]  Thus, StubHub had no duty to disclose preliminary, in-process financial results from a quarter that was still ongoing as of the IPO.  *See id.*; *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (affirming dismissal of Section 11 claims and finding no requirement to disclose interim financial information).

In any event, Plaintiffs' FCF-based claim fails because there was no material or contradictory information to disclose.  The Offering Materials disclosed that StubHub's "***results of operations vary from quarter to quarter and year over year, so our financial performance in certain financial quarters or years may not be indicative of, or comparable to, our financial performance in subsequent financial quarters or years***," OM at 31 (emphasis in original), and that "[s]easonal trends in [StubHub's] GMS and the timing of major events throughout the year impact free cash flow for any given quarter and can vary year to year," *id.* at 104.  That is precisely what happened here.  Data from the Offering Materials (reproduced below) shows that StubHub's FCF figures did fluctuate significantly from quarter to quarter:

---

[10] *See also Arfa v. Mecox Lane Ltd.*, 2012 WL 697155, at \*12 (S.D.N.Y. Mar. 5, 2012) (a company does not have "any obligation to disclose the results of a quarter in progress"), *aff'd*, 504 F. App'x 14 (2d Cir. 2012); *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 539 (S.D.N.Y. 2010) (rejecting effort "to hold Defendants liable for [their] failure to disclose financial information about the third quarter before that quarter had concluded"); *Wandel v. Gao*, 590 F. Supp. 3d 630, 645 (S.D.N.Y. 2022) (no duty to report financial data from the fourth quarter of 2019 that ended two weeks ***before*** the IPO).

| Fiscal Year | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| FY 2022 | $1,566 | $(35,275) | $(19,518) | $3,400 |
| FY 2023 | $184,014 | $(32,570) | $54,753 | $95,757 |
| FY 2024 | $258,691 | $136,442 | $10,602 | $(150,625) |
| FY 2025 | $151,110 | $9,716 | $(4,600) | $1,963 |

*See* OM at 23, 98, 103, 107-08; 10-Q for Q3 2025; 10-Q for Q4 2025. As this Court has previously held, "dramatic swings from quarter to quarter," particularly when such data "were accompanied by cautionary language warning of volatility," are dispositive on the question of whether there was any "trend" to disclose in the Offering Materials. *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619-25 (S.D.N.Y. 2021) (Furman, J.); *see also Vivint Solar*, 861 F.3d at 39 (finding no trend where the fluctuation was "substantial" and in different directions).

With regard specifically to FCF for Q3 2025, StubHub explained that the Company was "impacted by an atypical concentration in seller proceed outflows occurring in the fourth quarter of '24 following the final leg of Taylor Swift's North American tour." Ex. 3, Q3 25 Earnings Call at 9. The Offering Materials warned of this exact dynamic, even naming the exact artist/tour that would cause certain results to vary significantly from quarter to quarter. OM at 31 (disclosing that variability in "financial results and cash needs . . . depend[] on, among other things, the timing of and demand for certain tours, tour cancellations, event ticket sales," including "the timing of and demand for top sporting events and concert tours, such as . . . Taylor Swift's 'Eras' tour."). In short, because Plaintiffs are unable to show that the FCF figures for the as-yet-unfinished quarter were materially contrary to the information that StubHub already disclosed on this point, Plaintiffs cannot state a claim as a matter of law. *See UP Fintech*, 527 F. Supp. 3d at 619-25.

**D.    The AC Fails To Allege A Violation Of Item 303**

Plaintiffs' final theory is that Defendants violated Item 303 of SEC Regulation S-K by

23

failing to disclose four purported adverse trends: (1) StubHub's alleged inability to further penetrate the original issuance ticketing market; (2) StubHub's alleged inability to achieve its advertising growth projections; (3) the allegedly material decline of StubHub's FCF; and (4) the divergence between StubHub's forecasted growth prospects and those presented to investors. *See* ¶ 171. These are merely repackaged versions of Plaintiffs' other challenges to StubHub's disclosures and they fail for the same reasons as Plaintiffs' other claims.

This claim also fails for several reasons specific to Item 303. Item 303 requires the disclosure of "known trends or uncertainties" that StubHub "reasonably expect[ed]" to have a material impact on its business. 17 C.F.R. § 229.303(a)(3)(ii); *see also Vivint Solar*, 861 F.3d at 39 ("Disclosure is required where the trend is both "(1) known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations."). Plaintiffs have not pled facts to satisfy either prong.

*First*, as described above, the Offering Materials disclosed all the information that Plaintiffs claim was omitted, including the incipient nature of the direct issuance business and digital advertising effort, the challenges of expanding into the original issuance ticketing market, and the need for additional product development for these programs. No more is required under Item 303. *See Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2026 WL 810180, at *4 (2d Cir. Mar. 24, 2026) (no Item 303 liability where "[g]iven the[] fulsome disclosures and other publicly available data, the total mix of information provided investors with clear notice of the typical risks connected to fluctuations in global steel prices").[11]

---

[11] *See also Gen. Motors*, 46 F. Supp. 3d at 397 (no Item 303 violation where the company "had disclosed its increasing inventories and relatively slower growth in sales" and did not need to characterize this as a "trend"); *Lowinger v. Pzena Inv. Mgmt., Inc.*, 341 F. App'x 717, 720 (2d Cir. 2009) (dismissing Item 303 claim where the "prospectus fulfilled this obligation by disclosing" the claimed adverse trend and "warning that this development could be expected"); *Nurlybayev v.*

24

*Second*, Plaintiffs cannot premise an Item 303 claim on the absence of the in-process 3Q25 financials because Plaintiffs fail to establish any discernible trend.  The only common thread is that FCF fluctuated significantly from quarter to quarter, which StubHub disclosed.  *See* OM at 107-08.  This does not state a claim.  *See* UP Fintech, 527 F. Supp. 3d at 624 (no Item 303 violation "in light of the dramatic quarter-to-quarter swings in trading volume and commission revenue" and "warnings about the volatility of such metrics").

*Third*, Plaintiffs fail to plead facts establishing that any of the purported trends were "known" to Defendants at the time of the IPO.  Plaintiffs offer only the conclusory allegations that the Defendants "would have been aware" of certain purported trends "by virtue of their roles as officers and directors of the Company."  ¶ 172.  Those allegations lack the requisite factual specificity showing that defendants "had actual knowledge of the purported trends," which is required to state a claim based on Item 303.  Blackmoss, 2010 WL 148617, at *8; *Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 300-01 (S.D.N.Y. 2020) (dismissing Items 105 and 303 claims where plaintiffs alleged that defendant could be "presumed to have known the relevant facts"); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 302 (S.D.N.Y. 2021) (same).

## II.    PLAINTIFFS DO NOT ADEQUATELY PLEAD STANDING TO ASSERT A CLAIM UNDER SECTION 12(a)(2)

Section 12(a)(2) of the Securities Act creates a cause of action against a seller who makes material misstatements or omissions "by means of a prospectus," and also provides that such a party shall be liable only "to the person purchasing such security from him."  15 U.S.C. § 77l(a)(2).  "The Supreme Court has held that claims under Section 12(a)(2) may be brought by those who have purchased securities in 'initial public offerings' but not by those who purchased securities in

---

*ZTO Express (Cayman) Inc.*, 2019 WL 3219451, at *8 (S.D.N.Y. Jul. 17, 2019) (similar).

a 'secondary market.'" *Caiafa v. Sea Containers Ltd.*, 331 F. App'x 14, 16 (2d Cir. 2009) (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 571, 573, 578 (1995)).  That is because Section 12(a)(2) liability only attaches when there is an "obligation to distribute a prospectus," and "[a] private offering is not effected 'by means of a prospectus.'" *Yung v. Lee*, 432 F.3d 142, 148-49 (2d Cir. 2005).

Here, Plaintiffs allege that they purchased StubHub common stock "*pursuant, or traceable, to* the Registration Statement." ¶¶ 27-28; *see also* ¶ 187 ("Plaintiffs and other members of the Class purchased StubHub shares in the IPO *and/or* pursuant and traceable to the defective IPO Registration Statement.").  Courts in this District have repeatedly held that such allegations are insufficient to support Section 12(a)(2) standing.  *See, e.g., In re Cosi, Inc. Sec. Litig.*, 379 F.Supp.2d 580, 589 (S.D.N.Y. 2005) (dismissing Section 12(a)(2) claim where plaintiffs alleged only "that they bought their shares 'pursuant to or traceable to' the Prospectus"); *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 614 (S.D.N.Y. 2022) (same), *aff'd sub nom. Tseng v. De Vries*, 2023 WL 8073087 (2d Cir. Nov. 21, 2023).

Though the AC does not provide additional allegations concerning when and from whom Plaintiffs purchased their shares, Plaintiffs' own sworn certifications make clear that neither of them purchased StubHub shares at the $23.50 IPO price.  *See* ECF No. 47-2 (Liu purchased shares at $23.48); ECF No. 51-2 (Bajaj purchased shares at $22.38 and additional shares at $19.47).  Thus, Plaintiffs could not have possibly bought their shares directly from any of the Defendants during the IPO, which deprives them of standing to bring claims under Section 12(a)(2).  *See Stadnick v. Vivint Solar, Inc.*, 2015 WL 8492757, at *16–17 (S.D.N.Y. Dec. 10, 2015) (dismissing complaint where plaintiff purchased shares at prices above the IPO price), *aff'd*, 861 F.3d 31 (2d Cir. 2017); *RLX Tech. Inc.*, 632 F. Supp. 3d at 614 ("[T]he certifications indicate that the lead plaintiffs did

26

not buy their shares directly from RLX and thus lack standing to pursue Section 12(a)(2) claims.”);

*HEXO*, 524 F. Supp. 3d at 304-05 (finding lead plaintiffs lacked standing under Section 12(a)(2) where they did not purchase securities on the day of the IPO and purchased shares at a price different than the price that defendant sold the shares).

## III.    PLAINTIFFS HAVE FAILED TO PLEAD A SECTION 15 CLAIM

Because Plaintiffs fail to plead primary violations under the Securities Act, Plaintiffs' derivative Section 15 claims must also be dismissed.  *See Morgan Stanley*, 592 F.3d at 358, 366.

## <center>CONCLUSION</center>

Defendants request that the Court dismiss the AC with prejudice.

<center>27</center>

Dated: June 5, 2026                          Respectfully submitted,

New York, New York                           **LATHAM & WATKINS LLP**

                                             /s/ Jeff G. Hammel
                                             Jeff G. Hammel
                                             Jason C. Hegt
                                             Alexander L. Mills
                                             Chengliang (Larry) Hong
                                             1271 Avenue of the Americas
                                             New York, NY 10020
                                             Tel: (212) 906-1200
                                             Fax: (212) 751-4864
                                             jeff.hammel@lw.com
                                             jason.hegt@lw.com
                                             alexander.mills@lw.com
                                             larry.hong@lw.com

                                             *Counsel for StubHub Holdings, Inc., Eric H. Baker,
                                             Connie James, Mark Streams, Sameer Bhargava, and
                                             Jeremy Levine*

                                             **ALLEN OVERY SHEARMAN STERLING US LLP**

                                             /s/ Daniel Lewis
                                             Daniel Lewis*
                                             Daniel Kahn
                                             599 Lexington Avenue
                                             New York, New York 10022
                                             Tel: (212) 848-4000
                                             daniel.lewis@aoshearman.com
                                             daniel.kahn@aoshearman.com

                                             *Counsel for J.P. Morgan Securities LLC, Goldman Sachs
                                             & Co. LLC, BofA Securities, Inc., Evercore Group L.L.C.,
                                             BMO Capital Markets Corp., Mizuho Securities USA
                                             LLC, TD Securities (USA) LLC, Truist Securities, Inc.,
                                             Nomura Securities International, Inc., WR Securities,
                                             LLC, Citizens JMP Securities, LLC, Oppenheimer & Co.
                                             Inc., Wedbush Securities Inc., and PNC Capital Markets
                                             LLC*

*Electronic signatures are used with consent in accordance with Rule 8.5(b) of the Court's ECF
Rules and Instructions.

29

## CERTIFICATION OF WORD COUNT

I, Jeff G. Hammel, an attorney duly admitted to practice before this Court hereby certify that pursuant to Local Rules 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 8,713 words in accordance with the Local Rules. In making this calculation, I have relied on the word and page counts of the word-processing system used to prepare the document.

Dated: June 5, 2026                    /s/ Jeff G. Hammel
                                       Jeff G. Hammel

29