**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDWARD LIU, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>-v-<br><br>STUBHUB HOLDINGS, INC., *et al.*,<br><br>Defendants. | Case No. 1:25-cv-09776-JMF<br><br>[rel. Case No. 25-cv-10208-JMF]<br><br>[rel. Case No. 25-cv-10445-JMF]<br><br>[rel. Case No. 26-cv-2986-JMF] |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**LATHAM & WATKINS LLP**
Jeff G. Hammel
Jason C. Hegt
Alexander L. Mills
Chengliang (Larry) Hong
1271 Avenue of the Americas
New York, New York 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
jeff.hammel@lw.com
jason.hegt@lw.com
alexander.mills@lw.com
larry.hong@lw.com

*Counsel for StubHub Holdings, Inc., Eric H. Baker, Connie James, Mark Streams, Sameer Bhargava, and Jeremy Levine*

***Additional Counsel on Signature Page***

July 31, 2026

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ..................................................................................................3

A. StubHub Is the Largest Platform in the Secondary Ticketing Market ....................3

B. StubHub Plans to Expand into the Original Issuance Ticketing Market ................3

C. StubHub's IPO and the Offering Materials' Extensive Disclosures .......................4

D. Robinhood and SoFi ..................................................................................7

E. Post-IPO Developments ..............................................................................8

F. This Litigation ..........................................................................................9

LEGAL STANDARD ............................................................................................9

ARGUMENT ....................................................................................................10

I. PLAINTIFFS FAIL TO PLEAD A MATERIALLY FALSE OR MISLEADING STATEMENT ....................................................................................10

A. The Direct Issuance Statements Were Not Materially False or Misleading ..........11

1. The SAC Fails to Plead Contemporaneous Falsity ..........................................11

2. StubHub's Puffery Statements Are Not Actionable ........................................16

3. StubHub's Opinion Statements Are Not Actionable .......................................17

4. Plaintiffs Fail to Plead that the Risk Disclosure Statements Were Materially Misleading ....................................................................18

B. The SAC Fails to Plead that the Advertising Opportunity Statements Were Materially False or Misleading ........................................................19

C. Plaintiffs Fail to Plead that the Free Cash Flow Statements Were False ..............22

D. Plaintiffs Fail to Plead a Claim Based on the Roadshow Presentation .................24

E. The SAC Fails to Allege a Violation of Item 303 .............................................25

II. PLAINTIFFS HAVE FAILED TO PLEAD A SECTION 15 CLAIM ............................27

III. THE SECTION 12 CLAIM AGAINST ROBINHOOD AND SOFI FAILS FOR THE ADDITIONAL REASON THAT PLAINTIFFS DO NOT ALLEGE THOSE DEFENDANTS ARE STATUTORY SELLERS.....27

A. The SAC Does Not Allege Robinhood or SoFi Passed Title to StubHub IPO Shares to Any Plaintiff.....28

B. The SAC Does Not Allege Robinhood or SoFi Directly Solicited Any Plaintiff's Purchase of StubHub IPO Shares.....29

CONCLUSION.....31

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arfa v. Mecox Lane Ltd.*,
2012 WL 697155 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F. App'x 14 (2d Cir. 2012) ....22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....10

*Barilli v. Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. 2019)....10, 18, 21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....10

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ....15, 27

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) ....22

*Capri v. Murphy*,
856 F.2d 473 (2d Cir. 1988)....30

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)....18, 19

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
565 F. Supp. 3d 478 (S.D.N.Y. 2021)....14

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)....10

*Coronel v. Quanta Cap. Holdings Ltd.*,
2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ....12

*Fogel v. Wal-Mart de Mexico SAB de CV*,
2017 WL 751155 (S.D.N.Y. Feb. 27, 2017), *aff'd sub nom. Fogel v. Vega*, 759 F. App'x. 18 (2d Cir. 2018) ....10

*Friedman v. Endo Int'l PLC*,
2018 WL 446189 (S.D.N.Y. Jan. 16, 2018), *aff'd sub nom. Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494 (2d Cir. 2019)....17

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)........................19

*Griffin v. PaineWebber, Inc.*,
2001 WL 740764 (S.D.N.Y. June 29, 2001) ..................................................................28

*Hawes v. Argo Blockchain plc*,
2024 WL 4451967 (S.D.N.Y. Oct. 9, 2024)..................................................................11, 17

*Holsworth v. BProtocol Found.*,
2021 WL 706549 (S.D.N.Y. Feb. 22, 2021)..................................................................30

*Honig v. Hansen*,
2021 WL 4651475 (S.D.N.Y. Oct. 6, 2021)..................................................................17

*In re Bristol-Myers Squibb Co. CVR Sec. Litig.*,
658 F. Supp. 3d 220 (S.D.N.Y. 2023)..................................................................9, 16

*In re CIT Grp., Inc. Sec. Litig.*,
349 F. Supp. 2d 685 (S.D.N.Y. 2004)..................................................................18

*In re Deutsche Telekom AG Sec. Litig.*,
2002 WL 244597 (S.D.N.Y. Feb. 20, 2022)..................................................................29

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015), *adopted*, 2015 WL 5255469
(Sept. 9, 2015)..................................................................16

*In re Focus Media Holding Ltd. Litig.*,
701 F. Supp. 2d 534 (S.D.N.Y. 2010)..................................................................22

*In re Gen. Elec. Co. Sec. Litig.*,
856 F. Supp. 2d 645 (S.D.N.Y. 2012)..................................................................24

*In re HEXO Corp. Sec. Litig.*,
524 F. Supp. 3d 283 (S.D.N.Y. 2021)..................................................................27

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)..................................................................9, 16, 27, 28

*In re NovaGold Res. Inc. Sec. Litig.*,
629 F. Supp. 2d 272 (S.D.N.Y. 2009)..................................................................12

*In re OPUS360*,
2002 WL 31190157 (S.D.N.Y. Oct. 2, 2002)..................................................................30, 31

*In re Orion Sec. Litig.*,
2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009)..................................................................28

*In re ProShares Trust Sec. Litig.*,
728 F.3d 96 (2d Cir. 2013)....................13

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)....................3

*In re Stemline Therapeutics, Inc. Sec. Litig.*,
313 F. Supp. 3d 543 (S.D.N.Y. 2018)....................21

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
504 F. Supp. 3d 224 (S.D.N.Y. 2020)....................29

*Jiajia Luo v. Sogou, Inc.*,
465 F. Supp. 3d 393 (S.D.N.Y. 2020)....................14

*Johnson v. Sequans Commc'ns S.A.*,
2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ....................17

*Lau v. Opera Ltd.*,
527 F. Supp. 3d 537 (S.D.N.Y. 2021)....................13, 21

*Lowinger v. Pzena Inv. Mgmt., Inc.*,
341 F. App'x 717 (2d Cir. 2009) ....................26

*Mullen v. Terran Orbital Operating Corp.*,
2024 WL 3553134 (S.D.N.Y. July 26, 2024), *aff'd sub nom. Mullen v. Bell*, 2025 WL 1793642 (2d Cir. June 30, 2025) ....................12

*Nurlybayev v. ZTO Express (Cayman) Inc.*,
2019 WL 3219451 (S.D.N.Y. Jul. 17, 2019) ....................26

*Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*,
715 F. Supp. 3d 483 (S.D.N.Y. 2024), *aff'd*, 2024 WL 4647131 (2d Cir. Nov. 1, 2024) ....................13

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
98 F.3d 2 (2d Cir. 1996)....................12, 15, 20, 25

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)....................18

*Pinter v. Dahl*,
486 U.S. 622 (1988)....................28, 29, 30

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
2026 WL 810180 (2d Cir. Mar. 24, 2026)....................26

*Risley v. Universal Navigation Inc.*,
2025 WL 615185 (2d Cir. Feb. 26, 2025)....................31

*Rubinstein v. Credit Suisse Grp. AG*,
457 F. Supp. 3d 289 (S.D.N.Y. 2020)....................27

*Sandoz v. Waterdrop Inc.*,
2023 WL 1767526 (S.D.N.Y. Feb. 3, 2023), *aff'd sub nom. Mi v. Waterdrop Inc.*, 2024 WL 159191 (2d Cir. Jan. 16, 2024)....................22

*Saraf v. Ebix, Inc.*,
2023 WL 4561655 (S.D.N.Y. July 17, 2023), *aff'd in part*, 2024 WL 1298246 (2d Cir. Mar. 27, 2024), *aff'd in part*, 2024 WL 5103313 (2d Cir. Dec. 13, 2024)....................3

*Schaffer v. Horizon Pharma PLC*,
2018 WL 481883 (S.D.N.Y. Jan. 18, 2018)....................17, 22

*Schoenhaut v. Am. Sensors, Inc.*,
986 F. Supp. 785 (S.D.N.Y. 1997)....................25

*Scott v. Gen. Motors Co.*,
43 F. Supp. 3d 387 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015)....................11, 13, 26

*Shain v. Duff & Phelps Credit Rating Co.*,
915 F. Supp. 575 (S.D.N.Y. 1996)....................30

*Smith v. Gap, Inc.*,
177 F.4th 405 (2d Cir. 2026)....................19

*Sorial v. Robinhood Fin., LLC*,
2024 WL 4893263 (S.D.N.Y. Nov. 25, 2024)....................7

*Stadnick v. Vivint Solar, Inc.*,
861 F.3d 31 (2d Cir. 2017)....................22, 23, 26

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001)....................30

*Underwood v. Coinbase Glob., Inc.*,
654 F. Supp. 3d 224 (S.D.N.Y. 2023), *aff'd in part, rev'd on other grounds sub nom. Oberlander v. Coinbase Glob. Inc.*, 2024 WL 1478773 (2d Cir. Apr. 5, 2024)....................30, 31

*Wandel v. Gao*,
590 F. Supp. 3d 630 (S.D.N.Y. 2022)....................22

*Willard v. UP Fintech Holding Ltd.*,
527 F. Supp. 3d 609 (S.D.N.Y. 2021)....................23, 24, 27

*Wilson v. Saintine Exploration & Drilling Corp.*,
872 F.2d 1124 (2d Cir. 1989)....................30, 31

*Yaroni v. Pintec Tech. Holdings Ltd.*,
600 F. Supp. 3d 385 (S.D.N.Y. 2022)....................18, 19, 21, 31

*Youngers v. Virtus Inv. Partners Inc.*,
195 F. Supp. 3d 499 (S.D.N.Y. 2016)....................30, 31

**STATUTES**

15 U.S.C.
§ 77k(a)....................28
§ 77l(a)(2)....................28

**TREATISES**

1 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* §§ 2:7, 4.8
(8th ed. 2023)....................7

**REGULATIONS**

17 C.F.R. § 229.303(b)(2)(ii)....................26

## PRELIMINARY STATEMENT[1]

StubHub operates the world's largest online ticketing platform connecting buyers and sellers of concert, sporting event, and other tickets in more than 200 countries. Since its inception, substantially all of StubHub's sales have been resales of tickets originally sold elsewhere, although StubHub recently started to expand into the original issuance ticketing market by facilitating direct ticketing sales. When StubHub's stock price declined following its IPO, this lawsuit was filed.

Plaintiffs attempt to plead claims under Sections 11, 12(a)(2), and 15 of the Securities Act based on the theory that the Offering Materials for StubHub's IPO misled investors on three topics: (i) StubHub's future prospects in the original issuance ticketing market, (ii) its ability to develop an advertising business, and (iii) its 2025 free cash flow. Each of these theories fails because the Offering Materials themselves contained detailed disclosures addressing the very points Plaintiffs claim were concealed or misrepresented. Moreover, despite its wordiness, the SAC includes none of the usual hallmarks of a viable securities claim: no internal reports or documents contradicting the disclosures, no former employees or confidential witnesses—indeed, no contrary facts from any source. In short, despite having two opportunities to amend their complaint, Plaintiffs still do not plead a single fact that contradicts the statements in the Offering Materials, which is fatal to Plaintiffs' claims against all Defendants.

*First*, the SAC pleads no facts establishing that StubHub's statements regarding its future prospects in the original issuance ticketing market are false. StubHub told investors it was "in the early innings" of targeting this market and disclosed that its platform was "primarily focused on"

---

[1] Unless otherwise specified, emphases are added, quotations and internal citation marks are omitted, citations to Ex.__ are to the accompanying Declaration of Alexander L. Mills, and capitalized terms have the meaning set forth in the Second Amended Complaint (Ex. 1, cited as "SAC" or "¶_") and/or the Offering Materials (Ex. 2, cited as "OM").

the secondary market. OM at 13. The Offering Materials made no promise regarding the pace or extent of growth of this business. To the contrary, StubHub warned investors that "[t]here can be no assurance that [StubHub] will succeed in expanding the adoption of [its] platform for direct issuance" (OM at 28) and that success depended on factors "out of [StubHub's] control" (OM at 29). Plaintiffs identify nothing contradicting these disclosures and point only to StubHub's disclosure six months after the IPO that it was still working to grow this business—disclosures that are entirely consistent with the Offering Materials. *See* Section I.A.

*Second*, StubHub was equally transparent about its digital advertising opportunities. StubHub disclosed that it did not currently offer digital advertising and had negligible revenue from this business, but that it "intend[ed] to offer [this] in the future." OM at 142. Plaintiffs' allegation that six months after the IPO this business was "generating modest revenue" and "showing promising early results" is again entirely consistent with what StubHub disclosed in the Offering Materials and does not render any statements false or misleading. *See* Section I.B.

*Third*, Plaintiffs do not challenge the accuracy of StubHub's free cash flow figures from fiscal years 2022 through 2024 and the first half of 2025. Instead, they fault StubHub for not disclosing preliminary results from a quarter that had not yet closed as of the IPO. The law in this Circuit is clear that a company has no obligation to report in-process quarterly financials before they are finalized and that there is no discernible trend to be disclosed where, as here, the relevant figures fluctuated significantly from quarter to quarter. *See* Section I.C.

*Finally*, although the Court need not reach the issue because of Plaintiffs' failure to allege a materially false or misleading statement, Plaintiffs independently fail to state a Section 12 claim against Robinhood Financial LLC and SoFi Securities LLC because they do not allege those defendants either (a) passed title to StubHub IPO shares to Plaintiff Hunter (the only Plaintiff who

allegedly bought in the offering, ¶ 23), or (b) actively and directly solicited Hunter's purchase of those shares. Thus, the SAC fails to plead Robinhood and SoFi are statutory sellers under Section 12. *See* Section III.

The SAC states no claim and should be dismissed in its entirety with prejudice.

## BACKGROUND[2]

### A. StubHub Is the Largest Platform in the Secondary Ticketing Market

StubHub was founded in 2000 as the first online platform for buying and selling tickets on the secondary market. ¶ 68; OM at 1. To help grow this business, StubHub created a technology-enabled global ticketing marketplace where tickets were sourced and priced dynamically, and all types of live events could be supported. OM at 1, 82. As of its IPO, StubHub was the largest platform in both the international and U.S. secondary ticketing market for live events. *Id.* at 1-4.

### B. StubHub Plans to Expand into the Original Issuance Ticketing Market

At the time of the IPO, StubHub estimated the total sales in the secondary ticketing market at approximately $41 billion per year. ¶¶ 5, 59, 65; SAC, Ex. A, Roadshow Deck at 11, 13. By contrast, the estimated market for original issuance ticketing—*i.e.*, sales in which content rights holders like sports teams and musical artists make the initial ticket sale to customers—was over $130 billion. OM at 4. At the time of the IPO, StubHub's market share of the original issuance ticketing market was approximately 0.1%. ¶ 62. Seeking to break into this much larger market, StubHub introduced a business model known as "direct issuance," which allows content rights

---

[2] This background is drawn from (i) the well-pleaded factual allegations in the SAC and documents referenced therein, (ii) StubHub's SEC filings, and (iii) "information already in the public domain and facts known or reasonably available to the shareholders." *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 517 n.1, 539 n.13 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *Saraf v. Ebix, Inc.,* 2023 WL 4561655, at *1 (S.D.N.Y. July 17, 2023) (Furman, J.), *aff'd in part*, 2024 WL 1298246 (2d Cir. Mar. 27, 2024), *aff'd in part*, 2024 WL 5103313 (2d Cir. Dec. 13, 2024).

holders to sell tickets directly to purchasers on StubHub's global ticketing marketplace while continuing to use legacy distribution channels. ¶¶ 5, 67, 73; OM at 8-9.

To help accelerate adoption, StubHub entered into arrangements with several marquee content rights holders—including several major U.S. and international professional sports teams, musical artists, and festivals—under which StubHub guaranteed those sellers a minimum level of proceeds regardless of actual ticket sales. ¶¶ 75-77. That plan worked: StubHub's Gross Merchandise Sales (a metric that reflects the value of tickets sold) from direct issuance grew more than 14 times from 2022 to 2024—from $9 million to $128 million. ¶ 74. However, even with this upswing, StubHub's direct issuance business still represented just 0.1% of the total original issuance market. *Id.* As StubHub disclosed, it began to phase out those guaranteed revenue arrangements in 2025 "[a]s our marketplace continues to demonstrate its value as a distribution channel for original issuance tickets[.]" ¶ 136; OM at 9. Although in the early stages, StubHub was continuing to make progress in growing this business. For instance, just two weeks before the IPO, StubHub announced that Major League Baseball had designated StubHub as the "Official Direct Issuance Partner." ¶ 75 n.5 (citing press release).

**C. StubHub's IPO and the Offering Materials' Extensive Disclosures**

On September 17, 2025, StubHub conducted its IPO, listing its Class A common stock on the New York Stock Exchange with an opening price of $23.50 per share. ¶¶ 84-85. Fourteen investment banks served as the underwriters, who collectively purchased and underwrote 34 million shares offered in the IPO. ¶¶ 32-48.

In the Offering Materials, StubHub made extensive disclosures about its business and financial condition, its near-term and long-term prospects, and the associated risks, including disclosures on each of the topics Plaintiffs challenge in this lawsuit.

**<u>Original Issuance Disclosures.</u>** The Offering Materials described StubHub as being "in ***the early innings of targeting the original issuance ticketing market*** and bringing content rights holders to our platform." OM at 8, 13, 28, 132, 141. In a similar vein, StubHub projected that it was "***in the early stages*** of what we believe will be a major disruption to the way original issuance tickets are distributed." *Id.* at 10, 135. Despite this cautious optimism, the Offering Materials did not make any predictions about how much direct issuance would grow, or over what time period. Instead, StubHub tempered any optimism by providing a number of boldface "risk factors" warning investors about the potential challenges of expanding direct issuance, including the following:

- Under the heading "***We may not be successful in executing our business strategy to expand our reach to more categories of events and experiences***" (emphasis in original):
    - "There can be no assurance that we will succeed in expanding the adoption of our platform for direct issuance or that any demand for future offerings or initiatives we may pursue . . . will exist, develop or be sustained." OM at 28.
- Under the heading "***We may not be successful in expanding the adoption of our platform for direct issuance in a cost-effective manner***" (emphasis in original):
    - "If content rights holders are not convinced of the value proposition of our marketplace, if we are unsuccessful in building and maintaining relationships with content rights holders, or if we do so in a way that is not profitable or fails to compete successfully against our current or future competitors, we may be unable to realize the objectives of this business strategy or realize our anticipated value in the original issuance ticketing market." *Id.*
    - "[T]he adoption of our platform for direct issuance is subject to a number of factors, some of which may be out of [StubHub's] control, including the ability or willingness of content rights holders to use [the] platform to sell original issuance tickets, [StubHub's] competitors' exclusivity rights governing ticket sales for certain events or venues or buyers' willingness to engage with [StubHub's] brands and marketplace as a source for original issuance ticket purchases." *Id.* at 29.

The Offering Materials further disclosed that StubHub's "seller products today are primarily focused on inventory management and pricing intelligence for the secondary market" and that StubHub "plan[ned] to add additional features to [its] seller products and tools to continue reducing friction for sellers, including content rights holders with larger ticket portfolios, to list and sell their tickets on [its] marketplace." *Id.* at 13, 86, 142. Eliminating all doubt about the current and near-term size of the direct issuance business, the Offering Materials noted that the platform was not currently suited to serve content rights holders at scale: "[w]hile we are aware that certain content rights holders have historically used our marketplace from time to time, the supply side of our platform has been built primarily to service individual sellers and professional sellers in the secondary ticketing market." *Id.* at 8, 132.[3]

**Advertising Disclosures.** The Offering Materials were similarly transparent about StubHub's nascent efforts to add an advertising function, which would allow sellers to pay to advertise or promote their tickets within StubHub's marketplace. Under the heading "***Improve the Monetization of Our Marketplace Through Advertising***," StubHub disclosed that "[t]here are meaningful sources of additional monetization of our marketplace activity that we do not offer today" but that it "intend[ed] to offer in the future." OM at 142. The Offering Materials made clear that this revenue stream was not imminent by listing digital advertising as a component of Total Addressable Market ("TAM"), which StubHub described as a market that could be addressed "over the long term," as opposed to its Serviceable Addressable Market ("SAM"), which is the market "we address today." *Id.* at 10, 135, 137; *see also* SAC, Ex. A, Roadshow Deck at 11.

---

[3] In the roadshow presentation allegedly shown to prospective investors ahead of the IPO, StubHub presented largely the same information. This presentation described StubHub as being a "global leader in secondary ticketing," and noted its "vision" "to disrupt the original issuance market," which it presented as a "Larger Opportunity Beyond Resale." SAC, Ex. A, Roadshow Deck at 5, 13. Plaintiffs do not challenge any of these statements as misleading.

Likewise, as the SAC concedes, investors knew that StubHub's advertising business was generating "effectively zero" revenue in 2025, since all reported revenue came from traditional ticketing service fees. ¶ 115.

**Free Cash Flow Disclosures.** The Offering Materials disclosed StubHub's FCF for fiscal years 2022 through 2024 and the first six months of 2025—the accuracy of which was not in dispute. ¶¶ 179-82; OM at 23. These disclosures showed that FCF fluctuated significantly between different quarters. ¶¶ 180-81; OM at 23, 103-04, 107-08. The Offering Materials warned investors that StubHub's "***results of operations vary from quarter to quarter and year over year, so our financial performance in certain financial quarters or years may not be indicative of, or comparable to, our financial performance in subsequent financial quarters or years.***" OM at 31 (emphasis in original). StubHub also explained that "[s]easonal trends in . . . [sales] and the timing of major events throughout the year impact free cash flow for any given quarter and can vary year to year." *Id.* at 104. StubHub likewise warned of the "limitation of the use of" this metric because "it does not represent the total increase or decrease in our cash balance for the period [and therefore] should not be considered in isolation or as an alternative to cash flows from operations and . . . our other financial liquidity measures." *Id.* at 103.

### D. Robinhood and SoFi

Robinhood and SoFi are "brokerage firm[s] that provide[] trading and brokerage services through [their] app[s] and website[s]." *Sorial v. Robinhood Fin., LLC*, 2024 WL 4893263, at *1 (S.D.N.Y. Nov. 25, 2024) (describing Robinhood). They are sued here as "selling group member[s]." ¶¶ 49-51. Selling group members play a role in the distribution of an IPO, but they are not underwriters and do not share in the underwriting fee; they are typically compensated through sales commissions on any sales made through their platforms. 1 Thomas Lee Hazen, Treatise on the Law of Securities Regulation §§ 2:7, 4.98 (8th ed. 2023).

The SAC alleges that, through their online platforms, Robinhood and SoFi "participated in the promotion of the IPO" by advertising on their websites that investors "could access IPO shares on their online brokerage platforms" and "provid[ing] access to the StubHub IPO" through their platforms. ¶¶ 52, 86. The SAC does not allege Robinhood or SoFi passed title to StubHub IPO shares to Plaintiff Hunter (the only Plaintiff who allegedly bought in the offering, ¶ 23) or made the Prospectus available to any investor in the StubHub IPO, let alone to Hunter.

### E. Post-IPO Developments

Before StubHub made any statements to the market following the IPO—with no new information in the market about the company—its stock had declined approximately 20% from the IPO price. Ex. 10, Stock Price Chart.

StubHub made its first post-IPO announcement on November 13, 2025, when it provided its 3Q25 financial results and said that it would begin providing forward-looking earnings guidance in March 2026 (its first full year as a public company) but would not provide guidance for the balance of 2025. ¶¶ 117-19. The November 13, 2025 disclosures did not address StubHub's direct issuance or digital advertising businesses. ¶ 120.

On March 4, 2026, StubHub reported its 4Q25 financial results and issued forward-looking guidance for 2026. ¶¶ 121-49. In a detailed discussion of the factors that could impact performance over the coming year, StubHub explained that its "financial performance in 2026 will continue to be driven by our core resale marketplace, which constitutes the vast majority of our revenue." Ex. 5, Shareholder Letter at 2. With respect to direct issuance and advertising, StubHub noted that they "remain compelling opportunities for us, but our FY2026 guidance does not assume any material revenue contribution from either initiative." *Id.* StubHub emphasized that it "believe[s] Direct Issuance . . . remains a transformational long-term opportunity for StubHub and the broader live event ecosystem" and that the "demand for [its] distribution model has been

validated." *Id.* at 4. Similarly, StubHub noted that "[o]ur advertising business is generating modest revenue today, and we are continuing to iterate toward a model that enhances the seller and buyer experience." *Id.* at 5.

### F. This Litigation

This lawsuit was filed 12 days after the November 13, 2025 announcement. After a motion to dismiss an earlier iteration of the complaint, the Court issued an order on June 10, 2026 inviting Plaintiffs to file an SAC, noting that "Plaintiff will not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss." ECF No. 77 at 2. On June 26, 2026, Plaintiffs filed the SAC, which is premised on essentially the same theories and allegations. In an implicit acknowledgment that the original plaintiffs lack standing to assert a Section 12(a)(2) claim, the SAC added an additional plaintiff, Vincent Hunter, who allegedly purchased StubHub shares "at the IPO price ($23.50), directly from a Defendant in the IPO." ¶ 23. Like its predecessor, the SAC asserts three claims under the Securities Act: a Section 11 claim against StubHub, the Individual Defendants, and the Underwriter Defendants, a Section 12 claim against StubHub, the Underwriter Defendants, and the newly added Selling Group Defendants, and a Section 15 claim against the Individual Defendants. ¶¶ 194-215.

## LEGAL STANDARD

To state a claim under Section 11, the plaintiff must establish that a registration statement filed with the SEC "'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 235 (S.D.N.Y. 2023) (Furman, J.). Section 12(a)(2) creates similar claims with respect to prospectuses. *Id.* (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)). To survive dismissal, plaintiffs must allege facts showing that the registration statement contained a material misstatement "when

such part [of the registration statement] became effective," in the case of Section 11 claims, or at the time a prospectus was distributed, in the case of Section 12(a)(2) claims. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 182-83 (2d Cir. 2014).

In alleging these elements, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[L]egal conclusion[s] couched as [] factual allegation[s]" or "naked assertion[s]" devoid of "further factual enhancement" do not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007). "A court need not . . . accept as truth conflicting pleadings that . . . are contradicted by statements in . . . documents upon which [the] pleadings rely." *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 253 n.18 (S.D.N.Y. 2019). Plaintiffs fail to meet these standards.

## ARGUMENT

### I. PLAINTIFFS FAIL TO PLEAD A MATERIALLY FALSE OR MISLEADING STATEMENT

The SAC challenges statements in the Offering Documents concerning (i) the direct issuance business, (ii) advertising revenue streams, and (iii) free cash flow. In essence, Plaintiffs have taken any topic where they wanted StubHub's progress to be quicker and alleged that the Company's post-IPO disclosures revealed that dozens of statements in its Offering Materials were allegedly false or misleading when made. App'x A.[4] That hindsight-based theory is fundamentally flawed because StubHub's subsequent disclosures do not reveal any of its prior statements to be false. All of Plaintiffs' miscellaneous theories fail to plead a false statement.

[4] **Appendix A** is a chart containing the alleged misstatements and corresponding categories from the SAC. *See Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017) (collecting cases accepting appendices that serve as "organizational tools"), *aff'd sub nom. Fogel v. Vega*, 759 F. App'x. 18 (2d Cir. 2018).

### A. The Direct Issuance Statements Were Not Materially False or Misleading

#### 1. The SAC Fails to Plead Contemporaneous Falsity

Plaintiffs' core allegation is that the Offering Materials contained material misstatements regarding the imminency of its expansion into the original issuance ticketing market and the readiness of StubHub's platform to accommodate such expansion. ¶¶ 159-71. Plaintiffs fail to identify a single misstatement or omission.

***First***, Plaintiffs challenge statements about the current status and future plans for StubHub's direct issuance business but allege no facts rendering those statements false. In particular, Plaintiffs challenge as misleading StubHub's statements classifying the original issuance ticketing market as part of StubHub's SAM because, according to Plaintiffs, this opportunity was a "long-term opportunit[y]" and "not in fact achievable or even available in the near-term." ¶¶ 160-63; *see also* OM at 10, 132-33, 135. The problem for Plaintiffs is that StubHub never said that SAM was an opportunity that could be fully achievable "in the near term." To the contrary, StubHub explained that SAM was the market "we address today." ¶¶ 160-61; OM at 10, 135. Plaintiffs' own allegations show that statement to be true: "[s]everal marquee content rights holders . . . ***have already begun*** selling original issuance tickets through [StubHub's] marketplace" (¶¶ 101, 162, 168), and "[s]hortly before the IPO," MLB designated StubHub as the "Official Direct Issuance Partner" (¶ 75 n.5). *See also* ¶ 91 (citing SAC, Ex. A, Roadshow Deck at 16, which notes "Direct Issuance momentum is accelerating, with current DI clients," including professional sports teams and major musical artists and festivals). Thus, Plaintiffs fail to state a claim. *Scott v. Gen. Motors Co.*, 605 F. App'x 52, 54 (2d Cir. 2015) (affirming dismissal of Securities Act claims where the "District Court correctly held that plaintiff failed to identify any inaccuracy"); *Hawes v. Argo Blockchain plc*, 2024 WL 4451967, at *4 (S.D.N.Y. Oct. 9, 2024) (dismissing Section 11 claim where "not a single fact is pleaded tending to show that the statement

is untrue”).

Moreover, StubHub did not speak about the size of the market it was servicing or how quickly that market would grow. To the contrary, it expressly warned investors that StubHub was “in the early innings of targeting the original issuance ticketing market” (¶¶ 104, 137, 167; OM at 8, 13, 28, 132, 141) and that StubHub faced a number of risks in further targeting this market (OM at 28-29, 38, 40). “Prospectuses must be read as a whole.” *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996). And based on these disclosures, no reasonable investor could have concluded that an expansion of StubHub’s share of the original issuance ticketing market was guaranteed or imminent. *Mullen v. Terran Orbital Operating Corp.*, 2024 WL 3553134, at *5-6 (S.D.N.Y. July 26, 2024) (Furman, J.) (dismissing Section 11 claim because no reasonable investor would mistake estimate for a guarantee), *aff’d sub nom.* *Mullen v. Bell*, 2025 WL 1793642 (2d Cir. June 30, 2025); *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 292-95 (S.D.N.Y. 2009) (dismissing Section 11 claim because a reasonable investor would “understand that [the Registration Statement’s] cost estimates and [defendant’s] current view that the Project was economically viable were subject to change”).

Plaintiffs also challenge statements that StubHub was “growing in the $132 billion global original issuance ticketing market” and that StubHub was “in the early stages of what we believe will be a major disruption to the way original issuance tickets are distributed.” ¶¶ 161-62. But Plaintiffs do not make a single factual allegation that StubHub was not beginning to penetrate the original issuance ticketing market as of the IPO. In fact, the Complaint itself again alleges the opposite. ¶ 75 n.5 (recognizing that “[s]hortly before the IPO” StubHub became the “Official Direct Issuance Partner of Major League Baseball”). The absence of factual allegations undermining these statements is dispositive. *See* *Coronel v. Quanta Cap. Holdings Ltd.*, 2009 WL

174656, at *14 (S.D.N.Y. Jan. 26, 2009) (no Section 11 liability where "the Complaint puts forth no factual allegations contradicting" the disclosure); *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 396 (same), *aff'd*, 605 F. App'x 52 (2d Cir. 2015).

Plaintiffs attempt to support their theory about the growth of the direct issuance business by pointing to a statement by StubHub's CEO Eric Baker nearly six months after the IPO (March 2026) in which Mr. Baker supposedly "recategoriz[ed]" StubHub's "Direct Issuance/Original Issuance Ticketing Market opportunities" as "long-term." ¶¶ 133-34, 165. But Mr. Baker's statements during this March 2026 earnings call did not "recategorize" anything and were entirely consistent with what StubHub had said all along. During this call, Mr. Baker told investors that the original issuance ticketing market "*remains* a transformational long-term opportunity for StubHub." Ex. 4, March 4, 2026 Tr. at 5. This is consistent with StubHub's disclosure in the Offering Materials that it was "in the early innings of targeting the original issuance ticketing market." OM at 8. The fact that StubHub used slightly different language to address the same topic is not actionable. *See In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 109 (2d Cir. 2013) (dismissing Section 11 claim where issuer merely "alter[ed] disclosures deemed adequate in the first instance"). Moreover, even if StubHub did change how it viewed the direct issuance business six months after the IPO—which it did not—that subsequent change says nothing about whether the earlier statement was correct when made. *See Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*, 715 F. Supp. 3d 483, 504-05 (S.D.N.Y. 2024) (subsequent change to EBITDA projections did not mean earlier guidance was false when issued), *aff'd*, 2024 WL 4647131 (2d Cir. Nov. 1, 2024); *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 555 (S.D.N.Y. 2021) (Section 11 claims cannot be based on "events occurring after" IPO).

Nor do Plaintiffs plead any falsity based on Mr. Baker's statement during a May 18, 2026 conference hosted by J.P. Morgan. In response to an analyst question regarding the size of StubHub's "open distribution opportunity" (i.e., direct issuance) and the "economics" of that model "relative to core resale," Mr. Baker responded that direct issuance is a "large opportunity" and "big TAM expansion for us." ¶ 139; Ex. 9, May 18, 2026 Tr. at 8. That is entirely consistent with StubHub's pre-IPO recognition that the original issuance ticketing market is a large market and that StubHub was only "in the early innings of targeting" that market. OM at 8. Plaintiffs mischaracterize Mr. Baker's statement to mean that "the Company no longer defined its Direct Issuance business as part of its SAM," but that is contradicted by Mr. Baker's very next sentence where he stated that "we obviously already have tickets flowing [through direct issuance] and the economics to us [from direct issuance or resale] are the same." ¶ 139; Ex. 9, May 18, 2026 Tr. at 8. Plaintiffs cannot state a claim based on mischaracterization of what the defendants actually said. *See City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 494-95 (S.D.N.Y. 2021) (dismissing claims based on statements that company never made); *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 415 (S.D.N.Y. 2020) (dismissing Section 11 claim because "[p]laintiffs rely on a plain misreading of [the company's] Registration Statement").

***Second***, Plaintiffs challenge statements in the Offering Materials relating to the readiness of StubHub's platform to serve the original issuance ticketing market. ¶¶ 166-71. These include opinion statements like "[w]e believe our value proposition, providing broadened distribution and superior pricing intelligence through an open distribution model, is well-positioned to attract more content rights holders to use our marketplace" (¶ 167); or anodyne descriptions of marketplace capabilities like "[c]ontent rights holders can leverage our global reach, trusted brands and marketing expertise to maximize their distribution" (¶ 168) and "[o]ur marketplace enables sellers

of all types, including individual fans, professional sellers and content rights holders" (¶ 168). None of these statements state or even suggest that StubHub's platform was fully ready to support the direct issuance business. To the contrary, the Offering Materials disclosed precisely what Plaintiffs claim was omitted—that StubHub's platform was "built primarily to service" the secondary market and needed "additional features" to effectively service content rights holders in making initial ticketing sales. OM at 8, 13, 132. These disclosures preclude any claim of falsity. *See Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *8 (S.D.N.Y. Jan. 14, 2010) ("disclosure of information alleged in the Complaint to have been withheld from prospective investors renders the Complaint insufficient as a matter of law"); *Olkey*, 98 F.3d at 5 (recognizing that the prospectus must be read "as a whole"). In an attempt to sidestep the plain language of the Offering Materials, Plaintiffs rely solely on Mr. Baker's statements during the March 2026 conference call that StubHub was "prioritizing building the product foundation required to scale Direct Issuance broadly" and that "[d]evelopment is underway to bring these supply-side products to market." ¶¶ 128-29. However, none of those statements contradicted StubHub's earlier statements about the readiness of the platform for direct issuance; they merely confirmed again that the platform was a work-in-progress. *See* OM at 8 ("We are focused on expanding the supply on our marketplace to include original issuance tickets. . . ."); *id.* at 13 ("we plan to add additional features to our seller products and tools to continue reducing friction for sellers").[5]

***Finally***, Plaintiffs cannot salvage their claim by noting that certain analysts were "disappoint[ed]" by the March 4, 2026 disclosures (¶¶ 143-49) because these allegations say

[5] The SAC removed an entire section challenging statements about the "imminency of StubHub's expansion in the original issuance ticketing market." *See* ECF No. 78-3, Ex. C at pp. 70-73. Thus, Plaintiffs' only remaining challenges on this topic pertain to the growth of the direct issuance business and the readiness of the StubHub platform to serve that business.

nothing about whether StubHub's statements were false or misleading. *Sogou*, 465 F. Supp. 3d at 415 (dismissing Section 11 claim where "Plaintiffs do not state any 'concrete facts' showing that any statement [defendant] made was false"). As this Court has observed, "an analyst report is neither a 'registration statement' nor a 'prospectus' . . . [n]or is it an 'oral communication[ ]' that 'relate[s] to a prospectus.' . . . Thus, Plaintiffs cannot bring a claim based on the report under the Securities Act." *Bristol-Myers*, 658 F. Supp. 3d at 236 n.9 (citing *Morgan Stanley*, 592 F.3d at 358-59). Indeed, the SAC admits that the analysts' reactions had nothing to do with what StubHub actually stated in the Offering Materials but merely reflected a recalibration of certain analysts' own bullish growth assumptions.[6]

### 2. StubHub's Puffery Statements Are Not Actionable

Certain of the original issuance statements Plaintiffs challenge are inactionable expressions of corporate optimism. Puffery encompasses statements that are "too general to cause a reasonable investor to rely upon them." *UBS AG*, 752 F.3d at 183. StubHub's statements that it was "well-positioned" to expand into new markets (*see, e.g.*, ¶¶ 162, 167-68) are classic examples of inactionable corporate optimism. *See, e.g.*, *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *13 (S.D.N.Y. Aug. 19, 2015) (statements of "in the early innings of growth" and "well positioned to support growth" are "immaterial corporate puffery"), *adopted*, 2015 WL

[6] The SAC quotes analyst observing that "at the IPO, DI was ***expected by the Street*** to reach $1B of GMS contribution by FYE26." Ex. 6, Mark Mahaney, Q4 EPS: A Challenging Second Act, EVERCORE (Mar. 4, 2026) at 2 (cited at ¶ 145); *see also* Ex. 7, Lloyd Walmsley, STUB Quick Look and Callback Takes: Surprisingly Weak Outlook Across the Board, MIZUHO (Mar. 4, 2026), at 1 ("most investors assumed the ***sell-side forecasts*** for the DI business ***were aggressive***") (cited at ¶ 145 n. 18); Ex. 8, Doug Anmuth, Reset; Downgrade to Neutral and $10 PT, JPMORGAN (Mar. 5, 2026) at 1 ("STUB's guidance for 2026 EBITDA is now ~60% below ***what we projected*** in our Oct'25 initiation.") (cited at ¶ 149). In other words, although performance was less than what certain sell-side analysts themselves had estimated, that fact says nothing about the accuracy of StubHub's statements.

5255469 (Sept. 9, 2015); *Johnson v. Sequans Commc'ns S.A.*, 2013 WL 214297, at *14 (S.D.N.Y. Jan. 17, 2013) (company's statement that it "believe[s] we are better positioned to drive our roadmap to meet those needs" are "non-actionable"). The same is true of the statement that StubHub could "disrupt the legacy primary ticketing model." ¶ 105.[7] Courts routinely dismiss claims based on similarly generic predictions of success. *Honig v. Hansen*, 2021 WL 4651475, at *5 (S.D.N.Y. Oct. 6, 2021) ("Statements that 'vaguely and enthusiastically' describe a company's performance and 'expectations of business success' are considered to be inactionable puffery."); *Argo Blockchain*, 2024 WL 4451967, at *3 ("Statements expressing a general view that 'things are going well,' that a company is 'well positioned,' or that a year was 'successful' are . . . generally deemed to be puffery, and hence non-actionable.").

### 3. StubHub's Opinion Statements Are Not Actionable

Likewise, many of StubHub's statements are inactionable opinions. *See, e.g.,* ¶¶ 160-62, 167-68 (prefacing statements with "we believe"). Statements prefaced with terms like "we believe" are opinions because they "expressed Defendants' views." *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *10 (S.D.N.Y. Jan. 18, 2018) (Furman, J.). For such opinion statements to be actionable, Plaintiffs would need to allege that StubHub (1) "did not hold the belief [it] professed"; (2) "the supporting fact[s] [it] supplied were untrue"; or (3) "the speaker omit[ted] information whose omission makes the statement misleading to a reasonable investor." *Friedman v. Endo Int'l PLC*, 2018 WL 446189, at *5 (S.D.N.Y. Jan. 16, 2018) (Furman, J.), *aff'd sub nom. Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494 (2d Cir. 2019).

Here, none of these statements contain an embedded fact, much less a false one, and

[7] *See also* ¶ 167 ("[W]e believe StubHub can become the destination fans will turn to for access to every ticket, every event and every option on demand.").

Plaintiffs do not allege any fact even suggesting that Defendants disbelieved these statements when made. As to the third prong, Plaintiffs do not identify "particular []and material facts[]" about the basis for these opinions whose omission made the opinion statement misleading. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015) (noting that it is "no small task" to challenge an opinion statement). Thus, none of these opinion statements are actionable. *Sky Solar*, 389 F. Supp. 3d at 256 (dismissing Section 11 claims where "Plaintiffs have offered no factual allegations" that would "support an inference that [company] did not actually believe the opinions, nor has Plaintiff shown that they were misleading"); *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 687-89, 691 (S.D.N.Y. 2004) (dismissing Section 11 claims where plaintiffs did not plead "any facts to show that defendants did not believe, or have a reasonable basis to believe" opinion statements).

#### 4. Plaintiffs Fail to Plead that the Risk Disclosure Statements Were Materially Misleading

Plaintiffs next challenge the risk disclosures themselves as misleading based on the theory that they cautioned about risks related to StubHub's entry into the original issuance ticketing market (via direct issuance) when, in fact, there were unspecified issues that "were already occurring and had manifested as of the time of the IPO." ¶¶ 188-93. That theory fails for the simple reason that Plaintiffs have not pled that any of these risks "had already materialized" at the time of the Offering Materials. *Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 396-99 (S.D.N.Y. 2022) (Furman, J.); *see also* *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 405-06 (S.D.N.Y. 2020) (no liability based on "generic" risk disclosures that "cannot be understood as a guarantee" that products and systems would not have defects).

For example, Plaintiffs challenge the disclosure that "[i]f we are unsuccessful in executing on our business strategy to reach more categories of events and experiences, including through

direct issuance, our business and growth prospects may be harmed." ¶ 189. But Plaintiffs fail to allege any facts showing that as of the IPO, StubHub was already having trouble executing direct issuance or other business strategy, much less that StubHub "knew or should have known of that fact at the time of the IPO." *Pintec*, 600 F. Supp. 3d at 397; *see also* *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 n.19 (S.D.N.Y. 2018) ("[W]hile the risk of failure [of a drug candidate] was present (and disclosed) at all times, the reality of failure of [the candidate] did not durably come to pass during the Class Period."), *aff'd*, 757 F. App'x 35 (2d Cir. 2018). On the contrary, there is no dispute that as of the IPO, StubHub had already entered into multi-year direct issuance partnerships with marquee content rights holders, including a partnership with MLB just before the IPO. *See* ¶¶ 75-77; OM at 133. Moreover, even if a problem with executing business strategy later emerged—which it did not—StubHub's "risk disclosures cannot be understood as a guarantee" of the success of its business strategy. *Chapman*, 466 F. Supp. 3d at 406; *see also* *Smith v. Gap, Inc.*, 177 F.4th 405, 410 (2d Cir. 2026) ("We reject Plaintiffs' proposed rule that a risk disclosure is actionable whenever a company fails to disclose that the risk already materialized in some way."). Accordingly, Plaintiffs' challenge to the risk disclosures should be dismissed.

### B. The SAC Fails to Plead that the Advertising Opportunity Statements Were Materially False or Misleading

Plaintiffs' next theory of falsity centers around the Offering Materials' description of StubHub's digital advertising opportunity—in essence, the potential to allow ticket sellers to pay money to advertise or promote their listings ahead of other listings on the StubHub platform. ¶¶ 172-78. In particular, Plaintiffs challenge as false StubHub's statement that "[b]ased on the disclosed metrics of peer global digital marketplaces, we estimate our near-term [advertising] opportunity to be approximately 10% of our SAM, or $19 billion" because this statement allegedly

"presented StubHub's advertising opportunity as imminent and without material obstacle." ¶¶ 174, 176, 177. But again, no reasonable investor reading the Offering Materials as a whole could have concluded that StubHub's development into digital advertising was guaranteed or imminent. *Olkey*, 98 F.3d at 5. To the contrary, the Offering Materials disclosed in plain terms that StubHub did not currently offer these advertising products and only "intend[ed] to offer [them]" in the future. OM at 142. The reference to $19 billion "advertising opportunity" was a projection about the *market* StubHub could address or tap into, not a projection about its revenue. In other words, while StubHub used "10% of [] SAM" (¶ 174) as a way to measure the size of this opportunity as compared to its current business, the Offering Materials very clearly listed digital advertising under a boldface header of "Total Addressable Market (TAM)," which StubHub expressly defined as opportunities it could "address over the long term." OM at 137 (listing digital advertising under TAM); ¶ 160 (defining TAM).

To plead falsity, Plaintiffs again rely on Mr. Baker's post-IPO statements during the March 2026 earnings call and the May 18, 2026 J.P. Morgan conference. ¶¶ 131, 142. Specifically, Plaintiffs point to Mr. Baker's statement in March 2026 that StubHub wanted to "spend more time working . . . [its advertising] product through and experimenting with it," ¶ 131, and his May 2026 statement that StubHub "started testing in the fourth quarter" such that "our guidance in 2026 . . . does not assume any appreciable ad contribution." ¶ 142; Ex. 9, May 18, 2026 Tr. at 9; *see also* ¶ 13. But those statements do not contradict any of StubHub's prior statements in the Offering Materials. In the Offering Materials, StubHub said that it "d[id] not offer [advertising products] today and intend[s] to offer [them] in the future." OM at 142. Mr. Baker's statement during the March 2026 call that StubHub's advertising business was now "generating modest revenue" and "showing promising early results," ¶ 126 (quoting Ex. 5, Shareholder Letter at 5), or his statement

in May 2026 that StubHub was "rolling out ads" and testing customer experience in 4Q25 in an effort to "get [advertising] right before we scale in a dramatic way," ¶¶ 13, 142, are entirely consistent with the Offering Materials. If anything, these statements show progress in scaling up the advertising business, not a retreat. In any event, these statements more than six months after the IPO say nothing about the truth or falsity of StubHub's market projections more than six months prior. *Pintec*, 600 F. Supp. 3d at 397 (finding the statement must be false when made); *Opera Ltd.*, 527 F. Supp. 3d at 555 (same).

Plaintiffs' remaining challenges to statements about digital advertising involve quintessential opinion statements. *See* ¶ 176 ("***we believe*** that further monetizing our marketplace through advertising will require minimal incremental investment"); *id.* ("***we believe*** that the range of options to enable advertising on our marketplace is broad"). Plaintiffs do not point to any facts showing that these statements were not sincerely believed. *See* ¶¶ 172-78. Nor do Plaintiffs show that these statements contained an embedded false fact or omitted material contrary facts, by for example, showing that advertising requires substantive investment or that there was a limited range of options to enable advertising on StubHub's marketplace. *Id.* Absent these allegations, these opinions are not actionable. *See, e.g.*, *In re Stemline Therapeutics, Inc. Sec. Litig.*, 313 F. Supp. 3d 543, 550-51 (S.D.N.Y. 2018) (dismissing claims where plaintiffs' alleged opinions were misleading by omission but information omitted did not conflict "with what a reasonable investor would [have taken] from opinion statements in the [p]rospectus"); *Sky Solar*, 389 F. Supp. 3d at 256 (finding opinion statements inactionable where "Plaintiffs have offered no factual allegations" that would "support an inference that [company] did not actually believe the opinions, nor has Plaintiff shown that they were misleading").

### C. Plaintiffs Fail to Plead that the Free Cash Flow Statements Were False

Plaintiffs' next assertion is that the Offering Materials made certain misstatements concerning StubHub's FCF. ¶¶ 179-82.[8] The Offering Materials disclosed StubHub's FCF for fiscal years 2022 through 2024 and the first six months of 2025 and there is no debate that each of those historical figures was accurate. OM at 23, 98, 103; *see also* ¶¶ 180-81. "[I]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, *38-39 (2d Cir. 2012). Nonetheless, Plaintiffs claim that StubHub should have disclosed that purported negative trends in FCF "would accelerate, resulting in a negative FCF" in Q3 2025, even though the third quarter would not conclude until two weeks after the IPO. ¶¶ 181-82. That argument is also without basis.

As a starting point, the law is clear that "[a] company has no obligation to report its quarterly financial results before they have been finalized." *Sandoz v. Waterdrop Inc.*, 2023 WL 1767526, at *10 (S.D.N.Y. Feb. 3, 2023) (dismissing Section 11 claim based on alleged failure to disclose preliminary quarterly financial results), *aff'd sub nom. Mi v. Waterdrop Inc.*, 2024 WL 159191 (2d Cir. Jan. 16, 2024).[9] Thus, StubHub had no duty to disclose preliminary, in-process financial results from a quarter that was still ongoing as of the IPO. *See id.*; *Stadnick v. Vivint*

[8] To the extent Plaintiffs challenge the characterization of FCF as a "key business metric" and the statement "[w]e believe that free cash flow is a meaningful indicator of liquidity for management and investors" (OM at 98, 103; ¶ 179), those challenges fail because Plaintiffs plead no facts to suggest that these opinions were actionably false. *See Horizon Pharma*, 2018 WL 481883, at *10.

[9] *See also Arfa v. Mecox Lane Ltd.*, 2012 WL 697155, at *12 (S.D.N.Y. Mar. 5, 2012) (a company does not have "any obligation to disclose the results of a quarter in progress"), *aff'd*, 504 F. App'x 14 (2d Cir. 2012); *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 539 (S.D.N.Y. 2010) (rejecting effort "to hold Defendants liable for [their] failure to disclose financial information about the third quarter before that quarter had concluded"); *Wandel v. Gao*, 590 F. Supp. 3d 630, 645 (S.D.N.Y. 2022) (no duty to report financial data from the fourth quarter of 2019 that ended two weeks ***before*** the IPO).

*Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (affirming dismissal of Section 11 claims and finding no requirement to disclose interim financial information).

In any event, Plaintiffs' FCF-based claim fails because there was no material or contradictory information to disclose. The Offering Materials disclosed that StubHub's "***results of operations vary from quarter to quarter and year over year, so our financial performance in certain financial quarters or years may not be indicative of, or comparable to, our financial performance in subsequent financial quarters or years***," OM at 31 (emphasis in original), and that "[s]easonal trends in [StubHub's] GMS and the timing of major events throughout the year impact free cash flow for any given quarter and can vary year to year," *id.* at 104. That is precisely what happened here. Data from the Offering Materials (reproduced below) shows that StubHub's FCF figures did fluctuate significantly from quarter to quarter:

| **Fiscal Year** | **Q1** | **Q2** | **Q3** | **Q4** |
|---|---|---|---|---|
| FY 2022 | $1,566 | $(35,275) | $(19,518) | $3,400 |
| FY 2023 | $184,014 | $(32,570) | $54,753 | $95,757 |
| FY 2024 | $258,691 | $136,442 | $10,602 | $(150,625) |
| FY 2025 | $151,110 | $9,716 | $(4,600) | $1,963 |

*See* OM at 23, 98, 103, 107-08; 10-Q for Q3 2025; 10-Q for Q4 2025. As this Court has previously held, "dramatic swings from quarter to quarter," particularly when such data "were accompanied by cautionary language warning of volatility," are dispositive on the question of whether there was any "trend" to disclose in the Offering Materials. *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619-25 (S.D.N.Y. 2021) (Furman, J.); *see also* *Vivint Solar*, 861 F.3d at 38-39 (finding no trend where the fluctuation was "substantial" and in different directions).

With regard specifically to FCF for Q3 2025, StubHub explained that the Company was "impacted by an atypical concentration in seller proceed outflows occurring in the fourth quarter

of '24 following the final leg of Taylor Swift's North American tour." Ex. 3, Q3 25 Earnings Call at 9. The Offering Materials warned of this exact dynamic, even naming the exact artist/tour that would cause certain results to vary significantly from quarter to quarter. OM at 31 (disclosing that variability in "financial results and cash needs . . . depend[] on, among other things, the timing of and demand for certain tours, tour cancellations, event ticket sales," including "the timing of and demand for top sporting events and concert tours, such as . . . Taylor Swift's 'Eras' tour").[10]

In short, because Plaintiffs are unable to show that the FCF figures for the as-yet-unfinished quarter were materially contrary to the information that StubHub already disclosed on this point, Plaintiffs cannot state a claim as a matter of law. *See* *UP Fintech*, 527 F. Supp. 3d at 619-25.

**D. Plaintiffs Fail to Plead a Claim Based on the Roadshow Presentation**

In addition to challenging statements in the Offering Materials on these three topics, the SAC newly asserts that Defendants made "materially false and misleading statements [on the same topics] during the Roadshow and in the Roadshow Deck." ¶¶ 150-57. These claims fail for multiple independent reasons.

*First*, neither the Roadshow Deck nor the unspecified statements made "during the Roadshow" were incorporated into the Offering Materials and thus cannot support Securities Act claims as a matter of law. *See generally* OM; *see also* *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d at 655 (holding that plaintiffs could not rely on statements not incorporated into issuer's offering

[10] Mr. Baker's statement to *Bloomberg* that StubHub's "cash flow will even go up further" (¶ 157) does not refer to any specific time horizon and, in any case, cannot support a Securities Act claim because that statement did not appear in the Offering Materials. *See* *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 655 (S.D.N.Y. 2012) (holding that plaintiffs could not rely on statements not incorporated into issuer's offering document). Indeed, the SAC does not even allege that this pertained to FCF. *Cf.* OM at 103 (noting that "free cash flow . . . does not represent the total increase or decrease in our cash balance" and should not be considered as an alternative to "cash flows from operations" or "net cash provided by . . . operating activities").

document).

*Second*, as Plaintiffs themselves admit, the information presented in the Roadshow Deck "concerning StubHub's Direct Issuance and advertising growth opportunities" is "[c]onsistent with" that in the Offering Materials. ¶¶ 90, 98, 109, 111, 114, 120, 167, 173. Thus, any claims premised on such information fail for the same reason as their claims regarding the Offering Materials. As to cash flow, Plaintiffs also challenge statements in the Roadshow Deck about StubHub's business model (¶ 95), its "compelling cash flow conversion" (¶ 96), and "[p]redictable and favorable net working capital dynamic compound cash flow with >100% conversion" (¶ 97). Much of this is inactionable corporate puffery, but more importantly Plaintiffs fail to provide any explanation why any of these statements are false.

*Third*, even if there were any differences in language between them, the Roadshow Deck statements are not actionable because the Offering Materials govern. *See* *Olkey*, 98 F.3d at 9 (finding that representations made at roadshows were "immaterial since they are contradicted by plain and prominently displayed language in the prospectuses"); *Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 795 (S.D.N.Y. 1997) ("[P]laintiffs cannot now complain about road shows statements that were subsequently contradicted by specific disclosures in the Prospectus—which any plaintiff, regardless of his or her level of sophistication, could have read."); *see also* SAC, Ex. A, Roadshow Deck at 2 (directing investors to review the Registration Statement "[b]efore you invest").

**E. The SAC Fails to Allege a Violation of Item 303**

Plaintiffs' final theory is that Defendants violated Item 303 of SEC Regulation S-K by failing to disclose four purported adverse trends: (1) StubHub's alleged inability to further penetrate the original issuance ticketing market; (2) StubHub's alleged inability to achieve its advertising growth projections; (3) the allegedly material decline of StubHub's FCF; and (4) the

divergence between StubHub's forecasted growth prospects and those presented to investors. *See* ¶ 186. These are merely repackaged versions of Plaintiffs' other challenges to StubHub's disclosures, and they fail for the same reasons as Plaintiffs' other claims.

This claim also fails for several reasons specific to Item 303. Item 303 requires the disclosure of "known trends or uncertainties" that were "reasonably likely" to have a material impact on StubHub's business. 17 C.F.R. § 229.303(b)(2)(ii); *see also* *Vivint Solar*, 861 F.3d at 39 ("Disclosure is required where the trend is both (1) known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations."). Plaintiffs have not pled facts to satisfy either prong.

*First*, as described above, the Offering Materials disclosed all the information that Plaintiffs claim was omitted, including the incipient nature of the direct issuance business and digital advertising effort, the challenges of expanding into the original issuance ticketing market, and the need for additional product development for these programs. No more is required under Item 303. *See* *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2026 WL 810180, at *4 (2d Cir. Mar. 24, 2026) (no Item 303 liability where "[g]iven the[] fulsome disclosures and other publicly available data, the total mix of information provided investors with clear notice of the typical risks connected to fluctuations in global steel prices").[11]

*Second*, Plaintiffs cannot premise an Item 303 claim on the absence of the in-process 3Q25 financials because Plaintiffs fail to establish any discernible trend. The only common thread is

[11] *See also* *Gen. Motors*, 46 F. Supp. 3d at 397 (no Item 303 violation where the company "had disclosed its increasing inventories and relatively slower growth in sales" and did not need to characterize this as a "trend"); *Lowinger v. Pzena Inv. Mgmt., Inc.*, 341 F. App'x 717, 720 (2d Cir. 2009) (dismissing Item 303 claim where the "prospectus fulfilled this obligation by disclosing" the claimed adverse trend and "warning that this development could be expected"); *Nurlybayev v. ZTO Express (Cayman) Inc.*, 2019 WL 3219451, at *8 (S.D.N.Y. Jul. 17, 2019) (similar).

that FCF fluctuated significantly from quarter to quarter, which StubHub disclosed. *See* OM at 107-08. This does not state a claim. *See* *UP Fintech*, 527 F. Supp. 3d at 624 (no Item 303 violation "in light of the dramatic quarter-to-quarter swings in trading volume and commission revenue" and "warnings about the volatility of such metrics").

*Third*, Plaintiffs fail to plead facts establishing that any of the purported trends were "known" to Defendants at the time of the IPO. ¶ 187. Plaintiffs offer only the conclusory allegations that Defendants "would have been aware" of certain purported trends "by virtue of their roles as officers and directors of the Company." *Id.* Those allegations lack the requisite factual specificity showing that defendants "had actual knowledge of the purported trend[s]," which is required to state a claim based on Item 303. *Blackmoss*, 2010 WL 148617, at *9; *Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 300-01 (S.D.N.Y. 2020) (dismissing Items 105 and 303 claims where plaintiffs alleged that defendant could be "presumed to have known the relevant facts"); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 302 (S.D.N.Y. 2021) (same).

## II. PLAINTIFFS HAVE FAILED TO PLEAD A SECTION 15 CLAIM

Because Plaintiffs fail to plead primary violations under the Securities Act, Plaintiffs' derivative Section 15 claims must also be dismissed. *See* *Morgan Stanley*, 592 F.3d at 358, 366.

## III. THE SECTION 12 CLAIM AGAINST ROBINHOOD AND SOFI FAILS FOR THE ADDITIONAL REASON THAT PLAINTIFFS DO NOT ALLEGE THOSE DEFENDANTS ARE STATUTORY SELLERS

Although the Court does not need to address the issue because Plaintiffs' failure to plead a materially false and misleading statement defeats the Section 12 claim as to all Defendants, the Section 12 claim also fails as to Robinhood and SoFi because the SAC does not allege facts establishing Plaintiffs' standing to sue those defendants.

Section 12(a)(2) provides that "[a]ny person who . . . *offers or sells* a security . . . by means of a [materially misleading] prospectus . . . shall be liable . . . *to the person purchasing such security from him*." 15 U.S.C. § 77*l*(a)(2) (emphases added). Unlike Section 11, which imposes liability broadly on those who performed certain roles in an offering, *e.g.*, issuers and underwriters, *id*. § 77k(a), Section 12(a)(2) is limited to those who take specific actions to bring about a plaintiff's purchase. A Section 12(a)(2) defendant (known as a "statutory seller") must either have (1) directly passed title to the buyer or (2) successfully solicited the purchase. *Morgan Stanley*, 592 F.3d at 359 (citing *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)). The SAC does not allege facts showing Robinhood or SoFi passed title to a StubHub IPO share to any Plaintiff or successfully solicited any Plaintiff's purchase. Plaintiffs therefore lack standing to assert a Section 12(a)(2) claim—and fail to state such a claim—against them. *See Griffin v. PaineWebber, Inc.*, 2001 WL 740764, at *1 (S.D.N.Y. June 29, 2001).

**A. The SAC Does Not Allege Robinhood or SoFi Passed Title to StubHub IPO Shares to Any Plaintiff**

The passing-title prong of the Section 12(a)(2) statutory seller test requires the defendant to be "the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers." *Pinter*, 486 U.S. at 644 n.21. Here, the SAC does not allege Robinhood or SoFi passed title in StubHub IPO shares to any Plaintiff. The SAC alleges Hunter (the only Plaintiff who allegedly bought in the offering at the IPO price, ¶ 23) bought StubHub stock "directly from a Defendant in the IPO," *id.,* but there are 22 Defendants, including 14 underwriters. This allegation falls far short of pleading that either Robinhood or SoFi passed title in StubHub stock to Hunter. *See, e.g.*, *In re Orion Sec. Litig.*, 2009 WL 2601952, at *7-9 (S.D.N.Y. Aug. 20, 2009) (dismissing Section 12(a)(2) claim against particular defendants where plaintiff "ha[d] not alleged that Plaintiff either directly *purchased* . . . securities from" those defendants "or that [those

defendants] *successfully* solicited such sales" (emphasis in original)).

**B. The SAC Does Not Allege Robinhood or SoFi Directly Solicited Any Plaintiff's Purchase of StubHub IPO Shares**

Plaintiffs do not allege any actions on the part of Robinhood or SoFi rising to the level of solicitation necessary to make them statutory sellers under Section 12. Aside from a "bald allegation of solicitation" (*see* ¶ 52) that is "insufficient to sustain [Robinhood or SoFi's] liability as a 'seller' pursuant to the second *Pinter* test," *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *5 (S.D.N.Y. Feb. 20, 2002) (dismissing Section 12(a)(2) claim), the SAC's only factual allegations about Robinhood and SoFi's conduct related to the StubHub IPO are that they "marketed" or "participated in the promotion of the IPO" by advertising on their websites that investors "could access IPO shares on their online brokerage platforms" and "provided access to the StubHub IPO" through their platforms. ¶¶ 52, 86. Plaintiffs also allege, as a *general* matter, Robinhood and SoFi "make prospectuses and/or investor materials (including roadshow materials) available . . . on their websites prior to an IPO," *id.* ¶ 52, but do not allege they did so for the StubHub IPO. To the contrary, they allege Robinhood made available the prospectus for a *different* company's IPO. *Id.* ¶ 86 & n.8. These allegations do not plead solicitation.

In *Pinter*, the Supreme Court held the solicitation prong extends to "at least some persons who urged the buyer to purchase," such as a broker acting for the seller. 486 U.S. at 644-46. But it cautioned the solicitation prong is limited. Entities "whose participation in the buy-sell transaction [was] a substantial factor in causing the transaction to take place" do not become statutory sellers on that basis alone. *Id.* at 649-54. Nor do those who "*participate in soliciting the purchase*." *Id.* at 651 n.27. Thus, *Pinter* precludes Plaintiffs from pleading that Robinhood or SoFi engaged in solicitation simply by "participat[ing] in the promotion of the IPO." ¶ 52. It is settled law that "Section 12 liability cannot be imposed upon those who merely assist in another's

solicitation efforts." *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 260 (S.D.N.Y. 2020); *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 522 (S.D.N.Y. 2016) (same).

Post-*Pinter* case law in this Circuit confirms the insufficiency of Plaintiffs' allegations. The Second Circuit has held a plaintiff satisfies the solicitation prong *only* if it shows the defendant "actually solicited their investment." *Capri v. Murphy*, 856 F.2d 473, 479 (2d Cir. 1988); *see also Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1127 (2d Cir. 1989). As Judge Engelmayer recently summarized, solicitation liability under Section 12 requires the defendant's "*direct and active participation in the solicitation of the immediate sale*" *and* the plaintiff's "*purchase[] . . . as a result of such solicitation*." *Underwood v. Coinbase Glob., Inc.*, 654 F. Supp. 3d 224, 239 (S.D.N.Y. 2023), *aff'd in part*, *rev'd on other grounds sub nom. Oberlander v. Coinbase Glob. Inc.*, 2024 WL 1478773 (2d Cir. Apr. 5, 2024). Solicitation, in other words, "requires direct and personal contact, or control over and direction of the person who makes the direct solicitation." *Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575, 582 (S.D.N.Y. 1996) (citing *Capri*, 856 F.2d at 479). Direct and active participation has been further described as "directly contact[ing]" the buyer, *Holsworth v. BProtocol Found.*, 2021 WL 706549, at *3 (S.D.N.Y. Feb. 22, 2021), "actually solicit[ing] the shares [plaintiffs] purchased," *In re OPUS360*, 2002 WL 31190157, at *11 (S.D.N.Y. Oct. 2, 2002), or committing "specific acts . . . to directly solicit [plaintiff] to purchase the Certificates [and] that plaintiff in fact purchased the Certificates as a result of [defendant's] solicitation," *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001). The SAC makes no such allegations. As relevant here, the *Underwood* court held allegations about "marketing efforts" like those on which the SAC relies, ¶ 86, do not plead solicitation. 654 F. Supp. 3d at 239.

The generalized allegation that Robinhood and SoFi make "offering documents and/or investor materials, including specifically roadshow presentations" available on their platforms, ¶ 86, does not plead they directly solicited Hunter's purchase of StubHub IPO shares. Merely distributing offering materials "through [a] website and other channels" does not constitute solicitation. *Youngers*, 195 F. Supp. 3d at 522; *see also* *Wilson*, 872 F.2d at 1126 (providing a plaintiff offering materials prepared by others "cannot under any view be considered the kind of solicitation necessary"). Here, Plaintiffs do not even allege that much; there is no allegation Robinhood or SoFi made the StubHub IPO Prospectus available to anyone, much less to Hunter. And the allegation that Robinhood made available a *different* company's IPO prospectus, ¶ 86 & n.8, illustrates the paucity of their pleading as to the StubHub IPO. Their allegations are simply "too attenuated from [Hunter's] purchase" of the shares at issue here to constitute solicitation. *Risley v. Universal Navigation Inc.*, 2025 WL 615185, at *3 (2d Cir. Feb. 26, 2025).

Finally, the SAC fails to plead solicitation because it does not allege Robinhood or SoFi actually "solicited the sale[] in question." *Wilson*, 872 F.2d at 1127. Plaintiffs do not allege Hunter (or any of them) purchased StubHub IPO shares because of Robinhood's or SoFi's purported solicitation. Courts routinely dismiss Section 12 claims when plaintiffs do not allege their specific purchases resulted from the purported solicitation. *See, e.g.*, *Youngers*, 195 F. Supp. 3d at 523; *Underwood*, 654 F. Supp. 3d at 239; *In re OPUS360*, 2002 WL 31190157, at *11. This Court should dismiss the Section 12 claim against Robinhood and SoFi as well.

## CONCLUSION

Plaintiffs have amended twice already and still fail to state a claim. Plaintiffs' claims should be dismissed with prejudice in their entirety. *See* ECF No. 77 at 2 ("Plaintiff will not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss"); *see also* *Pintec*, 600 F. Supp. 3d at 405 (dismissing case with prejudice when the Court

"explicitly warned that [plaintiff] would not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss"). Any amendment would be futile because Plaintiffs cannot state a claim against any party for the reasons in Section I.

Dated: July 31, 2026
New York, New York

Respectfully submitted,

**LATHAM & WATKINS LLP**

/s/Jeff G. Hammel
Jeff G. Hammel
Jason C. Hegt
Alexander L. Mills
Chengliang (Larry) Hong
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
jeff.hammel@lw.com
jason.hegt@lw.com
alexander.mills@lw.com
larry.hong@lw.com

*Counsel for StubHub Holdings, Inc., Eric H. Baker, Connie James, Mark Streams, Sameer Bhargava, and Jeremy Levine (the "StubHub Defendants")***

**The StubHub Defendants join in the arguments presented in Sections I and II.

**ALLEN OVERY SHEARMAN STERLING US LLP**

*Electronic signatures are used with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

/s/Daniel Lewis*
Daniel Lewis
Daniel Kahn
599 Lexington Avenue
New York, New York 10022
Tel: (212) 848-4000
daniel.lewis@aoshearman.com
daniel.kahn@aoshearman.com

*Counsel for J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, BofA Securities, Inc., Evercore Group L.L.C., BMO Capital Markets Corp., Mizuho Securities USA LLC, TD Securities (USA) LLC, Truist Securities, Inc.,*

*Nomura Securities International, Inc., WR Securities, LLC, Citizens JMP Securities, LLC, Oppenheimer & Co. Inc., Wedbush Securities Inc., and PNC Capital Markets LLC (the "Underwriter Defendants")***

**The Underwriter Defendants join in the arguments presented in Section I.

**WILMER CUTLER PICKERING HALE AND DORR LLP**

/s/Andrew Rhys Davies*
Andrew Rhys Davies
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel: (212) 230-8800
Andrew.Davies@wilmerhale.com

Robert Kingsley Smith (pro hac vice)
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Robert.Smith@wilmerhale.com

*Counsel for SoFi Securities LLC***

**SoFi Securities LLC joins in the arguments presented in Sections I and III.

**JONES DAY**

/s/Nina Yadava*
Nina Yadava
Paul Francis Rugani
Jeffrey E. Meehan
250 Vesey Street
New York, NY 10281
Tel: (212) 326-3939
nyadava@jonesday.com
prugani@jonesday.com
jmeehan@jonesday.com

*Counsel for Robinhood Financial, LLC***
**Robinhood Financial, LLC joins in the arguments presented in Sections I and III.

**CERTIFICATION OF WORD COUNT**

I, Jeff G. Hammel, an attorney duly admitted to practice before this Court hereby certify that pursuant to Local Rules 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 10,549 words in accordance with this Court's Order (ECF No. 98). In making this calculation, I have relied on the word and page counts of the word-processing system used to prepare the document.

Dated: July 31, 2026

/s/Jeff G. Hammel
Jeff G. Hammel